# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-01093

**COLORADO APARTMENT ASSOCIATION et al.**

        Plaintiffs,

**v.**

**JILL HUNSAKER RYAN, in her Official Capacity as the Executive Director of the Colorado Department of Public Health and Environment, et al.**

        Defendants.

AND

**COALITION FOR COMMUNITY SOLAR ACCESS, COLORADO SOLAR AND STORAGE ASSOCIATION, NATURAL RESOURCES DEFENSE COUNCIL, AND SIERRA CLUB**

        Intervenor-Defendants.

_____

**PLAINTIFFS' APPENDIX TO MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT**
_____

| Exhibit | Document Description | Page Number |
|---------|---------------------|-------------|
| 1 | [Proposed] First Amended Complaint | 3 |
| | Exhibit 1 to First Amended Complaint Declaration of E. Schloss | 56 |
| | Exhibit 2 to First Amended Complaint Declaration of J. Lorenzen | 67 |
| | Exhibit 3 to First Amended Complaint Declaration of C. Lessard | 76 |

| | Exhibit 4 to First Amended Complaint Declaration of J. Chan | 85 |
|---|---|---|
| | Exhibit 5 to First Amended Complaint Declaration of J. Cassell | 96 |
| | Exhibit 6 to First Amended Complaint Declaration of T. Bardenett | 107 |
| | Exhibit 7 to First Amended Complaint Declaration of W. Isenberg | 116 |
| | Exhibit 8 to First Amended Complaint Declaration of K. Kramer | 125 |
| | Exhibit 9 to First Amended Complaint Declaration of S. Fletcher | 134 |
| | Exhibit 10 to First Amended Complaint Declaration of B. Blessing | 142 |
| 2 | Comparison of Original Complaint to First Amended Complaint | 153 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.  1:24-cv-01093-RMR

**COLORADO APARTMENT ASSOCIATION; APARTMENT ASSOCIATION OF METRO DENVER; COLORADO HOTEL AND LODGING ASSOCIATION, INC.; AND NAIOP COLORADO CHAPTER;**

                    Plaintiffs,

**v.**

**JILL HUNSAKER RYAN, in her Official Capacity as the Executive Director of the Colorado Department of Public Health and Environment, MICHAEL OGLETREE, in his Official Capacity as the Director of the Colorado Air Pollution Control Division; AND WILL TOOR, in his Official Capacity as the Executive Director of the Colorado Energy Office; AND**

**THE CITY AND COUNTY OF DENVER; THE DENVER CITY COUNCIL; DENVER MAYOR MIKE JOHNSTON; THE DENVER OFFICE OF CLIMATE ACTION, SUSTAINABILITY, AND RESILIENCY; AND ELIZABETH BABCOCK, in her Official Capacity as the Executive Director of the Denver Office of Climate Action, Sustainability, and Resiliency.**

                    Defendants.

AND

**COALITION FOR COMMUNITY SOLAR ACCESS, COLORADO SOLAR AND STORAGE ASSOCIATION, NATURAL RESOURCES DEFENSE COUNCIL, AND SIERRA CLUB**

                    Intervenor-Defendants.

---

## [PROPOSED] FIRST AMENDED COMPLAINT

---

## INTRODUCTION

1.      Plaintiffs Colorado Apartment Association and Apartment Association of Metro Denver ("CAA" and "AAMD"), the Colorado Hotel and Lodging Association, Inc. ("CHLA"), and the NAIOP Colorado Chapter ("NAIOP Colorado") seek declaratory and injunctive relief under federal law against enforcement of:

a.      The Colorado Air Quality Control Commission's ("Commission") final regulation entitled Building Benchmarking and Performance Standards, 5 CCR 1001-32 ("Regulation 28") enacting regulations directed by the State of Colorado's House Bill 21-1286 and as modified by recent House Bill 25-1269; and

b.      The City and County of Denver, Colorado's Denver Ordinance No. 20211310 ("Energize Denver Ordinance"), and the implementing rules for Energize Denver enacted by the Denver Office of Climate Action, Sustainability, and Resiliency, ("Denver OCASR") entitled "Rules & Regulations Governing Energize Denver Building Energy Performance Requirements" ("Energize Denver Regulations") (the Ordinance and Regulations may be collectively referred to as "Energize Denver"), as last amended on April 1, 2025.

2.      Both Regulation 28 and Energize Denver purport to establish and impose energy conservation standards on buildings and the appliances and equipment within those buildings.  However, the Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§ 6201-6422, as amended by the National Appliance Energy Conservation Act of 1987 ("NAECA"), Public Law No. 100-12, and the Energy Policy Act of 1992 ("EPACT"), Public

2

Law No. 102-486,[1] preempts these standards on appliances and equipment, instead placing primary jurisdiction under the U.S. Department of Energy ("DOE").  Specifically, EPCA preempts any "State regulation concerning the energy efficiency, energy use, or water use of such" appliances and equipment.  42 U.S.C. § 6297(c); 42 U.S.C. § 6316. Plaintiffs bring this action seeking to have Regulation 28 and Energize Denver declared unlawful and void due to EPCA's express preemption provision.

3.    Regulation 28 sets "building performance standards" that required "covered buildings" (commercial and multifamily buildings over 50,000 square feet) ("Covered Buildings") to reduce the energy consumption or greenhouse gas emissions associated with the use of consumer and commercial equipment and appliances in the buildings to meet the building performance standards with compliance deadlines beginning in 2026.

4.    Energize Denver sets "building performance standards" which require "Covered Buildings" (commercial, multifamily, and certain industrial buildings over 25,000 square feet) to reduce the energy consumption of Covered Buildings associated with the use of consumer and commercial appliances in the buildings to meet the building performance standards with compliance deadlines beginning in 2024.

5.    The consumer and commercial appliances used in the Covered Buildings that are affected by Regulation 28 and Energize Denver are considered "Covered Products".  Under EPCA, the term "covered product" is used to described consumer equipment preempted under 42 U.S.C. § 6291 *et seq.*  The term "covered equipment" is

_____

[1] Hereinafter, EPCA and all its subsequent amendments under NAECA and EPACT will be collectively referred to as EPCA.

3

used to describe commercial equipment preempted under 42 U.S.C. § 6311 *et seq*. For simplicity, the term "Covered Product" is used to reference all covered products and covered equipment regulated by EPCA herein.

6. The building performance standards in both Regulation 28 and Energize Denver "concern" the energy efficiency of "Covered Products" because they require a Covered Building to reduce the energy used by the Covered Building, without regards to whether the energy is attributable to a Covered, or Non-Covered Product.

7. The building performance standards in both Regulation 28 and Energize Denver also require and force Covered Building owners to replace existing EPCA compliant Covered Products that comply with federal EPCA energy efficiency standards. This is true regardless of whether those Covered Products still have a remaining useful life.

8. By requiring the removal and replacement of functioning and compliant Covered Products based on their energy efficiency performance, Regulation 28 and Energize Denver thus further regulate the energy efficiency of Covered Products that are subject to regulation under, and thus are preempted by EPCA.

9. EPCA was born out of the energy crises of the 1970s and embodied Congress' national framework for with energy independence, domestic energy supply, and national security. EPCA requires a consistent national and practical approach to energy regulation, maintaining neutrality on energy sources, and recognizing the need for a diverse energy supply. Congress intended EPCA to preempt patchwork state or local laws that are unworkable, undercut a coordinated national energy strategy, disregard the

4

public's need for reliable and resilient energy, and deny consumer choice.

10.      EPCA establishes a federal energy conservation program for Covered Products, the purpose of which is to "provide Federal energy conservation standards applicable to covered products" and to "authorize the Secretary [of Energy] to prescribe amended or new energy conservation standards for each type (or class) of covered product" (42 U.S.C. § 6295(a)) in order to "conserve the energy resources of the Nation" (42 U.S.C. § 6312(a)).

11.      EPCA contains express preemption provisions that bar, with limited exceptions, any "[s]tate regulation, or revision thereof, concerning the energy efficiency, energy use, or water use of the covered products. . . ." 42 U.S.C. § 6297(c).

12.      EPCA embodies Congress's decision that the nation's energy policy cannot be dictated by state and local governments; such patchwork approach would be the antithesis of a national energy policy.

13.      Numerous provisions of Regulation 28 and Energize Denver challenged in this action conflict with and are preempted by EPCA by:

a.      Requiring owners of Covered Buildings to comply with building performance standards requiring reductions in the Covered Building's energy usage without regard to whether the Covered Building's energy usage is attributable to Covered, or Non-Covered Products, thus necessarily requiring energy efficiency measured to be implemented for Covered Products;

b.      Requiring existing Covered Building owners to replace existing EPCA-regulated Covered Products (both consumer and commercial) in order to

5

meet the building performance standards of Regulation 28 and Energize Denver, even if the Covered Products are fully functional, have a remaining existing life, and meet current EPCA standards; and

       c.    Creating energy conservation standards that are not "energy source neutral", forcing the replacement of compliant Covered Products that use natural gas or other fossil fuels with the favored electric-powered Covered Products.

14.    As a result, these challenged regulations are preempted by EPCA and violate the Supremacy Clause of Article VI of the United States Constitution.

15.    Defendants' efforts to establish far-reaching energy requirements and building standards conflict with federal law, are contrary to the public interest, and impose irreparable harm on Plaintiffs' members. Plaintiffs, on behalf of their members, bring this action seeking a declaration that Regulation 28, the Energize Denver Ordinance, and the Energize Denver Regulations, are void and unenforceable, and seek to enjoin their enforcement.

## JURISDICTION

16.    This Court has authority to grant the relief sought under 28 U.S.C. §§ 1331, 1343, and 2201, 42 U.S.C. §§ 1983 and 1988, and 42 U.S.C. § 6306(c).

## VENUE

17.    Venue is proper in this Court under 28 U.S.C. § 1391 because Defendants all have offices in this District, all Defendants reside in or are entities formed in this State of Colorado, and at least one of the individual Defendants performs their official duties in this District and so resides here for the purpose of § 1391. Venue is also proper

6

because the acts and events giving rise to the claims occurred at least in part in this
District, and the regulations at issue will be enforced in this District.

## PARTIES

18.    Plaintiff CAA is a Colorado nonprofit corporation authorized to conduct
business in the State of Colorado (ID Number 19871275058).

a.    Plaintiff CAA is a leading nonprofit, trade association representing
the multifamily housing industry, including owners, developers, management
companies, and vendors. Plaintiff CAA is comprised of four local affiliates from
across the state. Plaintiff CAA represents over 3,600 members who own and
manage over 350,000 apartments, which total more than $98 billion in assets.

b.    Plaintiff CAA's members own Covered Buildings that are subject to
both Regulation 28 and Energize Denver, and will be harmed by Regulation 28
and Energize Denver. *See* Exhibit 1, Decl. of E. Schloss; Exhibit 2, Decl. of J.
Lorenzen; Exhibit 3, Decl. of C. Lessard; Exhibit 4, Decl. of J. Chan.

19.    Plaintiff AAMD is a Colorado nonprofit corporation authorized to conduct
business in the State of Colorado (ID Number 19871274473).

a.    Plaintiff AAMD is an association of local apartment building owners
that promotes the multi-family rental housing industry in the Denver metropolitan
area, including seeking improvements in the techniques of ownership and
management.

b.    Plaintiff AAMD's members own Covered Buildings that are subject to
both Regulation 28 and Energize Denver, and will be harmed by Regulation 28

and Energize Denver. *See* Exhibits 1-4.

20.    Plaintiff CHLA is a Colorado nonprofit corporation authorized to conduct business in the State of Colorado (ID Number 19871239063).

a.    Plaintiff CHLA is a professional trade association that promotes the hotel and lodging industry in Colorado and advocates on behalf its hotel and lodging business members.

b.    Plaintiff CHLA's members own Covered Buildings that are subject to both Regulation 28 and Energize Denver, and will be harmed by Regulation 28 and Energize Denver. *See* Exhibit 5, Decl. of J. Cassell; Exhibit 6, Decl. of T. Bardenett; Exhibit 7, Decl. of W. Isenberg; Exhibit 8, Decl. of K. Kramer.

21.    Plaintiff NAIOP Colorado is a Colorado nonprofit corporation authorized to conduct business in the State of Colorado (ID Number 19991185328).

a.    Plaintiff NAIOP Colorado is a commercial real estate development association that promotes and advocates on behalf of its commercial real estate industry members in Colorado.

b.    Plaintiff NAIOP Colorado's members own Covered Buildings that are subject to both Regulation 28 and Energize Denver, and will be harmed by Regulation 28 and Energize Denver. *See* Exhibit 9, Decl. of S. Fletcher; Exhibit 10, Decl. of B. Blessing.

22.    Defendant Jill Hunsaker Ryan is the Executive Director of the Colorado Department of Public Health and Environment ("CDPHE"). The Colorado Department of Public Health and Environment ("CDPHE") is the Colorado regulatory Department with

8

jurisdiction and authority to implement the Colorado Air Pollution Prevention and Control Act ("Colorado APPCA"), C.R.S. § 25-7-101, *et seq.*   This includes implementation of Regulation 28 through oversight of the Colorado Air Pollution Control Division.

23.     Defendant Michael Ogletree is the Director of the Colorado Air Pollution Control Division ("Division"), which is a Division of the CDPHE that is tasked with air quality control and compliance under Colorado APPCA.   *See* C.R.S. § 25-7-103(2), (9); C.R.S. § 25-7-115.  The Division is specifically tasked with enforcement of Regulation 28 pursuant to C.R.S. § 25-7-122, as well as approving calculation methodologies under Regulation 28.

24.     Defendant Will Toor is the Executive Director of the Colorado Energy Office ("CEO"), which was created pursuant to C.R.S. § 24-38.5-101 and within the office of the Governor of Colorado.  The CEO is charged with administering Regulation 28 pursuant to C.R.S. §§ 24-38.5-112(1) and 24-38.5-112(1)(a).  Under Regulation 28, the CEO is also responsible for the implementation and continuation of Regulation 28.

25.     Defendant Jill Hunsaker Ryan, through CDPHE and the Division, and Defendant Will Toor, through the CEO, are charged with the enforcement and administration of Regulation 28 as adopted by the Commission.

26.     Defendant the City and County of Denver is a home rule municipality incorporated in the State of Colorado. COLO. CONST., Art. XX.

27.     Defendant Denver City Council is established pursuant to Article III of the Charter of the City of Denver.

a.     The Denver City Council is vested with "all legislative powers

9

possessed by the City and County of Denver, conferred by Article XX of the
Constitution of the State of Colorado, or contained in the Charter of the City and
County of Denver." DENVER, CITY AND CTY., CHARTER, art. III, part 2, § 3.2.1.

b.      The Denver City Council also has general police power "to enact
and provide for the enforcement of all ordinances" in the City and County of
Denver. *Id.* § 3.2.3.

c.      The Denver City Council adopted the Energize Denver Ordinance
by Council Bill No. CB21-1310 on November 22, 2021, as later signed by then
Denver Mayor Michael B. Hancock on November 24, 2021.

28.     Defendant Mike Johnston is the presiding Mayor of the City and County of
Denver.

29.     Defendant Denver OCASR is a regulatory office created under the Office of
the Denver Mayor pursuant to the Denver Revised Municipal Code ("D.R.M.C."), Article
XIX, § 2-401 *et seq*.  The Energize Denver Ordinance vests the Denver OCASR with
creating rules governing building performance standards in Denver.  The Denver OCASR
promulgated the Energize Denver Regulations, implementing the Energize Denver
Ordinance.

30.     Defendant Elizabeth Babcock is the Executive Director of the Denver
OCASR.  The Executive Director of the Denver OCASR is charged under the Energize
Denver Ordinance with promulgating the Energize Denver Regulations and enforcing any
violations of the Energize Denver Regulations.

## STANDING

31.    Many of Plaintiffs' members have conducted comprehensive Level II American Society of Heating, Refrigerating and Air- Conditioning Engineers ("ASHRAE") Energy Audits for their Covered Buildings.  These Level II ASHRAE Energy Audits, although not explicitly required by either Regulation 28 or Energize Denver (unless a Covered Building owner is seeking alternative relief from either regulation), were necessary for Plaintiffs' members to determine what energy reductions would be required, at what specific building equipment, in order to meet the building performance standards of both Regulation 28 and Energize Denver.

32.    Many of Plaintiffs' members' ASHRAE Level II Energy Audits determined that the only way to meet the building performance standards of Regulation 28 and Energize Denver is by, among other things, targeting Covered Products within their buildings.  *See* Exhibits 1-10. This often includes targeting the replacement of existing and compliant Covered Products with remaining useful life. *Id.*

33.    For example, Plaintiff CAA's members' Level II ASHRAE Audits have determined that low-cost energy efficiency measures such as installing LED lights, modifying building envelopes (through windows or insulation), and installing on-site solar rooftop arrays, by themselves, will not be sufficient to achieve the building performance standards of Regulation 28 and Energize Denver.  Instead, even if such measures are implemented, it will be necessary to remove and replace existing and functioning EPCA-

11

compliant Covered Products, such as: replacing shower heads and faucets,[2] replacing existing gas-fired domestic water heaters with electrified heat-pump water heaters, and gas-fired hot water boilers used for building heat with electrified heat-pump water heating boilers (Exhibit 1 at ¶¶ 19-23); replacing a natural gas heating water boiler with a high efficiency boiler with a variable frequency drive ("VFD") motor, upgrading existing baseboard heaters to include hydronic fan convectors, adding a central air-source reversible chiller (heat pump) to the building's existing water heating system, and replacing the building's natural gas domestic water heating boiler with a high efficiency modulating condensing water heater (Exhibit 2 at ¶¶ 21-24); replacing gas-fired domestic water heaters with a centralized electric heat pump water heater (Exhibit 3 at ¶¶ 18-20); installing demand controllers to fourteen central domestic hot water boilers, replacing boiler circulation pumps with ECM motors, replace pool pumps with VFD models and replacing cooling and heating systems with new electric powered mini-split heat pump systems (Exhibit 4 at ¶¶ 20-30).

34.    Similarly, Plaintiff CHLA's members' Level II ASHRAE Audits have determined that other energy efficiency measures, such as installing LED lights, modifying building envelopes (through windows or insulation), and installing on-site solar rooftop arrays, will not by themselves allow them to achieve the building performance

---

[2] "Showerheads," "faucets," "water closets," and "urinals" are explicitly defined as consumer "Covered Products" under EPCA. 42 U.S.C. § 6292(a)(15)-(18). While they concern water usage, reducing water usage corresponds to a reduction in energy usage in a building due to less domestic hot water heating being necessary. To that end, EPCA also preempts state regulations "concerning the energy efficiency, energy use, *or water use* of such Covered Products." 42 U.S.C. § 6297(c) (emphasis added).

standards of Regulation 28 and Energize Denver.  Instead, it will be necessary to, in addition to any other measures to remove and replace existing and functioning EPCA-compliant Covered Products, such as: replacing showerheads and faucets, replacing natural gas fired HVAC and domestic water heating equipment with electric powered equipment (Exhibit 5 at ¶¶ 19-24); installing five new domestic hot water low footprint boilers and electrifying a significant portion of the buildings existing HVAC equipment (Exhibit 6 at ¶¶ 18-23); replacing existing electric resistance water heaters with electric hybrid heat pump water heaters, and replacing other gas-powered equipment such as HVAC and domestic water heating equipment with electric-powered equipment  (Exhibit 7 at ¶¶ 16-20); and replacing existing shell tube heat exchangers that use steam from a buildings natural-gas boilers to provide domestic hot water with electric heat pump water exchangers (Exhibit 8 at ¶¶ 16-19).

35.    Plaintiff NAIOP Colorado's members' Level II ASHRAE Audits have determined that other efficiency measures such as installing LED lights, modifying building envelopes (through windows or insulation), and installing on-site solar rooftop arrays, will not, by themselves, allow them to achieve the building performance standards of Regulation 28 and Energize Denver. Instead, in addition to any other measures, it will be necessary to remove and replace existing, functioning, and EPCA-compliant Covered Products  such as: replacing shower heads and faucets, replacing existing and recently installed gas-powered HVAC rooftop units ("RTUs") with electric-powered heat pumps (Exhibit 9 at ¶¶ 18-21); and replacing a 225-ton building chiller with a high efficiency model, replacing natural gas-fired hydronic hot water ("HHW") boilers manufactured in

13

2015 with electric-powered models, and replacing existing natural gas HVAC RTUs with electric heat pump RTUs (Exhibit 10 at ¶¶ 19-22).

36.     The building benchmarking and performance standards of both Regulation 28 and Energize Denver have already required Plaintiffs' members to submit benchmarking reports to the State of Colorado and the City and County of Denver for existing buildings and to immediately begin the process for making material modifications to their Covered Buildings in order to meet the fast-approaching compliance deadlines of both regulations, all at significant expense to their members.

a.     These material modifications will irreparably change the physical systems of most of Plaintiffs' members' Covered Buildings by forcing the removal of Covered Products utilizing fossil fuels such as natural gas and replacing them with either newer Covered Products or electrified Covered Products.

b.     The building performance standard requirements of these regulations will require Plaintiffs' members to make significant capital expenditures, force them to seek amendment of their existing financing contracts and impairing contractual obligations for the maintenance and upkeep of the EPCA Covered Products currently used that now must be replaced prior to the end of their useful life. These material costs will increase capital, financing and operating costs, which will result in increased lease, rental or lodging rates, and may result in reductions in net operating income and deteriorated property values. These increased lease and rental rates will be harmful to both Plaintiffs' member and the public at large, during a time when Colorado is facing a housing crisis.

14

c.    The building performance standard requirements of both regulations will decrease Plaintiffs' members' competitiveness because similarly situated buildings that are not Covered Buildings under either the 50,000 square feet (Regulation 28) or 25,000 square feet (Energize Denver) thresholds will not bear these burdens and expenses. This is contrary to the uniform playing field that EPCA requires for all buildings using Covered Products.

d.    Plaintiffs' members accordingly are experiencing or will imminently experience harm in the form of economic injuries, altered business practices and opportunities, and compliance burdens because of the regulations challenged here.

37.    Therefore, all Plaintiffs have one or more members that own or operate buildings  subject to both Regulation 28 and Energize Denver; do business in Colorado, and the City and County of Denver; and are suffering or will imminently suffer harm to their revenues and business operations as a result of Regulation 28 and Energize Denver through the forced replacement of Covered Products preempted from regulation by Defendants under EPCA.   Plaintiffs thus have associational standing to challenge Regulation 28 and Energize Denver.

## THE CHALLENGED REGULATIONS

### I.    COLORADO HOUSE BILL 21-1286

38.    Colorado House Bill 21-1286 declares that the "Commission has both the statutory authority and the obligation to require a reduction of greenhouse gas emissions in the State in every sector including buildings."

15

39.     Colorado House Bill 21-1286 requires that the owners of Covered Buildings over 50,000 sq/ft shall submit a benchmarking report of their energy usage for the previous calendar year by June 1st of each year, starting on December 1, 2022.

40.     Further, Colorado House Bill 21-1286 directs that the Commission "shall promulgate" rules for Covered Buildings owners to achieve a reduction in greenhouse gas emissions associated with their Covered Buildings' operations of seven percent by 2026 and twenty percent by 2030 as compared to 2021 levels. *See* C.R.S. § 25-7-142(1), (8).

41.     Colorado House Bill 21-1286 authorizes CDPHE, through the Division, to collect civil penalties of up to five hundred dollars ($500) for a first violation and up to two thousand dollars ($2,000) for each subsequent violation of a Covered Building owners' failure to submit benchmarking data, and civil penalties of up to two thousand dollars ($2,000) for a first violation and up to five thousand dollars ($5,000) for each subsequent violation of a Covered Building owners' failure to meet the building performance standards adopted by the Commission.

## II.    COLORADO REGULATION 28

42.     Regulation 28 as adopted by the Commission on August 17, 2023, under the direction of HB 21-1286, sets "building performance standards" for Covered Buildings (commercial and multifamily buildings over 50,000 square feet) that must be met by 2026 and 2030.

43.     Regulation 28 applies to existing or new Covered Buildings (including

16

those under construction or being renovated). Thus Regulation 28 regulates and imposes restrictions on existing and installed EPCA regulated Covered Products.

44.    There are two building performance standards under Regulation 28: (1) an energy-use intensity ("EUI") score, which is calculated from a building's total site energy use per square foot per year; and (2) a greenhouse gas intensity ("GHG Intensity") score, which is calculated by the carbon dioxide equivalent ("CO2e") measured in kilograms of CO2e per square foot (kg/Co2e per sq/ft) emitted per year associated with the operations of a Covered Building.

45.    Regulation 28 sets compliance deadlines of 2026 and 2030 for a Covered Building to meet the performance standards through the implementation of energy efficiency measures, greenhouse gas intensity reductions, or combinations of both those options.

46.    Covered Building owners must demonstrate they have either (1) met the applicable building performance standard EUI score or (2) met the applicable GHG Intensity score.

47.    The EUI and GHG Intensity compliance targets are set on a "property type" basis, meaning that standards will differ depending on the property type of the Covered Building (e.g. office buildings, multifamily housing, and restaurants all have different EUI score and GHG Intensity targets).

48.    Covered Building owners are then given four main "compliance pathways" for meeting the 2026 and 2030 building performance standards.

a.    First, Covered Building owners can opt to achieve the 2026 and 2030

17

EUI building performance standard targets for their property type by reducing the annual energy usage at their buildings to be withing the target EUI scores.

b.      Second, Covered Building owners can opt to reduce their EUI score by a flat percentage from their 2021 EUI baseline score, of 13% by 2026 and 29% by 2030.  This pathway is intended for Covered Buildings with existing EUI scores higher than 29% off of the standard EUI targets.

c.      Third, Covered Building owners can opt to achieve the 2026 and 2030 GHG Intensity score (i.e., not the EUI standard) set for their property type by reducing "greenhouse gas emissions attributable to the building's energy use through energy efficiency or replacing fossil fuel equipment with high-efficiency electric equipment".

d.      Fourth, Covered Building owners can opt to reduce their GHG Intensity score by a flat percentage from their 2021 GHG Intensity Score baseline, of 13% by 2026 and 29% by 2030. This pathway is intended for Covered Buildings with existing GHG Intensity scores higher than 29% off of the standard GHG Intensity targets.

49.      In order to reduce the EUI score of a Covered Building, the building owner must reduce the total amount of energy the building uses on a calendar year basis.

50.      In order to reduce a GHG Intensity score of a Covered Building, the building owner must reduce the total amount of greenhouse gas emissions attributable to energy use on a calendar year basis.

51.      Regulation 28 also allows a Covered Building owner to meet the building

18

performance standards by purchasing Renewable Energy Credits ("RECs").  In order to qualify for the use of RECs, a Covered Building owner must submit an energy audit confirming they have "exhausted cost-effective energy efficiency and electrification measures for the [C]overed [B]uilding."

52.    Finally, Regulation 28 allows Covered Building owners to modify their 2026 and 2030 compliance obligations by applying to the CEO for an adjusted EUI score, adjusted GHG intensity target, or an adjusted compliance timeline.

53.    Though both the EUI score and GHG Intensity score targets are based on the percent of greenhouse gas emissions reductions attributable to energy use reductions, the EUI and GHG intensity building performance standards are not equivalent: i.e., meeting the EUI-based standard does not ensure compliance with the GHG intensity standard.

54.    Regardless, the EUI and GHG Intensity scores of Regulation 28, despite being based on GHG emissions, *de facto* regulate the energy efficiency of Covered Products because the only sources of GHG emissions are the energy consuming equipment within a Covered Building.

55.    Both the EUI score and GHG Intensity score have been set so stringently as to effectively require Covered Building owners to remove existing, functioning and EPCA compliant Covered Products and replace them with new, often electric-powered, Covered Products.

56.    Extensive Level II ASHRAE Energy Audits conducted by Plaintiffs' members demonstrate that the only feasible way for the vast majority of Covered

19

Buildings to meet the energy reduction EUI score or the GHG Intensity score standards by the applicable compliance dates is to replace existing, EPCA compliant Covered Products that have a remaining useful life (in addition to whatever other energy efficiency measures may be taken). That is because EPCA regulated Covered Products such as HVAC and domestic water heating systems are responsible for the vast majority of energy used in, and emissions generated by, Covered Buildings. In most cases, the most effective (but not cost effective) way for Covered Buildings to meet the building performance standards of Regulation 28 is to target the removal fossil fuel utilizing Covered Products, as those products have the greatest associated GHG emissions at the Covered Buildings.

57. Regulation 28 therefore both strongly favors electric Covered Products and effectively requires that a Covered Building owner replace existing, EPCA compliant Covered Products.

58. The procedures in Regulation 28 allowing for the adjustment of compliance timeline or building performance standards further emphasizes that Regulation 28 is intended to force Covered Building owners into replacing existing EPCA complaint Covered Products with electric Covered Products.

59. In order to apply for an adjusted compliance timeline, a Covered Building owner must submit documentation to the CEO including an "inventory of the natural gas equipment in the building including the age of the equipment and the energy savings associated with electrification of the equipment" and "[d]ocumentation demonstrating collaboration with the building's utility(ies) related to updating the electrical distribution

20

infrastructure." 5 CCR 1001-32, Part C, II.A.1.

60.    Categories of Covered Building owners able to apply for a timeline adjustment include: affordable housing and under-resourced buildings; buildings undergoing major renovations that will still achieve the EUI or GHG Intensity building performance standards; buildings that can demonstrate they plan to replace existing heating and cooling systems at the end of their system of life if that end of life occurs after the compliance period; and buildings that require updates to the electrical distribution infrastructure that cannot be timely completed to meet the performance standard deadline.

61.    For a building performance standard target adjustment, Covered Building owners must submit on a "CEO approved form" which at a minimum must include 2021 through the present annual benchmarking data with third-party verification and a list of property category types (e.g. allocation of square footage to multifamily, retail, gym, etc.) at the Covered Building.

62.    In order to adjust the building performance standards for "under resourced buildings", the CEO requires documentation that the building has examined "the feasibility of gas and electric beneficial electrification and/or gas or electric demand side management programs."

63.    "Beneficial electrification" is defined in Regulation 28 as "converting the energy source of a customer's end use from a nonelectric fuel source to a high-efficiency electric source, or avoiding the use of nonelectric fuel sources in new construction or industrial applications" in order to reduce net greenhouse gas emissions over the lifetime

21

of the conversion to meet building performance standards. Thus the compliance schedule adjustment process is targeted at fossil fuel powered Covered Products and achieving building electrification.

64. Failure to meet the 2026 and 2030 building performance standard compliance obligations subjects a Covered Building owner to fines and civil injunctive relief of up to $5,800 per 30 days of violation, including orders to meet the Regulation 28 building performance standards.

65. Regardless of the "compliance pathway" chosen to meet the building performance standards, Level II ASHRAE Energy Audits conducted by Plaintiffs' members demonstrate that most Covered Building owners will be required to remove and replace existing EPCA-compliant Covered Products, regardless of whether those Covered Products have remaining useful life. In many instances, the Covered Building owner will not be able meet the building performance standards in Regulation 28 by simply replacing existing compliant Covered Products with similarly fueled, but higher efficiency, Covered Products, instead being forced to purchase electric Covered Products). *See* Exhibit 1 at ¶¶ 25-34; Exhibit 2 at ¶¶ 26-31; Exhibit 3 at ¶¶ 23-28; Exhibit 4 at ¶¶ 29-31; Exhibit 5 at ¶¶ 28-31; Exhibit 6 at ¶¶ 24-27; Exhibit 7 at ¶¶ 22-27; Exhibit 8 at ¶¶ 24-26; Exhibit 9 at ¶¶ 23-30; Exhibit 10 at ¶¶ 24-29.

66. Regulation 28 thus contains building performance standards that regulate and concern the energy efficiency and energy use of EPCA Covered Products.

## III. COLORADO HOUSE BILL 25-1269

67. Colorado House Bill 25-1269 was passed by the Colorado Legislature on

22

May 7, 2025, and signed into law by Governor Polis on May 20, 2025.

68.    Colorado House Bill 25-1269 made changes to the requirements of Colorado House Bill 21-1286 and the regulatory requirements of Regulation 28 that are relevant here.

69.    Specifically, House Bill 25-1269 now defines an "Operator" of a Covered Building as a "owner, tenant, or other individual or entity", significantly expanding the universe of those liable for failure to comply with Regulation 28's benchmarking requirements to owners, tenants, and managers of Covered Buildings.

70.    House Bill 25-1269 also allows a Covered Building owner to elect to choose their 2019 calendar year as an alternative baseline year (instead of 2021) to determine the Covered Building's compliance obligations.

71.    House Bill 25-1269 also makes the 2026 building performance standards adopted in Regulation 28 permissive (i.e., not mandatory), but only if a Covered Building owner submits benchmarking reports to the CEO that track the Covered Building's progress towards compliance with the building performance standards' (new) 2031 deadline and: (1) respond to any questions from the CEO; (2) indicate whether technical assistance or guidance would be helpful; and (3) provide any additional nonproprietary information requested by the CEO that the CEO believes is relevant to understanding implementation trends or common barriers to compliance.  Thus, under House Bill 25-1269, the 2026 building performance standards remain mandatory unless the above conditions are met.

72.    House Bill 25-1269 modifies Regulation 28 by extending the 2030 building

23

performance standards compliance date by one year, until 2031. House Bill 25-1269 thus does not remove or revise the building compliance standards, but only extends the compliance data by one year, to 2031.

73.    House Bill 25-1269 also increased penalties for noncompliance with Regulation 28 up to five hundred dollars ($577) for a first violation and up to two thousand dollars ($2,300) for each subsequent violation of a Covered Building owners' failure to submit benchmarking data. House Bill 25-1269 also increased civil penalties amounts to up to two thousand three hundred dollars ($2,300) for the first thirty days of violation and up to five thousand eight hundred dollars ($5,800) for each subsequent thirty days of violation of a Covered Building owners' failure to meet the building performance standards adopted by the Commission after 2030.

74.    House Bill 25-1269 is self-executing: it does not require the Commission to revise any rules adopted prior to July 1, 2025 (such as Regulation 28).

IV.    **THE ENERGIZE DENVER ORDINANCE**

75.    The Energize Denver Ordinance establishes a building performance program which requires Covered Building (commercial, multifamily buildings, and certain industrial buildings over 25,000 square feet) to meet energy use performance targets in calendar years 2024, 2027, and 2030.

76.    The Energize Denver Ordinance directs the Denver OCASR to establish rules by which every Covered Building is assigned a building type and EUI building performance standard target such that 30% total energy savings across all Covered Buildings is achieved by 2030.

24

77.     Under the Energize Denver Ordinance, Covered Building owners are subject to civil penalties for violating any provision of the Ordinance of up to $0.70 per year for each required kBtu reduction that the Covered Building owner fails to achieve in that year.[3]

78.     Failure to pay any civil penalty within one hundred and eighty (180) days is considered a debt to the City and County of Denver until paid in full, and the debt represents a perpetual lien on the property superior to all other liens, except for liens for general taxes and prior special assessments.

## V.    THE ENERGIZE DENVER REGULATIONS

79.     The Energize Denver Regulations, as adopted by the Denver OCASR under the direction of the Energize Denver Ordinance, set 2030 "building performance standards" for Covered Buildings (commercial, multifamily, and certain industrial buildings over 25,000 square feet) which require the owners of Covered Building to meet certain building performance standards by 2024, 2027, and 2030 compliance deadlines.

80.     The Energize Denver Regulations apply to all Covered Buildings, regardless of whether the Covered Buildings are undergoing any renovations or construction.

81.     Like Regulation 28, Covered Buildings under the Energize Denver

---

[3] OCASR's April 1, 2025 "Technical Guidance" for Energize Denver purports to authorize OCASR to charge lesser penalty rates in certain circumstances.    Available at: https://denvergov.org/Government/Agencies-Departments-Offices/Agencies-Departments-Offices-Directory/Climate-Action-Sustainability-and-Resiliency/Cutting-Denvers-Carbon-Pollution/Efficient-Commercial-Buildings/Denver-Building-Regulations/Energize-Denver-Building-Performance-Policy/Buildings-25000-sq-ft-or-Larger/Technical-Guidance-25k-or-more (last visited June 6, 2025).

Regulations are given a target EUI performance score for the 2030 deadline, set by "property type".

82.    The 2024 and 2027 interim EUI building performance standards in the Energize Denver Regulations are then set drawing a "straight line" from the Covered Building's 2019 EUI benchmarking score to the 2030 EUI building performance standard to determine interim targets for the 2024 and 2027 compliance year deadlines.[4]

83.    Like Regulation 28, the EUI scores of Energize Denver, despite being based on GHG emissions, *de facto* regulate the energy efficiency of Covered Products because the only sources of GHG emissions are the energy consuming equipment and fixtures within a Covered Building.

84.    Also like Regulation 28, the EUI building performance standards in the Energize Denver Regulations are so stringent that the only feasible way for the vast majority of Covered Buildings to comply is, in addition to implementing any other energy efficiency measures, to remove existing, EPCA compliant Covered Products with remaining useful life and replaced them with higher efficiency, typically electric, Covered Products.[5] That is because EPCA regulated Covered Products such as HVAC and domestic water heating systems are responsible for the vast majority of energy used, and

---

[4] Certain property type categories, such as Aquariums, Convention Centers, Ice Rinks, and Indoor Arenas are given a flat 30% EUI reduction requirement by 2030 rather than an EUI building performance standard score.

[5] The EUI targets for most categories of property types are essentially identical between Regulation 28 and the Energize Denver Regulations. For example, the "multifamily housing" property type, which applies to CAA's and AAMD's members buildings, has a 2030 EUI target in Regulation 28 of 42.1, and a 2030 EUI target in the Energize Denver Regulations of 44.2, essentially identical.

emissions generated, in Covered Buildings.  In most cases, the most effective (but not

cost effective) way for Covered Buildings to meet these building performance standards

is to target the removal of fossil fuel utilizing Covered Products, as those products have

the greatest GHG associated emissions at the Covered Buildings

85.    The Energize Denver Regulations therefore effectively require the removal

and replacement of existing EPCA-compliant Covered Products with remaining useful life

in Covered Buildings in Denver.

86.    The Energize Denver Regulations allow compliance timeline and building

performance standard target adjustments, but these adjustments do not affect this

conclusion.  Instead, the procedures for allowing these adjustments further emphasize

that the Energize Denver Regulations are intended to force Covered Building owners into

removing existing, EPCA compliant Covered Products.

87.    For example, a Covered Building owner may seek adjustments of their final

target, such as the baseline year, or selecting a maximum percent energy reduction

pathway that requires a 42% energy reduction from the Covered Building's baseline year.

Yet for Plaintiffs' members, regardless of the target adjustment or compliance pathway

chosen, Energize Denver still results in the forced replacement of EPCA complaint

covered products in their buildings.  *See* Exhibit 1 at ¶¶ 25-34; Exhibit 2 at ¶¶ 26-31;

Exhibit 3 at ¶¶ 23-28; Exhibit 4 at ¶¶ 29-31; Exhibit 5 at ¶¶ 28-31; Exhibit 6 at ¶¶ 24-27;

Exhibit 7 at ¶¶ 22-27; Exhibit 8 at ¶¶ 24-26; Exhibit 9 at ¶¶ 23-30; Exhibit 10 at ¶¶ 24-29.

88.    The Energize Denver Regulations also allow a 10% adjustment to the 2030

EUI building performance standard target, but only for Covered Buildings that have

achieved 80% "whole building electrification" (meaning 80% of the building's systems are electrified).

89.     Under the Energize Denver Regulations, Covered Building owners can seek a timeline adjustment option (changing the 2024, 2027, or 2030 compliance deadlines) by submitting an application with a qualifying energy audit and a retrofitting plan, but this package must include an evaluation of the electrification feasibility for natural gas equipment, and supporting documentation validating the reason for a timeline adjustment.

90.     Additionally, under the April 1, 2025 changes to the Energize Denver Regulations, Covered Building owners can submit an exemption request in the 2025 reporting year that will shift the 2024 target to 2028, eliminate the 2027 target, and shift the 2030 target to 2032.  However, providing additional *time* for Covered Buildings to achieve the stringent EUI targets does not change that the final targets (either in 2030 or 2032) still require the replacement of existing Covered Products in Covered Buildings.

91.     Covered Building owners can also seek credit for using renewable power that can be applied towards a building's total energy use (minimum five-year purchase contract).   Separately, short term renewable contracts may be used for up to 20% of a buildings' electricity usage through 2031.

92.     Finally, Covered Building owners can seek custom target adjustments if, after all other applicable target adjustments are applied, the Covered Building still does not have a viable path to reach the final EUI targets.  Under this custom target adjustment option, Covered Building owners must first have completed the standard target

28

adjustment process and must submit an application to OCASR that includes an energy audit that meets the minimum requirements of the technical guidance (which generally require ASHRAE equivalent audits).  If approved, the Covered Building owner will be granted a custom target that will result in a compliance notice that will require (1) energy efficiency measures with less than a 20-year simply payback; (2) improving the leakage of the Covered Building's envelope if identified in the energy audit; (3) replacing or upgrading existing building equipment a necessary to reach the final target at the end of the equipment's useful service life (as defined by OCASR, and not the Covered Building owner); and implementing viable renewable energy options.

93.    Regardless of the "compliance pathway" a Covered Building owner chooses, Level II ASHRAE Energy Audits completed by Plaintiffs' members demonstrate that Covered Building owners are forced to remove existing EPCA regulated and compliant Covered Products and replace them with new Covered Products under Energize Denver (and in most cases electric in lieu of existing fossil fuel utilizing Covered Products). *See* Exhibit 1 at ¶¶ 25-34; Exhibit 2 at ¶¶ 26-31; Exhibit 3 at ¶¶ 23-28; Exhibit 4 at ¶¶ 29-31; Exhibit 5 at ¶¶ 28-31; Exhibit 6 at ¶¶ 24-27; Exhibit 7 at ¶¶ 22-27; Exhibit 8 at ¶¶ 24-26; Exhibit 9 at ¶¶ 23-30; Exhibit 10 at ¶¶ 24-29.

94.    The Energize Denver Ordinance and Energize Denver Regulations thus contain building performance standards that regulate and concern the energy efficiency and energy use of EPCA Covered Products.

**FEDERAL LAW GOVERNING STATE AND LOCAL ENERGY REGULATIONS**

**I.    THE ENERGY POLICY AND CONSERVATION ACT**

95.    EPCA regulates the energy efficiency of both residential (or consumer) (42 U.S.C. § 6291 *et seq*) and industrial (or commercial) Covered Products (42 U.S.C. § 6311 *et seq*) and explicitly preempts state and local regulations "concerning the energy efficiency" and "energy use" of the Covered Product[6] for which DOE sets energy efficiency standards under EPCA.  42 U.S.C. § 6297(c); 42 U.S.C. § 6316(b)(2).

96.    The Covered Products regulated by EPCA include consumer appliances such as air conditioners, water heaters, furnaces, clothes washers and dryers, stoves, pool heaters, faucets and showerheads, and toilets (*see* 42 U.S.C. §§ 6292; 6295), and commercial equipment such as air conditioners, furnaces, water heaters, and clothes washers, as well as ancillary or related equipment, such as motors, pumps, etc. (*see* 42 U.S.C. §§ 6311(1); 6313).

97.    The regulatory status of this equipment is not tied to who is using the Covered Products.   A  "consumer product" used in a commercial enterprise is still a Covered Product.  *See id.* §§ 6291(2), 6929(a), 6311(2)(A)(iii).  EPCA covered consumer heating and cooling equipment and water heaters are often installed in commercial establishments, in addition to their typical consumer (residential) installations.

98.    EPCA preempts any "energy conservation standard" set by a state or local government for consumer and commercial Covered Products.  42 U.S.C. § 6297(b), (c); 42 U.S.C. § 6316(a)(10), (e)(3)(A), (e)(4)(B), (f)(1)(A)(ii), (f)(2)(A)(ii), (f)(3)(B), (g)(1)(B).

---

[6] *See* paragraph 5, *supra*, noting that the use of "Covered Product" herein applies to both "Covered Products" meaning *consumer* equipment preempted under EPCA, 42 U.S.C. § 6291 *et seq*. and "Covered Equipment", meaning *commercial* equipment preempted under EPCA, 42 U.S.C. § 6311 *et seq*.

30

99.    "Energy use" is defined as "the quantity of energy directly consumed by a consumer or commercial product at point of use."  42 U.S.C. § 6291(4); 42 U.S.C. § 6311(4).  "Energy" is defined as "electricity, or fossil fuels," such as natural gas or propane. 42 U.S.C. § 6291(3); 42 U.S.C. § 6311(7).

100.    EPCA defines an "energy conservation standard" as "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use."  42 U.S.C. § 6291(6)(A); 42 U.S.C. § 6311(18).

101.    The express preemption provision in EPCA states that "on the effective date of an energy conservation standard established in or prescribed under [42 U.S.C. § 6295] for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product unless the regulation" falls within certain enumerated exceptions.  42 U.S.C. § 6297(c); 42 U.S.C. § 6316(a)(8), (b)(2)(A) (preempting "any State or local regulation concerning the energy efficiency or energy use of a product for which" there is a federal standard in regard to commercial Covered Products).

102.    Putting these definitions together, EPCA preempts state or local laws or regulations relating to "the quantity of [fossil fuel] directly consumed by" (42 U.S.C. § 6291(4); 42 U.S.C. § 6311(4)) covered consumer and commercial Covered Products at the place where those Covered Products are used.

### A. Limited Exceptions to Preemption for Federal Energy Efficiency and Energy Use Standards for Consumer Covered Products.

103.    EPCA provides a single exception for state energy efficiency regulations

31

regulating consumer Covered Products in *existing construction*.  A state may only
regulate consumer Covered Products present in existing construction if the state applies
for a waiver to the Secretary of DOE, and the Secretary, through a stringent public petition
process, finds that the state has established that the state regulation is needed to meet
"unusual or compelling [s]tate or local energy or water interests," which are defined as
interests "substantially different in nature or magnitude than those prevailing in the United
States generally."  42 U.S.C. § 6297(d)(1)(C).  Even then, the Secretary may not allow a
waiver if the Secretary finds that "such State regulation will significantly burden
manufacturing, marketing, distribution, sale, *or servicing* of the covered product on a
national basis."  *Id.* at (d)(3) (emphasis added).

104.    To Plaintiffs' knowledge, none of the Defendants have applied for or
obtained a waiver of preemption for their regulations as they relate to *existing
construction*.

105.    For *new construction*, EPCA provides narrow exceptions for certain
building codes regulating consumer Covered Products.  42 U.S.C. § 6297(f)(3).  EPCA's
exceptions from preemption for performance-based building codes apply only to new
construction, not to existing buildings or building renovations or replacements of existing
systems, and do not allow the retroactive imposition of new code requirements on existing
systems.  42 U.S.C. § 6297(c).

106.    In new construction, trade-offs can be made during the design process
regarding a building's energy consumption, including the building envelope, wall and
ceiling insulation and other materials selections, window area, lighting, HVAC equipment,

and water heating equipment, onsite and offsite energy sources, etc. to achieve a desired overall building energy consumption objective. However, when various components of an existing building are being altered or renovated, there is nothing to trade off against because the building envelope and systems are already in place. These challenges are amplified for existing buildings when there are no plans to alter or renovate, and the renovations are due solely to the retroactive imposition of new requirements on existing systems. Performance-based building codes contemplate the entire building and all of its systems as a single design and cannot be applied retroactively in a piecemeal fashion, such as to renovations or replacements of systems or equipment.

107.     Both Regulation 28 and Energize Denver apply to *existing* Covered Buildings and do not qualify for any of the exemptions from EPCA preemption, forcing building owners to choose remove existing EPCA compliant consumer Covered Products and replace them with new, typically electric, Covered Products in most of their Covered Buildings.

### B. Limited Exemptions to Preemption for Federal Energy Efficiency and Energy Use Standards Governing Commercial Covered Products.

108.     With limited exceptions, federal standards for commercial Covered Products preempt any state or local regulations concerning the energy efficiency or energy use of such Covered Products. 42 U.S.C. § 6316(b)(2).

109.     For state regulations governing commercial Covered Products in *existing construction*, the single exemption from preemption is identical to that for consumer Covered Products: the DOE can grant a waiver of preemption to a state (or locality) if the DOE, through a stringent rulemaking process, finds that the state (or locality) has

established that the state regulation is needed to meet "unusual or compelling [s]tate or local energy or water interests," which are defined as interests "substantially different in nature or magnitude than those prevailing in the United States generally." 42 U.S.C. §§ 6297(d) and 6316(b)(2)(D).

110.    To Plaintiffs' knowledge, none of the Defendants have applied for or obtained a waiver of preemption for their regulations as they relate to *existing construction*.

111.    There is also a limited exception from preemption for energy efficiency standards for commercial Covered Products in state or local building codes for *new construction*. 42 U.S.C. § 6316(b)(2)(B). However, that exemption does not apply to the application of Regulation 28 and Energize Denver challenged here, which is in *existing* construction.

112.    Further, EPCA provides no exception from preemption for performance-based building codes (energy conservation standards) for commercial Covered Products, unlike the exception from preemption for consumer Covered Products at 42 U.S.C. § 6297(f)(3).

113.    Regulation 28 and Energize Denver apply to *existing* Covered Buildings, and force building owners to remove existing EPCA compliant commercial Covered Products and replace them with new, and typically electric, Covered Products in most of their Covered Buildings.

## ALLEGATIONS

## I.    COLORADO REGULATION 28 AND ENERGIZE DENVER REGULATE COVERED PRODUCTS PREEMPTED BY EPCA

114.    Both Regulation 28 and Energize Denver impose energy efficiency building performance standards that (1) regulate and concern the energy efficiency and energy use of consumer and commercial Covered Products in *existing* buildings; (2) effectively require the removal and replacement of existing, EPCA compliant Covered Products; and (3) conflict in fundamental ways with the standards passed by Congress and regularly updated by DOE by effectively requiring the installation and use of electric Covered Products and the removal of fossil fuel utilizing Covered Products in most Covered Buildings.

115.    During the Regulation 28 rulemaking proceedings, and after Energize Denver was finalized, the United States Court of Appeals for the Ninth Circuit invalidated the City of Berkeley's comparable, though less stringent, building code which prohibited gas piping in new buildings (unlike Regulation 28 and Energize Denver, Berkeley's ordinance applied only to *new* construction and not *existing* buildings). *Cal. Rest. Ass'n v. City of Berkeley*, 65 F.4th 1045 (9th Cir. 2023). Later, on a petition for rehearing en banc, the Ninth Circuit denied the petition for rehearing and issued an amended opinion in *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir., Jan. 2, 2024).

116.    In the amended opinion, the Ninth Circuit held that "[b]y its plain text and structure, EPCA's preemption provision also encompasses building codes concerning the energy use of [C]overed [P]roducts." *Id.* at 1099.[7]

---

[7] Recently, a Court in the S.D. of New York reached a contrary opinion in regards to a local law which prohibited the use of fossil fuels in *new* construction. *Assoc. of Contracting Plumbers of City of New York, Inc. v. City of New York*, 2025 WL 843619 (S.D. N.Y. March 18, 2025). That case is distinguishable here, because Plaintiffs are

35

117.    Both Regulation 28 and Energize Denver do exactly what the Ninth Circuit concluded was preempted – regulate the energy use (natural gas use) of EPCA-regulated Covered Products by requiring Covered Building owners to (1) examine the energy usage of Covered Products in their buildings; and (2) reduce the energy usage of those Covered Products to meet the building performance standards of Regulation 28 and Energize Denver.  This alone is enough to implicate EPCA's preemption provisions, which preempt any "State regulation concerning the energy efficiency, energy use, or water use of such [C]overed [P]roduct."  42 U.S.C. § 6297(c); 42 U.S.C. § 6316.

118.    In many cases, Regulation 28 and Energize Denver also require Covered Building owners to remove existing EPCA compliant Covered Products and replace them with more efficient Covered Products, with a built-in bias towards electric over corresponding fossil fuel utilizing Covered Products.

119.    Regulation 28 and Energize Denver also effectively and *de facto* prohibit or severely limits the use of natural gas appliances in most existing and new Covered Buildings by setting the energy conservation standards so stringently so as to provide Covered Building owners with no alternative other than replace existing, EPCA compliant Covered Products with new, and in most cases electric, Covered Products.

120.    Despite the express preemption provisions of EPCA, Defendants seek to impose their own energy efficiency standards for existing Covered Products, both consumer and commercial, on Plaintiffs, their members, and all other similarly situated

---

challenging regulations that impact *existing* Covered Products in *existing* Covered Buildings, forcing building owners at a very high cost to retrofit existing functioning buildings.

Covered Building owners in Colorado and Denver.

121.    None of the Defendants have obtained the single and limited waiver from EPCA preemption for regulating Covered Products in *existing* construction.

122.    Plaintiffs accordingly bring this action seeking a declaration that Regulation 28 and Energize Denver are preempted by EPCA and therefore unenforceable, as well as seeking an injunction to prevent enforcement of the regulations.

## II.    Colorado Regulation 28 Mandates Energy Efficiency Standards for Covered Products and is Preempted by EPCA.

123.    Regulation 28 requires existing Covered Buildings to meet building performance standards by 2026 and 2030 regardless of whether the *existing* covered buildings are undergoing renovations or changing out equipment.

124.    By its plain terms, Regulation 28 is "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use" (42 U.S.C. § 6291(6)(A)) and is preempted by EPCA as a "regulation concerning the energy efficiency, energy use, or water use" of Covered Products (42 U.S.C. § 6297(c)).

125.    More specifically, Regulation 28 requires a Covered Building owner to "reduce the energy consumption of the building through the implementation of energy efficiency measures and/or technologies to meet the applicable property type weather-normalized site EUI target" or GHG Intensity score target.

126.    As set forth in paragraph 54, *supra*, Regulation 28 concerns the energy efficiency of Covered Products because the building performance standards focus on whole building energy usage – and the Covered Products within existing buildings make up the vast majority of their energy usage.

37

127.    Plaintiffs' members have determined that for most of their Covered Buildings, the only way to meet the prescriptive building performance standards in Regulation 28, in addition to other available energy efficiency measures, is to remove EPCA-compliant Covered Products and replace them with new, typically electric, Covered Products.  For most Covered Buildings, there is no combination of other energy efficiency measures (e.g. changing insulation, replacing non EPCA-regulated lights, etc.) that, by themselves, will allow Plaintiffs to meet the building performance standards of Regulation 28. Only the removal and replacement of existing EPCA-compliant Covered Products can achieve the building performance standards of Regulation 28.

**A. Colorado Regulation 28 Regulates the Energy Efficiency of Covered Products in Existing Covered Buildings.**

128.    As demonstrated by the Level II ASHRAE Energy Audits conducted by Plaintiffs' members, there is no feasible way for Plaintiffs' members to meet the building performance standards in most of their existing buildings under Regulation 28 unless they target the energy efficiency of Covered Products in their buildings, often being required to replace both consumer and commercial existing, EPCA compliant Covered Products in their buildings with new, and typically electric, Covered Products.  *See* e.g. Exhibit 1 at ¶¶ 19-23; Exhibit 2 at ¶¶ 21-24; Exhibit 3 at ¶¶ 18-20; Exhibit 4 at ¶¶ 20-30; Exhibit 5 at ¶¶ 19-24; Exhibit 6 at ¶¶ 18-23; Exhibit 7 at ¶¶ 16-20; Exhibit 8 at ¶¶ 16-19; Exhibit 9 at ¶¶ 18-21; Exhibit 10 at ¶¶ 19-22.  This true regardless of the compliance pathways chosen and the implementation of other energy efficiency measures.  *See id.*

129.    As demonstrated by the Level II ASHRAE Energy Audits conducted by

38

Plaintiffs' members, "low hanging" energy efficiency measures involving non-EPCA Covered Products such as LED lights, windows, and other building envelop items, by themselves, are not sufficient to achieve the building performance standards of Regulation 28. Nor are measures such as installing rooftop solar arrays sufficient to meet the compliance targets. *See id.*

130.    Preliminary estimates show that compliance with Regulation 28 to retrofit existing Covered Buildings by removing and replacing Covered Products will require significant capital expenditures, from hundreds of thousands to millions of dollars at each Covered Building. Exhibit 1 at ¶¶ 22, 24; Exhibit 2 at ¶ 25; Exhibit 3 at ¶¶ 21-22; Exhibit 4 at ¶¶ 21-22, 28; Exhibit 5 at ¶¶ 22, 25; Exhibit 6 at ¶ 21; Exhibit 7 at ¶ 21; Exhibit 8 at ¶ 20; Exhibit 9 at ¶ 22; Exhibit 10 at ¶¶ 21, 23

131.    In addition, the existing EPCA compliant Covered Products that will have to be removed and replaced frequently have a long remaining useful life and may still be subject to financing, imposing additional and unnecessary financial burdens (not to mention the waste of natural resources caused by removing from service tens of thousands of functioning EPCA-compliant Covered Products that have remaining useful lives). *Id.*

132.    Regulation 28 has caused Plaintiffs' members to immediately begin expending additional resources to hire consultants or conduct energy audits and begin the process of planning the engineering work necessary to remove existing infrastructure and install the new systems in order to meet the 2026 and 2030 compliance deadlines for Regulation 28. *See* Exhibit 1 at ¶¶ 25-34; Exhibit 2 at ¶¶ 26-31; Exhibit 3 at ¶¶ 23-28;

Exhibit 4 at ¶¶ 29-31; Exhibit 5 at ¶¶ 28-31; Exhibit 6 at ¶¶ 24-27; Exhibit 7 at ¶¶ 22-27;

Exhibit 8 at ¶¶ 24-26; Exhibit 9 at ¶¶ 23-30; Exhibit 10 at ¶¶ 24-29.

133.    There are significant technical challenges as well, as entire building

systems would need to be renovated, likely displacing residents/tenants for prolonged

periods of times in Plaintiffs' members' buildings.  *Id.*  Removing fossil-fueled Covered

Products and replacing them with electric Covered Products is not a simple matter of

exchanging equipment: it requires removing and replacing extensive systems that are

integrated and buried into the building's physical infrastructure. In most cases this

disruptive, and potentially long-lasting, work will require tenants to be removed from the

areas where this mandated demolition and renovation work is being conducted. This

imposes financial burdens on building owners and financial and physical hardships on

displaced tenants.

134.    Further, at least some of these significant compliance costs would be

borne by residents/tenants through significant rent increases, causing economic hardship

to residents/tenants and making Plaintiffs' members' Covered Buildings less competitive

with buildings not covered by Regulation 28, ultimately harming their business and

rental/tenant prospects in Colorado.  Requiring the removal and replacement of perfectly

good and functioning EPCA-regulated Covered Products would thus waste already

expended capital, waste the resources used for the manufacture of the current Covered

Products that would have to be removed despite having remaining useful life, and require

additional resources for disposal of the Covered Products, displace residents, and

increase rents. *Id.*

**B. Colorado Regulation 28 Does Not Meet Any of EPCA's Exemptions to Preemption.**

135.    Regulation 28 does not meet any of EPCA's exemptions to preemption.

136.    First, to Plaintiffs' knowledge, Defendants have not applied for or obtained the required waiver under EPCA, 42 U.S.C. § 6297(d), for the application of Regulation 28 to either *existing* Covered Buildings.

137.    Second, EPCA provides no exemption for energy conservation standards in building codes regulating Covered Products (consumer or commercial) in *existing* buildings.  Because Regulation 28 imposes energy conservation standards on all existing and new Covered Buildings in the State of Colorado, it is preempted to the extent it regulates *existing* buildings because no waiver has been obtained.

**III.    Energize Denver Mandates Energy Efficiency Standards for Covered Products and is Preempted By EPCA.**

138.    Energize Denver applies to all *existing* Covered Buildings in the City and County of Denver and requires existing Covered Buildings to meet building performance standards by 2024, 2027, and 2030 (or 2028 and 2032 if a Covered Building applies for extensions) regardless of whether the *existing* Covered Buildings are undergoing renovations or changing out equipment.

139.    By its plain terms, Energize Denver sets "performance standard[s] which prescribes a minimum level of energy efficiency or a maximum quantity of energy use" (42 U.S.C. § 6291(6)(A)), and by doing so is preempted by EPCA (42 U.S.C. § 6297(c)).

140.    More specifically, Energize Denver requires a Covered Building owner "to meet energy performance targets in calendar years 2024, 2027, and 2030" and to

41

"maintain the interim targets each subsequent year and shall maintain the final energy performance target indefinitely."

141.    As set forth in paragraph 83, *supra*, Energize Denver concerns Covered Products because the building performance standards focus on whole building energy usage – and the Covered Products within existing buildings make up the vast majority of their energy usage.

142.    Despite offering several different "pathways" towards compliance with the building performance standards, Energize Denver is a performance standard that, because other available energy efficiency measures will not, by themselves, achieve compliance, requires most existing Covered Buildings in Colorado to replace EPCA compliant Covered Products with new Covered Products in order to meet a "minimum level of energy efficiency or a maximum quantity of energy use" under 42. U.S.C. § 6291(6)(A) that is preempted by EPCA.

143.    Plaintiffs' members have determined that the only way to meet the prescriptive building performance standards in Energize Denver in most of their Covered Buildings is, in addition to other energy efficiency measures, to replace EPCA-compliant Covered Products in their buildings with new Covered Products, and in most cases with electric Covered Products.  There is no combination of non-EPCA Covered Products replacements (e.g. changing insulation, replacing non EPCA-regulated lights, etc.) that, by themselves, will allow Plaintiffs to meet the performance standards of Energize Denver in most of their Covered Buildings – only the removal and replacement of EPCA-compliant Covered Products with can achieve compliance.

**A. Energize Denver Regulates the Energy Efficiency of Covered
Products in Existing Covered Buildings.**

144.    As demonstrated by the Level II ASHRAE Energy Audits conducted by
Plaintiffs' members, there is no feasible way for Plaintiffs' members to meet the building
performance standards in most of their existing buildings under Energize Denver unless
they target the energy efficiency of Covered Products in their buildings, often being
required to replace both consumer and commercial existing, EPCA compliant Covered
Products in their buildings with new, and typically electric, Covered Products. *See* e.g.
Exhibit 1 at ¶¶ 19-23; Exhibit 2 at ¶¶ 21-24; Exhibit 3 at ¶¶ 18-20; Exhibit 4 at ¶¶ 20-30;
Exhibit 5 at ¶¶ 19-24; Exhibit 6 at ¶¶ 18-23; Exhibit 7 at ¶¶ 16-20; Exhibit 8 at ¶¶ 16-19;
Exhibit 9 at ¶¶ 18-21; Exhibit 10 at ¶¶ 19-22.  This true regardless of the compliance
pathways chosen. *See id.*

145.    Due to Energize Denver's electrification bias, Plaintiffs' members have
determined that in most of their Covered Buildings, they must remove EPCA compliant
fossil fuel-fired heating and cooling equipment and replace it with electric HVAC
equipment, such as heat pumps, in order to meet the building performance standards in
Energize Denver.  *Id.*  Energize Denver thus further concerns the energy efficiency of
EPCA compliant covered products because generally the only source of fossil fuel using
equipment in Covered Buildings are Covered Products such as HVAC and domestic
water heating equipment, or kitchen equipment.

146.    As demonstrated by the Level II ASHRAE Energy Audits conducted by
Plaintiffs' members, "low hanging" energy efficiency measures involving non-EPCA

43

Covered Products such as LED lights, windows, and other building envelop items, by themselves are not sufficient to achieve the building performance standards of Energize Denver in most Covered Buildings.  Nor are measures such as installing rooftop solar arrays sufficient to meet the compliance targets.  *See* Exhibit 1 at ¶¶ 19-23; Exhibit 2 at ¶¶ 21-24; Exhibit 3 at ¶¶ 18-20; Exhibit 4 at ¶¶ 20-30; Exhibit 5 at ¶¶ 19-24; Exhibit 6 at ¶¶ 18-23; Exhibit 7 at ¶¶ 16-20; Exhibit 8 at ¶¶ 16-19; Exhibit 9 at ¶¶ 18-21; Exhibit 10 at ¶¶ 19-22.

147.    Preliminary estimates show that compliance with Energize Denver will require significant capital expenditures, from hundreds of thousands to millions of dollars for each Covered Building.  Exhibit 1 at ¶¶ 22, 24; Exhibit 2 at ¶ 25; Exhibit 3 at ¶¶ 21-22; Exhibit 4 at ¶¶ 21-22, 28; Exhibit 5 at ¶¶ 22, 25; Exhibit 6 at ¶ 21; Exhibit 7 at ¶ 21; Exhibit 8 at ¶ 20; Exhibit 9 at ¶ 22; Exhibit 10 at ¶¶ 21, 23.

148.    In addition, the existing EPCA compliant Covered Products that will have to be removed and replaced frequently have a long remaining useful life and may still be subject to financing, imposing  additional and unnecessary financial burdens (not to mention the waste of natural resources caused by removing from service tens of thousands of functioning EPCA-compliant Covered Products that have remaining useful lives).  *Id.*

149.    Energize Denver has caused Plaintiffs' members to immediately need to begin expending additional resources to hire consultants or conduct energy audits and begin the process of planning the engineering work necessary to remove existing infrastructure and install the new systems in order to meet the 2027 and 2030 (or if

44

extended 2028 and 2032) compliance deadlines for Energize Denver. *See* Exhibit 1 at ¶¶ 25-34; Exhibit 2 at ¶¶ 26-31; Exhibit 3 at ¶¶ 23-28; Exhibit 4 at ¶¶ 29-31; Exhibit 5 at ¶¶ 28-31; Exhibit 6 at ¶¶ 24-27; Exhibit 7 at ¶¶ 22-27; Exhibit 8 at ¶¶ 24-26; Exhibit 9 at ¶¶ 23-30; Exhibit 10 at ¶¶ 24-29.

150.    There are significant technical challenges as well, as entire building systems would need to be renovated, likely displacing residents/tenants for prolonged periods of times in Plaintiffs' members' buildings. *Id.* Removing fossil-fueled Covered Products and replacing them with electric Covered Products is not a simple matter of exchanging equipment: it requires removing and replacing extensive systems that are integrated and buried into the building's physical infrastructure. In most cases this disruptive, and potentially long-lasting, work will require tenants to be removed from the areas where this mandated demolition and renovation work is being conducted. This imposes financial burdens on building owners and financial and physical hardships on displaced tenants.

151.    Further, at least some of these significant compliance costs would be borne by residents/tenants through significant rent increases, causing economic hardship to residents/tenants and making Plaintiffs' members' Covered Buildings less competitive with buildings not covered by Energize Denver, ultimately harming their business and rental/tenant prospects in Colorado. Requiring the removal and replacement of perfectly good and functioning EPCA-regulated Covered Products would thus waste already expended capital, waste the resources used for the manufacture of the current Covered Products that would have to be removed despite having remaining useful life, and require

45

additional resources for disposal of the Covered Products, displace residents, and increase rents. *Id.*

**B. Energize Denver Does Not Meet Any of EPCA's Exemptions to Preemption.**

152.    Energize Denver does not meet any of EPCA's exemptions to preemption. Energize Denver imposes energy conservation standards on all existing Covered Buildings in the City and County of Denver requiring replacement of existing, EPCA compliant, *consumer* and *commercial* Covered Products.

153.    First, to Plaintiffs' knowledge, Defendants have not applied for or obtained the required waiver under EPCA, 42 U.S.C. § 6297(d) for *existing* construction.  Without waiver, regulations that are more stringent than the federal regulations are preempted. Thus, because Energize Denver imposes more stringent requirements and because no waiver has been obtained, Energize Denver is preempted to the extent they regulate existing buildings.

154.    Second, EPCA provides no exemption for energy conservation standards regulating Covered Products in *existing* buildings.   Because Energize Denver imposes energy conservation standards on all existing Covered Buildings in Denver, it is preempted to the extent it regulates *existing* buildings because no waiver has been obtained.

**IV.   Plaintiffs' and Their Members are Injured by Regulation 28 and Energize Denver.**

155.    Plaintiffs, and their members, are injured by Regulation 28 and Energize Denver, and will be irreparably harmed if Regulation 28 and Energize Denver are not

enjoined.

156.    Plaintiffs, and their members, have already experienced and will continue to experience harms in the form of economic injuries, altered business practices, and compliance burdens under Regulation 28 and Energize Denver.

157.    Plaintiffs' members have determined, using Level II ASHRAE Energy Audits, that they will be forced to replace functioning EPCA Compliant Covered Products with remaining useful life in their buildings to meet the building performance standards of Regulation 28 and Energize Denver.  *See* Exhibit 1 at ¶¶ 19-23; Exhibit 2 at ¶¶ 21-24; Exhibit 3 at ¶¶ 18-20; Exhibit 4 at ¶¶ 20-30; Exhibit 5 at ¶¶ 19-24; Exhibit 6 at ¶¶ 18-23; Exhibit 7 at ¶¶ 16-20; Exhibit 8 at ¶¶ 16-19; Exhibit 9 at ¶¶ 18-21; Exhibit 10 at ¶¶ 19-22.

158.    Plaintiffs' members have incurred the costs to contract for and complete Level II ASHRAE Energy Audits which were necessary to determine which Covered Product replacements will be necessary at their Covered Buildings in order to comply with Regulation 28 and Energize Denver.  Level II ASHRAE Energy Audits are not required by either Regulation 28 or Energize Denver (a Covered Building owner could simply comply with the building performance standards), but are critically necessary for a Covered Building owner to determine how to lower their building energy usage to meet the final building performance standards of either regulation.   Plaintiffs' members have incurred these costs under the threat of penalty and enforcement action from Defendants.  *See* Exhibits 1-10.

159.    Plaintiffs must incur the design and engineering costs now to start the process of these Covered Product replacements, because otherwise they risk not

47

meeting the fast-approaching compliance deadlines under Regulation 28 and Energize Denver and being subject to penalty and enforcement actions from Defendants. *See* Exhibit 1 at ¶¶ 25-34; Exhibit 2 at ¶¶ 26-31; Exhibit 3 at ¶¶ 23-28; Exhibit 4 at ¶¶ 29-31; Exhibit 5 at ¶¶ 28-31; Exhibit 6 at ¶¶ 24-27; Exhibit 7 at ¶¶ 22-27; Exhibit 8 at ¶¶ 24-26; Exhibit 9 at ¶¶ 23-30; Exhibit 10 at ¶¶ 24-29.  That is because substantial lead time is necessary to effectuate the replacement of Covered Products by even the farthest out deadline of 2032.

160.    Plaintiffs' members will also imminently experience harms from the loss of competitiveness in rental rates compared to similarly situated buildings that are below the Covered Building thresholds of Regulation 28 and Energize Denver, or buildings located in adjacent states without similar (preempted) energy efficiency standards.

161.    Plaintiffs' members' are also experiencing harms to their business planning, infrastructure investments, hiring decisions, jobs, and livelihoods.  Plaintiffs' members must now replace existing and functioning EPCA compliant Covered Products with remaining useful life, often where that equipment is not even fully paid off.  These costs impair Plaintiffs' members Covered Buildings and the operation and business planning for those Covered Buildings.

162.    Plaintiffs, and their members, have no adequate remedy at law for these irreparable harms.  Unless the Defendants are enjoined from effectuating and enforcing Regulation 28 and Energize Denver, Plaintiffs and their members will continue to be denied their legal rights and the protection against patchwork energy efficiency regulations that EPCA was designed to prevent.

48

163.    There will be no significant harm to Defendants from an injunction because Defendants have no legitimate interest in enforcing invalid laws and regulations.

164.    The balance of harms thus favors injunctive relief.

165.    An injunction is also in the public interest. The public interest is not served by enforcing invalid laws.  Moreover, EPCA embodies a strong public interest in the uniform national regulation of energy conservation and use policy, encouraging diverse domestic supply of energy, and protecting consumer choice, all of which is undermined by conflicting state regulation of these matters, exemplified by Regulation 28 and Energize Denver.

166.    In short, both Regulation 28 and Energize Denver are already causing substantial adverse consequences for Plaintiffs and the public.  The Defendants' efforts to bypass federal law to implement their own energy policies violate EPCA, are contrary to the public interest, and cause irreparable harm to Plaintiffs and their members.

## CAUSES OF ACTION:

## First Cause of Action

## Colorado Regulation 28 is Preempted by EPCA as to Existing Covered Buildings

167.    Plaintiffs re-allege the preceding paragraphs as though set forth fully herein.

168.    Regulation 28 concerns the energy efficiency of Covered Products in existing Covered Buildings in Colorado, requiring Plaintiffs' members to analyze their building energy usage, including the energy usage and efficiency of Covered Products, and

49

implement energy efficiency measures that target Covered Products.

169.    In many cases, Regulation 28 requires the replacement of EPCA compliant consumer and commercial Covered Products in existing Covered Buildings, and is thus preempted by EPCA under 42 U.S.C. § 6297(c); 42 U.S.C. § 6316.

170.    In many cases, Regulation 28 effectively prohibits the use of certain classes of EPCA compliant Covered Products (fossil fuel utilizing Covered Products), and is thus preempted by EPCA under 42 U.S.C. § 6297(c); 42 U.S.C. § 6316.

171.    Regulation 28 does not fall within the exceptions to preemption in EPCA for Covered Products in existing buildings because:

a.    The State of Colorado has not applied for a waiver from preemption.

b.    None of the applicable exemptions for regulations concerning *consumer* or *commercial* Covered Products in new construction in 42 U.S.C. § 6297(f)(3) apply to *existing* buildings.

172.    Regulation 28 violates the Supremacy Clause of Article VI of the United States Constitution, because Congress, under EPCA, has expressly preempted the type of energy conservation standard enacted by Regulation 28 and Regulation 28 fails to meet the exceptions to preemption under EPCA.

173.    Plaintiffs therefore request that the Court (i) declare that Regulation 28 as it is applied to existing buildings is preempted by EPCA, and (ii) enjoin Defendants from enforcing Regulation 28.

**<u>Second Cause of Action</u>**

**The Energize Denver Ordinance and the Energize Denver Regulations are
Preempted by EPCA as to Existing Covered Buildings**

174.    Plaintiffs re-allege the preceding paragraphs as though set forth fully herein.

175.    Energize Denver concerns the energy efficiency of Covered Products in existing Covered Buildings in Denver, requiring Plaintiffs' members to analyze their building energy usage, including the energy usage and efficiency of Covered Products, and implement energy efficiency measures that target Covered Products.

176.    In many cases, Energize Denver requires the replacement of EPCA compliant consumer and commercial Covered Products in existing Covered Buildings, and is thus preempted by EPCA under 42 U.S.C. § 6297(c); 42 U.S.C. § 6316.

177.    Additionally Energize Denver effectively prohibits the use of certain classes of EPCA compliant Covered Products (fossil fuel utilizing Covered Products), and is thus preempted by EPCA under 42 U.S.C. § 6297(c); 42 U.S.C. § 6316.

178.    Energize Denver does not fall within the exceptions to preemption in EPCA for existing buildings because:

a.    The City and County of Denver has not applied for a waiver from preemption.

b.    None of the applicable exemptions for *consumer* or *commercial* Covered Products in new construction in 42 U.S.C. § 6297(f)(3) apply to existing buildings.

179.    Energize Denver violates the Supremacy Clause of Article VI of the United

51

States Constitution because Congress, under EPCA, has expressly preempted the type of energy conservation standard enacted by Energize Denver, and Energize Denver fails to meet the exceptions to preemption under EPCA.

180. Plaintiffs therefore request that the Court (i) declare that the Energize Denver Ordinance and the Energize Denver Regulations as they are applied to existing buildings are preempted by EPCA, and (ii) enjoin Defendants from enforcing the Energize Denver Ordinance and the Energize Denver Regulations.

## REQUESTED RELIEF

181. Plaintiffs request that the Court award the following relief:

a. Issue a declaratory judgment under 28 U.S.C. § 2201(a) that Regulation 28, the Energize Denver Ordinance, and the Energize Denver Regulations are preempted by EPCA and are therefore void and unenforceable;

b. Issue a preliminary injunction enjoining Defendants from implementing and enforcing Regulation 28, the Energize Denver Ordinance, and the Energize Denver Regulations during the pendency of this action;

c. Issue a permanent injunction enjoining Defendants from implementing and enforcing Regulation 28, the Energize Denver Ordinance, and the Energize Denver Regulations;

d. Grant Plaintiffs costs of this suit, including reasonable attorneys' fees; and

e. Grant such other and further relief as the Court may deem just and proper.

Dated: June 10, 2025                    Respectfully submitted,


                                        GREENBERG TRAURIG, LLP

                                        /s/ *Paul M. Seby*
                                        Paul M. Seby
                                        Matthew K. Tieslau
                                        GREENBERG TRAURIG, LLP
                                        1144 15th Street, Suite 3300
                                        Denver, Colorado 80202
                                        Phone Number:  303.572.6500
                                        Fax Number: 303.572.6540
                                        E-Mail:    SebyP@gtlaw.com
                                                   TieslauM@gtlaw.com

                                        ATTORNEYS FOR PLAINTIFFS

                                        *Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:24-cv-01093-RMR

**COLORADO APARTMENT ASSOCIATION et al.**

          Plaintiffs,

**v.**

**JILL HUNSAKER RYAN, in her Official Capacity as the Executive Director of the Colorado Department of Public Health and Environment, et al.**

          Defendants.

**COALITION FOR COMMUNITY SOLAR ACCESS, et al.**

          Intervenor-Defendants.

_____

**Declaration of Elizabeth Schloss**

I, Elizabeth Schloss, declare as follows:

1.  My name is Elizabeth Schloss.  I am over 18 years of age.  The information in this declaration is true and correct to the best of my knowledge, information, and belief and is based on my personal experience.

2.  I live in Scottsdale, Arizona.

3.  I am currently the Chief Operating Officer at Baron Property Services, LLC ("Baron").

4.  In my position as the Chief Operating Officer, I oversee all aspects of capital improvements, regulatory compliance, and renovations to our multifamily assets.

5.  As Chief Operating Officer, I am familiar with the day-to-day and long-term operations of Baron in Colorado, and am qualified and authorized by Baron to speak to the matters discussed in this declaration.

6.  Baron is a member of the Colorado Apartment Association ("CAA") and the Apartment Association of Metro Denver ("AAMD"), and has been since 1997.

7.  As a member of CAA and AAMD, Baron relies on CAA and AAMD to represent its interests in the City and County of Denver, Colorado and the State of Colorado, including advocating for regulations that comply with state and federal law.

8.  Baron  owns and operates two multifamily buildings subject to the requirements of the City of Denver, Colorado's Denver Ordinance No. 20211310 ("Energize Denver Ordinance"), and the implementing rules for Energize Denver enacted by the Denver Office of Climate Action, Sustainability, and Resiliency, ("OCASR") entitled "Rules & Regulations Governing Energize Denver Building Energy Performance Requirements" ("Energize Denver Regulations") (the Ordinance and Regulations may be

2

collectively referred to as "Energize Denver"), including as modified April 1, 2025.

9.    These two multi-family buildings are also subject to the requirements of the Colorado Air Quality Control Commission's ("Commission") final regulation entitled Building Benchmarking and Performance Standards, 5 CCR 1001-32 ("Regulation 28") enacting agency regulations directed by the State of Colorado's House Bill 21-1286, including as modified by recently by House Bill 25-1269.

10.    Those buildings are: (1) the Harper, 8680 E. Alameda Avenue, Denver, Colorado 80247; and (2) the Belmont Buckingham, 1050 Sherman Street, Denver, Colorado 80203.

11.    The Harper is a 213,920 square foot building originally developed in 1973 that underwent a substantial renovation in 2022.  The net rentable area of all units is 181,897 square feet, with 253 individual units housing approximately 530 tenants. Amenities include built-in dishwashers, Energy Star appliances (refrigerators), central laundry facilities, bike storage, fitness center and a package receiving area. The Property has an in-ground automatic sprinkler system that is fed entirely from an on-site pond.

12.    The Belmont Buckingham is a 157,800 square foot building originally developed in 1923 that underwent a substantial renovation in 2017.  The net rentable area of all units is 106,983 square feet, with 122 rentable units housing approximately 260 tenants. Amenities include property-owned washer/dryers, built-in dishwashers, Energy Star appliances (refrigerators and most dishwashers), central laundry facility, a movie room, a community lounge with kitchen, a fitness center, seating areas, a business center, Leasing Office and outdoor pet park. The Property has an in-ground automatic sprinkler system.

## **Benchmarking**

13.     Baron conducted "benchmarking" for the Harper and Belmont Buckingham as required by Energize Denver and Regulation 28, and timely submitted benchmarking under both regulations.    Benchmarking consists of reviewing utility and energy usage documentation to measure and assess a buildings' energy performance and related direct or indirect greenhouse gas emissions for a reporting year (indirect greenhouse gas emissions are not emitted from the building itself but are calculated from the energy used at the building).  Benchmarking does not involve conducting an energy audit to determine what must be done at the building to comply with the performance requirements of Regulation 28 or Energize Denver, such as implementing energy efficiency practices or replacing energy consuming equipment to decrease the amount of energy the building consumes or the greenhouse gas emissions produced by the building's operation.

14.     The Harper's current Site Energy Use Intensity ("EUI") score is 71.2.  The Harper's 2019 baseline Site EUI score was 77.1.  Under Energize Denver, the Harper is required to achieve a Site EUI score of 62.1 by 2025, 53.2 by 2027, and 44.7 by 2030. Under Regulation 28, the Harper is required to achieve a Site EUI of 50.6 by 2026, and 42.1 by 2030 under the energy efficiency compliance pathway; or 67.1 by 2026 and 54.7 by 2030 under the standard percent reduction pathway.  The Harper's current Greenhouse Gase Intenisty ("GHGi") score is 5.657, with a 2026 target under Regulation 28 of 3.1 and a 2030 target of 1.9 under the GHGi target pathway, or a 2026 target of 4.922 and a 2030 target of 4.017 under the GHGi standard percent reduction pathway under Regulation 28.

15.     The Belmont Buckingham's current Site EUI score is 66.2.  The Belmont Buckingham's 2019 baseline Site EUI score was 68.3.  Under Energize Denver, the Belmont Buckingham is required to achieve a Site EUI score of 57.3 by 2025, 50.8 by

4

2027, and 44.2 by 2030.  Under Regulation 28, the Belmont Buckingham is required to achieve a Site EUI of 50.6 by 2026, and 42.1 by 2030 under the energy efficiency compliance pathway, or 59.4 by 2026 and 48.5 by 2030 under the standard percent reduction pathway.   The Belmont Buckingham's current GHGi score is 4.56, with a 2026 target under Regulation 28 of 3.1 and a 2030 target of 1.9 under the GHGi target pathway, or a 2026 target of 3.96 and a 2030 target of 3.24 under the GHGi standard percent reduction pathway under Regulation 28.

16.    Based on the benchmarking, Baron's Harper and Belmont Buckingham buildings have EUI and GHGi scores that do not meet the building performance standards that must be achieved under both Energize Denver and Regulation 28.  As such, the energy consumed at Baron's Harper and Belmont Buckingham buildings must be significantly reduced to meet the final building performance standards, expressed in terms of EUI, for both Regulation 28 or Energize Denver.

## ASHRAE Energy Auditing and Forced Replacement of Energy Policy and Conservation Act Regulated Equipment

17.    In order to determine what measures must be taken to meet the building performance standards of Regulation 28 and Energize Denver, Baron has not choice but to conduct Level II ASHRAE Audits, using a protocol developed by the American Society of Heating, Refrigerating, and Air-Conditioning Engineers (ASHRAE) that entails a detailed evaluation of a building's energy use, with the aim of identifying opportunities for improving energy efficiency.   Without this information, Baron is unable to determine its options for achieving the potential energy reductions necessary to meet the building performance standards of Regulation 28 and Energize Denver.

18.    Baron contracted with a qualified energy auditing consultant to conduct Level

5

II ASHRAE energy audits in 2024 at its Harper and Belmont Buckingham properties. The ASHRAE Level II Audits were conducted to determine whether the initial benchmarking data was accurate, and to identify what range of energy use reduction options were available in order to comply with Energize Denver and Regulation 28. This information was used to begin the planning process for making material modifications to Baron's buildings to implement the chosen options, in order to meet the fast-approaching compliance deadlines and corresponding EUI building performance standards under Energize Denver and Regulation 28.

19.    These Level II ASHRAE energy audits have been completed, and they conclude that each building cannot not meet the current final building performance standards under Energize Denver and Regulation 28 without implementing significant energy efficiency measures (replacing shower heads and faucet areators, retrofitting lights, replacing toilets with lower flow models), installing an on-site solar rooftop array at both buildings, and replacing existing gas-fired domestic water heaters used for domestic water with electrified heat-pump water heaters and gas-fired hot water boilers used for building heat with electrified heat-pump water heating boilers.

20.    The energy efficiency and solar measures, by themselves, will not bring these buildings into timely compliance: the ASHRAE Level II audits demonstrated that equipment replacement will also be necessary.

21.    For example, for the Harper, energy efficiency measures such as replacing shower heads, faucets, toilets, and lights will only achieve an estimated 1.1 EUI reduction. Installing a rooftop solar array will only account for another estimated 10.0 point EUI reduction. From the current Site EUI score of a 71.2, that only results in a 61.2 EUI score, still well short of the 44.7 (Energize Denver) and 54.7 (Regulation 28) 2030 standards. For

6

the GHGi pathway under Regulation 28, implementing all of the above efficiency measures, solar array, and replacing boilers will result in a 3.9 GHGi score for the property, barely meeting the 2030 GHGi reduction standard of 4.017 under the standard percent reduction pathway.  It is thus only with replacing existing gas-fired domestic water heaters used for domestic water with electrified heat-pump water heaters and gas-fired hot water boilers used for building heat with electrified heat-pump water heating boilers that the Harper can achieve the required 2030 standards under Energize Denver and Regulation 28.

22.    Replacing the boilers used for building heat and domestic water heating at the Harper is expected to cost at least $160,000 at the Harper, not accounting for engineering, design, and electrical infrastructure upgrade costs. That is because the estimated costs from the ASHRAE audit only take into account material and labor costs based on RSmeans[1] values, do not include design engineering costs, any necessary electrical infrastructure upgrade costs, or any other potential costs or barriers to installation including tenant displacement, lost rent, and building challenges such as asbestos in areas that will be disturbed.

23.    Similarly, for the Belmont Buckingham, energy efficiency measures such as replacing shower heads, faucets, toilets, and lights will only achieve an estimated .83 EUI reduction. Installing a rooftop solar array will only account for another estimated 3.69 point EUI reduction.  From the current Site EUI score of a 66.2, that only results in a 61.68 EUI score, still well short of the 44.2 (Energize Denver) and 48.5 (Regulation 28) 2030

---

[1] RSMeans is a proprietary construction estimating software with a database of expected construction cost estimates.  *See* https://www.rsmeans.com/info/contact/about-us (Last visited June 4, 2025)

7

standards.  For the GHGi pathway under Regulation 28, implementing all of the above efficiency measures, solar array, and replacing boilers will result in a 4.3 GHGi score for the property, above the 2030 GHGi reduction standard of 3.24 under the standard percent reduction pathway.  It is only with replacing existing gas-fired domestic water heaters used for domestic water with electrified heat-pump water heaters and gas-fired hot water boilers used for building heat with electrified heat-pump water heating boilers that the Harper can achieve the required 2030 standards under Energize Denver and Regulation 28.

24.    Replacing the boilers used for building heat at the Belmont Buckingham is expected to cost at least $540,000, not accounting for engineering, design, and electrical infrastructure upgrade costs.  That is because the estimated costs from the ASHRAE audit only take into account material and labor costs based on RSmeans values, do not include design engineering costs, any necessary electrical infrastructure upgrade costs, or any other potential costs or barriers to installation including tenant displacement, lost rent, and building challenges such as asbestos in areas that will be disturbed.

25.    These costs also don't take into account the lost economic value of replacing perfectly good operating units that have a long remaining useful life (the hot water boilers used for building heat have a typical useful life of over 20 years). The hot water boilers at the Harper property were installed in 2022, and some of the boilers requiring replacement at the Belmont Buckingham were installed in 2019 and 2020.  Further, these costs do not include other design challenges, including whether there is sufficient clearance for the replacement units or necessary electrical infrastructure.

26.    Based on the information and evaluation generated by the Level II ASHRAE energy audits discussed above, the forced replacement of the existing domestic water heater boilers and building heating hot water boilers will be necessary to meet the

8

performance requirements regardless of the compliance pathways chosen under Energize Denver and Regulation 28 – including the default compliance pathway, the standard percentage reduction pathway, or the GHG intensity pathway.

27.    According to Baron's Level II ASHRAE energy audits, the boiler replacements will not have a positive cashflow or return on investment, especially because of the remaining useful life of that equipment and the fact that utility costs for electric heat pump boilers exceed those of the existing natural gas-fired boilers. In other words, Baron will be removing functioning units with a long remaining useful life and replacing them with costly units that have higher operating costs, meaning that the losses to Baron will extend into the future.

28.    Further, the Level II ASHRAE energy audits reported that it may be difficult to find an adequately sized heat pump  on the market at this time to replace the existing large building heat boilers without additional (and costly) custom engineering and design. Therefore, electric replacement options for larger boilers could be limited to electric resistance models which have even lower efficiencies and will drive up utility costs.

29.    To be able to implement the boiler replacements in time to comply with the compliance deadlines in Regulation 28 and Energize Denver, Baron must immediately start the process of hiring design and construction engineering consultants, developing the plans, specifying and procuring equipment, and the other measures necessary to such disruptive and capital-intensive infrastructure projects.  Baron is incurring these costs now. A Level II ASHRAE energy audit does not include the necessary design specifications, including actually sourcing the necessary equipment, determining if building infrastructure modifications are necessary, and determining if existing electrical infrastructure is adequate.

9

30.    Due to current project lead times on procuring boiler equipment, Baron must immediately start on the process of design engineering and product specification in order to have the equipment delivered and installed by the current final 2030 compliance dates. The lengthy procurement lead times, and equipment supply and costs, will be exacerbated by the sector-wide effect of these requirements, since building owners throughout the State will be seeking to purchase and install similar equipment.  This remains true even if Baron's timelines are extended under Regulation 28 or Energize Denver, as extending the timelines to 2031 or 2032 will not make a material difference in the need to start planning for equipment replacement now.

31.    Total costs to meet the building performance standards of Energize Denver and Regulation 28 at the Belmont Buckingham are expected to cost at least $1 million, again not accounting for the necessary engineering, design, and electrical infrastructure upgrade costs.

32.    Total expected energy efficiency measure costs to meet the building performance standards of Energize Denver and Regulation 28 at the Harper are expected to cost at least $1.19 million, again not accounting for the necessary engineering, design, and electrical infrastructure upgrade costs.

33.    Additionally, to replace critical building systems such as the domestic water boilers and heating boilers, Baron expects it will incur additional burdens and expenses in the form of tenant displacement and lost revenue.

34.    These costs were not anticipated as a part of Baron's regular maintenance and capital outlays for the properties, and will be a significant burden.

10

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:

6/5/2025

By:

_Liz Schloss_

Elizabeth Schloss
Chief Operating Officer
Baron Property Services, LLC

11

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:24-cv-01093-RMR

**COLORADO APARTMENT ASSOCIATION et al.**

            Plaintiffs,

**v.**

**JILL HUNSAKER RYAN, in her Official Capacity as the Executive Director of the Colorado Department of Public Health and Environment, et al.**

            Defendants.

**COALITION FOR COMMUNITY SOLAR ACCESS, et al.**

            Intervenor-Defendants.

_____

**Declaration of James A. Lorenzen**

I, James A. Lorenzen, declare as follows:

1.      My name is James A. Lorenzen.  I am over 18 years of age.  The information in this declaration is true and correct to the best of my knowledge, information, and belief and is based on my personal experience.

2.      I live in Denver, Colorado.

3.      I am currently the owner of the James A. Lorenzen Profit Sharing Plan, an entity that owns multifamily properties in Colorado.

4.      As owner of the James A. Lorenzen Profit Sharing Plan, I oversee and am familiar with the Plan's assets and planned capital improvements, regulatory compliance, and renovations to the Plan's multifamily assets.

5.      I am also familiar with the day-to-day and long-term operations of James A. Lorenzen Profit Sharing Plan in Colorado, and I am qualified and authorized by James A. Lorenzen Profit Sharing Plan to speak to the matters discussed in this declaration.

6.      I am personally a member of the Colorado Apartment Association ("CAA") and the Apartment Association of Metro Denver ("AAMD"), and have been for over 30 years.

7.      As a member of CAA and AAMD, the I rely on CAA and AAMD to represent its interests in the City and County of Denver, Colorado and the State of Colorado, including advocating for regulations that comply with state and federal law.

8.      I am also currently the President of Cornerstone Apartment Services, Inc. ("Cornerstone").  Cornerstone focuses exclusively on managing apartment properties in Denver's urban core.

9.      In my position as the President of Cornerstone, I oversee and am familiar

2

with Cornerstones' management of multifamily assets in Denver, and the planned capital improvements, regulatory compliance, and renovations to those managed multifamily assets.

10.    As President of Cornerstone, I am also familiar with the day-to-day and long-term operations of Cornerstone in Colorado, and I am qualified and authorized by Cornerstone to speak to the matters discussed in this declaration.

11.    Cornerstone is a member of the Colorado Apartment Association ("CAA") and the Apartment Association of Metro Denver ("AAMD"), and has been since September 9, 1991.

12.    As a member of CAA and AAMD, Cornerstone relies on CAA and AAMD to represent its interests in the City and County of Denver, Colorado and the State of Colorado, including advocating for regulations that comply with state and federal law.

13.    The James A. Lorenzen Profit Sharing Plan is a 45% co-owner of the 1300 Apartments at 1300 Monroe St., Denver, Colorado 80206.    The 1300 Apartments are managed by Cornerstone.

14.    The 1300 Apartments are a 34,295 square foot, five story apartment building that contains 43 individual apartments.  A central gas fired boiler provides space heat to all apartments and common areas via hydronic baseboard heaters.  Each apartment is equipped with one or more through-wall packaged terminal air-conditioning units providing cooling.  Domestic hot water is supplied by a central water heater with a storage tank.

15.    The 1300 Apartments are subject to the requirements of the City of Denver, Colorado's Denver Ordinance No. 20211310 ("Energize Denver Ordinance"), and the implementing rules for Energize Denver enacted by the Denver Office of Climate Action, Sustainability, and Resiliency, ("OCASR") entitled "Rules & Regulations Governing

3

Energize Denver Building Energy Performance Requirements" ("Energize Denver Regulations") (the Ordinance and Regulations may be collectively referred to as "Energize Denver"), including as modified April 1, 2025.

## Benchmarking

16.    Cornerstone, on behalf of the James A. Lorenzen Profit Sharing Plan and other co-owners of the 1300 Apartments, has conducted "benchmarking" for the 1300 Apartments as required by Energize Denver.  Benchmarking consists of reviewing utility and energy usage documentation to measure and assess a buildings' energy performance and related direct or indirect greenhouse gas emissions for a reporting year (indirect greenhouse gas emissions are not emitted from the building itself but are calculated from the energy used at the building).  Benchmarking does not involve conducting an energy audit to determine what must be done at the building to comply with the performance requirements of Energize Denver, such as implementing energy efficiency practices or replacing energy consuming equipment to decrease the amount of energy consumed, or the greenhouse gas emissions produced, by the building's operation.

17.    The 1300 Apartments' current Site Energy Use Intensity ("EUI") score is 79.9. The 1300 Apartments' 2019 baseline Site EUI score was 75.0.  The 1300 Apartments 2020 Site EUI Score was 80.0, and was approved as an alternative baseline year.  The 1300 Apartments are required to achieve a Site EUI score of 64.7 by 2027, and 44.2 by 2030 under the default pathway.  Under the currently approved alternate 2020 baseline year, the 1300 Apartments are required to achieve a 64.7 EUI by 2028, and a 46.4 EUI by 2032.

18.    Based on the benchmarking performed, the 1300 Apartments have EUI scores that do not meet the building performance standards that must be achieved under Energize Denver.  As such, the energy consumed at the 1300 Apartments must be

4

significantly reduced to meet the final building performance standards for Energize Denver.

## ASHRAE Energy Auditing and Forced Replacement of Energy Policy and Conservation Act Regulated Equipment

19.     In order to determine what measures must be taken meet the building performance standards of Energize Denver, Cornerstone had no choice but to conduct a Level II ASHRAE Audit, using a protocol developed by the American Society of Heating, Refrigerating, and Air-Conditioning Engineers (ASHRAE) that entails a detailed evaluation of a building's energy use, with the aim of identifying opportunities for improving energy efficiency.   Without this information, Cornerstone would have been unable to determine its options for achieving the potential energy reductions necessary to meet the building performance standards of Energize Denver.

20.     Cornerstone contracted with a qualified energy auditing consultant to conduct a Level II ASHRAE Energy Audit in 2024 for the 1300 Apartments. The ASHRAE Level II Audits were conducted to determine whether the initial benchmarking data was accurate, and to identify what range of energy use reduction options were available in order to comply with Energize Denver.  This information was used to begin the planning process for making material modifications to Cornerstone existing buildings to implement the chosen options, in order to meet the fast-approaching compliance deadlines and corresponding EUI building performance standards under Energize Denver.

21.     For the 1300 Apartments, the Level II ASHRAE Energy Audit concludes that the property cannot not meet the current final building performance standards under Energize Denver without implementing significant energy efficiency measures (installing exterior and interior LED lighting, low flow fixtures, and programmable thermostats) and replacing the existing heating water boiler with a high efficiency boiler with a variable

5

frequency drive ("VFD"), upgrading existing baseboard heaters to include hydronic fan convectors, adding a central air-source reversible chiller (heat pump) to the buildings existing water heating system, and replacing the building's existing domestic water heating boiler with a high efficiency modulating condensing water heater.

22.     The energy efficiency measures (installing exterior and interior LED lighting, low flow fixtures, and programmable thermostats), by themselves, will not bring the 1300 Apartments into timely compliance: the ASHRAE Level II audit demonstrated that existing building heating, cooling, and domestic water heating equipment replacement will also be necessary – including replacing existing building boilers for space heating and domestic water heating to meet the final 2032 building performance standards for Energize Denver.

23.     For example, for the 1300 Apartments, energy efficiency measures such as installing exterior and interior LED lighting, low flow fixtures, and programmable thermostats will only achieve an estimated 9.46 EUI reduction.  From the current Site EUI score of a 79.9, that only results in a 70.44 EUI score, still well short of the 64.7 EUI by 2028, and a 46.4 EUI by 2032 standards for Energize Denver.

24.     To that end, the 1300 Apartments' Level II ASHRAE energy audit recommends that the building replace the existing heating water boiler with a high efficiency boiler with a variable frequency drive ("VFD"), upgrading existing baseboard heaters to include hydronic fan convectors, adding a central air-source reversible chiller (heat pump) to the buildings existing water heating system, and replacing the building's existing domestic water heating boiler with a high efficiency modulating condensing water heater.

25.     The Level II ASHRAE energy audit for the 1300 Apartments estimates that the net installation cost of (including rebates) of these building heating and cooling, and

6

domestic water heating equipment replacement measures will be over $440,000. Further, these costs do not include design engineering costs, any necessary electrical infrastructure upgrade costs, or any other potential costs or barriers to installation including tenant displacement, lost rent, and building challenges such as asbestos in areas that will be disturbed.

26.    The above-noted costs for the 1300 Apartments also don't take into account the lost economic value of replacing perfectly good operating HVAC units that have a long remaining useful life.  Further, these costs do not include other design challenges, including whether there is sufficient clearance for the replacement units or necessary electrical infrastructure.

27.    Based on the information and evaluation generated by the Level II ASHRAE energy audit discussed above, the forced replacement of existing building heating, cooling, and domestic water heating equipment will be necessary for the 1300 Apartments to meet the performance requirements regardless of the compliance pathways chosen under Energize Denver.

28.    To be able to implement the necessary heating, cooling, and domestic water heating equipment replacements in time to comply with the compliance deadlines Energize Denver, Cornerstone must immediately start the process of hiring design and construction engineering consultants, conducting further electrification studies, developing the plans, specifying and procuring equipment, and the other measures necessary to such disruptive and capital-intensive infrastructure projects.  Cornerstone incurring these costs now.  A Level II ASHRAE energy audit does not include the necessary design specifications, including actually sourcing the necessary equipment, determining if building infrastructure modifications are necessary, and determining if existing electrical infrastructure is

7

adequate.

29.    Due to current project lead times on procuring equipment, Cornerstone believes it must immediately start on the process of design engineering and product specification in order to have the necessary equipment replacements determined, delivered, and installed by the current final 2032 compliance dates. The lengthy procurement lead times, and equipment supply and costs, will be exacerbated by the sector-wide effect of these requirements, since building owners throughout the State will be seeking similar equipment.

30.    Additionally, to replace critical building systems such as the heating, cooling, and domestic water heating equipment systems, Cornerstone expects it will incur additional burdens and expenses in the form of tenant displacement and lost revenue.

31.    These costs were not anticipated as a part of Cornerstone' regular maintenance and capital outlays for the 1300 Apartments, and will be a significant burden to the James A. Lorenzen Profit Sharing Plan and other co-owners of the 1300 Apartments.

8

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:

6-2-2025

By:

James A. Lorenzen
President, James A. Lorenzen Profit
Sharing Plan
Cornerstone Apartment Services, Inc.

9

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:24-cv-01093-RMR

**COLORADO APARTMENT ASSOCIATION et al.**

     Plaintiffs,

**v.**

**JILL HUNSAKER RYAN, in her Official Capacity as the Executive Director of the Colorado Department of Public Health and Environment, et al.**

     Defendants.

**COALITION FOR COMMUNITY SOLAR ACCESS, et al.**

     Intervenor-Defendants.

_____

**Declaration of Craig M. Lessard**

I, Craig M. Lessard, declare as follows:

1.      My name is Craig M. Lessard.  I am over 18 years of age.  The information in this declaration is true and correct to the best of my knowledge, information, and belief and is based on my personal experience.

2.      I live in Denver, Colorado.

3.      I am currently the Director of Acquisitions at Woodspear PM-Member, LLC, a Colorado Limited Liability Company d/b/a Woodspear Properties (hereinafter "Woodspear Properties").

4.      In my position as the Director of Acquisitions of Woodspear Properties, I oversee and am familiar with Woodspear Properties' assets and planned capital improvements, regulatory compliance, and renovations to our multifamily assets.

5.      As Director of Acquisitions of Woodspear Properties, I am also familiar with the day-to-day and long-term operations of Woodspear Properties in Colorado, and I am qualified and authorized by Woodspear Properties to speak to the matters discussed in this declaration.

6.      Woodspear Properties is a member of the Colorado Apartment Association ("CAA") and the Apartment Association of Metro Denver ("AAMD"), and has been since April 1, 2023.

7.      As a member of CAA and AAMD, Woodspear Properties relies on CAA and AAMD to represent its interests in the City and County of Denver, Colorado and the State of Colorado, including advocating for regulations that comply with state and federal law.

8.      Woodspear Properties owns, operates, and manages the Sleek Lofts at 770 Grant St., Denver, Colorado 80203.

2

9.      The Sleek Lofts are a 49,149 square foot apartment building.  The building includes 60 dwelling units, common corridors, a lobby with office, and parking garage covering half of the ground floor, as well as auxiliary spaces such as a mechanical and electrical.  The Sleek Lofts' existing storage tank style gas domestic hot water heaters were installed in 2019, and the existing heating water boiler is 15-20 years old and understood to be in good working condition.  The majority of the buildings original fluorescent lighting has been replaced with LED lighting, including in residential units, corridors, and the parking garage.

10.     The Sleek Lofts are subject to the requirements of the City of Denver, Colorado's Denver Ordinance No. 20211310 ("Energize Denver Ordinance"), and the implementing rules for Energize Denver enacted by the Denver Office of Climate Action, Sustainability, and Resiliency, ("OCASR") entitled "Rules & Regulations Governing Energize Denver Building Energy Performance Requirements" ("Energize Denver Regulations") (the Ordinance and Regulations may be collectively referred to as "Energize Denver"), including as modified April 1, 2025.

### Benchmarking

11.     Woodspear Properties has conducted "benchmarking" for the Sleek Lofts as required by Energize Denver.  Benchmarking consists of reviewing utility and energy usage documentation to measure and assess a buildings' energy performance and related direct or indirect greenhouse gas emissions for a reporting year (indirect greenhouse gas emissions are not emitted from the building itself but are calculated from the energy used at the building).  Benchmarking does not involve conducting an energy audit to determine what must be done at the building to comply with the performance requirements of Energize Denver, such as implementing energy efficiency practices or replacing energy consuming

3

equipment to decrease the amount of energy consumed, or the greenhouse gas emissions produced, by the building's operation.

12.     The Sleek Lofts' Site Energy Use Intensity ("EUI") score as of 2023 was a 64.0.  The Sleek Lofts' 2019 baseline Site EUI score was 64.8.  Under Energize Denver, the Sleek Lofts are required to achieve a Site EUI score of 49.8 by 2027, and 44.2 by 2030 under the default pathway.  Under the maximum percentage reduction pathway for Energize Denver (42%), the total reduction would be greater and was not analyzed by Woodspear Properties' energy consultant.

13.     Based on the benchmarking performed, the Sleek Lofts have EUI scores that do not meet the building performance standards that must be achieved under Energize Denver.  As such, the energy consumed at the Sleek Lofts must be significantly reduced to meet the final building performance standards for Energize Denver.

**ASHRAE Energy Auditing and Forced Replacement of Energy Policy and Conservation Act Regulated Equipment**

14.     In order to determine what measures must be taken meet the building performance standards of Energize Denver, Woodspear Properties had no choice but to conduct a Level II ASHRAE Audit, using a protocol developed by the American Society of Heating, Refrigerating, and Air-Conditioning Engineers (ASHRAE) that entails a detailed evaluation of a building's energy use, with the aim of identifying opportunities for improving energy efficiency.   Without this information, Woodspear Properties would have been unable to determine its options for achieving the potential energy reductions necessary to meet the building performance standards of Energize Denver.

15.     Woodspear Properties contracted with a qualified energy auditing consultant to conduct a Level II ASHRAE Energy Audit in 2024 for the Sleek Lofts. The ASHRAE

4

Level II Audits were conducted to determine whether the initial benchmarking data was accurate, and to identify what range of energy use reduction options were available in order to comply with Energize Denver. This information was used to begin the planning process for making material modifications to Woodspear Properties existing buildings to implement the chosen options, in order to meet the fast-approaching compliance deadlines and corresponding EUI building performance standards under Energize Denver.

16.    For the Sleek Lofts, the Level II ASHRAE Energy Audit concludes that the property cannot not meet the current final building performance standards under Energize Denver without implementing significant energy efficiency measures (adjusting the garage thermostat set point, a hot water reset on the heating boiler, LED light replacements, occupancy sensors on lighting, and window replacements), installing a rooftop solar array, and replacing and electrifying the existing gas-fired domestic water heaters with a centralized heat pump water heater.

17.    The energy efficiency measures (adjusting the garage thermostat set point, a hot water reset on the heating boiler, LED light replacements, occupancy sensors on lighting, and window replacements) and rooftop solar array, by themselves, will not bring the Sleek Lofts into timely compliance: the ASHRAE Level II audit demonstrated that replacing and electrifying the existing gas-fired domestic water heaters with a centralized heat pump water heater will be necessary to meet the final building performance standards for Energize Denver.

18.    For example, for the Sleek Lofts, energy efficiency measures such as adjusting the garage thermostat set point, a hot water reset on the heating boiler, LED light replacements, occupancy sensors on lighting, and window replacements will only result in a 59.6 EUI score, still well short of the 49.8 by 2027, and a 44.2 by 2030 EUI standards for

5

Energize Denver.  Further, the occupancy sensor EUI reduction will likely be lower, as it assumed occupancy sensors on all lighting, including in apartment units.  However, it is impractical to install lighting in residential apartment units, as in Woodspear Properties' experience, tenants do not tolerate occupancy sensors and would override them.

19.    Installing a rooftop solar array is expected to drop the properties' EUI score to an estimated 50.9 EUI score, also short of the 2030 standards under Energize Denver.

20.    To that end, the Sleek Lofts' Level II ASHRAE energy audit recommends that the building replace and electrify the existing gas-fired domestic water heaters with a centralized heat pump water heater, because "[t]he most effective way to reduce energy use in a building of this type is to electrify hot water usage and space heating. Unfortunately, the hot water heater serving the building are only 5 years old and the heating water boiler is 15-20 years old and in good working condition."  Further, the Level II ASHRAE energy audit noted that the consultant noted that it had "reached out to Xcel and received notification that there is a 300kVA transformer on a pole behind the building. This transformer has approximately 50kW available capacity. This is unlikely to support full building electrification" for the heating water boiler and hot water heater, which will raise the costs of those equipment replacements. Further, the existing 300kVA transformer pole services multiple buildings, further decreasing the likelihood there is available capacity, especially in light of the likelihood that nearby buildings will also need additional capacity due to Energize Denver's requirements.  In other words, it is virtually guaranteed that the Woodspear Properties would incur additional costs in upgrading the existing transformer or installing an additional transformer to be able to support electrification of the Sleek Lofts.

21.    The Level II ASHRAE energy audit for the Sleek Lofts estimates that the net installation cost of replacing and electrifying the existing domestic water heaters will be

6

$179,820. Further, these costs do not include design engineering costs, any necessary electrical infrastructure upgrade costs, or any other potential costs or barriers to installation including tenant displacement, lost rent, and building challenges such as asbestos in areas that will be disturbed.

22.    Separately, the cost of installing a solar array was estimated at $391,726, making it a much less cost-effective option for the Sleek Lofts.

23.    The above-noted costs for the Sleek Lofts also don't take into account the lost economic value of replacing perfectly good operating domestic water heating units that have a long remaining useful life.  Further, these costs do not include other design challenges, including whether there is sufficient clearance for the replacement units or necessary electrical infrastructure.

24.    Based on the information and evaluation generated by the Level II ASHRAE energy audit discussed above, the forced replacement and electrification of existing domestic water heating equipment will be necessary for the Sleek Lofts to meet the performance requirements regardless of the compliance pathways chosen under Energize Denver.

25.    To be able to implement the necessary domestic water heating equipment replacements in time to comply with the compliance deadline for Energize Denver, Woodspear Properties must immediately start the process of hiring design and construction engineering consultants, conducting further solar and electrification studies, developing the plans, specifying and procuring equipment, and the other measures necessary to such disruptive and capital-intensive infrastructure projects.  A Level II ASHRAE energy audit does not include the necessary design specifications, including actually sourcing the necessary equipment, determining if building infrastructure

7

modifications are necessary, and determining if existing electrical infrastructure is adequate.

26.    Due to current project lead times on procuring equipment, Woodspear Properties believes it must immediately start on the process of design engineering and product specification in order to have the necessary equipment replacements determined, delivered, and installed by the current final 2030 compliance dates. The lengthy procurement lead times, and equipment supply and costs, will be exacerbated by the sector-wide effect of these requirements, since building owners throughout the State will be seeking similar equipment.  This remains true even if Woodspear Properties' timelines are extended under Energize Denver, as extending the timelines to 2032 will not make a material difference in the need to start planning for equipment replacement now.

27.    Additionally to replace critical building systems such as the heating, cooling, and domestic water heating equipment systems, Woodspear Properties expects it will incur additional burdens and expenses in the form of tenant displacement and lost revenue.

28.    These costs were not anticipated as a part of Woodspear Properties' regular maintenance and capital outlays for the Sleek Lofts and will be a significant burden.

8

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: 6/2/25

By: _____

Craig M. Lessard
Director of Acquisitions
Woodspear Properties

9

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:24-cv-01093-RMR

**COLORADO APARTMENT ASSOCIATION et al.**

          Plaintiffs,

**v.**

**JILL HUNSAKER RYAN, in her Official Capacity as the Executive Director of the Colorado Department of Public Health and Environment, et al.**

          Defendants.

**COALITION FOR COMMUNITY SOLAR ACCESS, et al.**

          Intervenor-Defendants.

_____

**Declaration of Jeff Chan**

I, Jeff Chan, declare as follows:

1.    My name is Jeff Chan.  I am over 18 years of age.  The information in this declaration is true and correct to the best of my knowledge, information, and belief and is based on my personal experience.

2.    I live in San Diego, California.

3.    I am currently the Asset Manager at MG Properties.  MG Properties has over 30 years of experience managing multifamily apartment buildings over 30,000 apartment homes in over 95 communities across the west, including in Colorado.  MG Properties focuses on workforce housing – which in most cases involves investing in existing multifamily properties that require renovations and operational improvements.  MG Properties is fundamentally committed to minimizing environmental impacts at its managed properties through continues improvement of energy performance and sustainable operating practices.

4.    In my position as the Asset Manager at MG Properties, I oversee and am familiar with MG Properties' assets and planned capital improvements, regulatory compliance, and renovations to our multifamily assets.

5.    As Asset Manager at MG Properties, I am also familiar with the day-to-day and long-term operations of MG Properties in Colorado, and I am qualified and authorized by MG Properties to speak to the matters discussed in this declaration.

6.    MG Properties is a member of the Colorado Apartment Association ("CAA") and the Apartment Association of Metro Denver ("AAMD"), and has been since 2022.

7.    As a member of CAA and AAMD, MG Properties relies on CAA and AAMD to represent its interests in the City and County of Denver, Colorado and the State of

2

Colorado, including advocating for regulations that comply with state and federal law.

8.     Two representative multifamily properties owned and operated by MG Properties in Denver, Colorado are: (1) the 3300 Tamarac Apartments, located at 3300 S. Tamarac Drive, Denver, Colorado 80231; and (2) the Bear Valley Park Apartments, located at 5775 W. Dartmouth Ave, Denver Colorado 80227.

9.     The 3300 Tamarac Apartments consist of 14 garden-style multifamily low-rise buildings with 426,129 gross square feet and 411,129 square feet of net rentable area and 15,000 square feet of common areas.  The 3300 Tamarac Apartments were originally developed in 1977.  The 3300 Tamarac Apartments have 564 individual rentable units and maintains an average twelve month occupancy of 92%.  Amenities on site include two outdoor pools, two indoor racquetball courts, a fitness center, dog park, playground, business center, common laundry, and a lounge.  MG Properties is committed to maintaining the 3300 Tamarac Apartments, which have undergone substantial updates since 2022, including: a new roof  ($2.8 million); new windows ($1.6 million); new exterior paint ($595,000); landscaping upgrades ($525,000); parking lot resurfacing ($975,000); hallway upgrades ($923,000); stairwell repairs ($641,000); walkway repairs ($453,000), with total capital expenditures improving the property of $12.8 million since 2022.

10.     The Bear Valley Park Apartments consist of 10 garden style multifamily low-rise apartment buildings with 292,655 gross square feet and 258,660 square feet of net rentable area and 33,995 square feet of common areas.  The Bear Valley Park Apartments were originally developed in 2003.  The Bear Valley Park Apartments have 260 total rentable units and maintains an average twelve month occupancy of 96%.  The amenities on site include a fitness center, outdoor heated pool, dog park, and parking garage.  MG Properties is committed to maintaining the Bear Valley Park Apartments, which have

3

undergone substantial updates since 2022 including: a new roof ($761,000) and a new parking lot ($362,000).

11.      The 3300 Tamarack Apartments and the Bear Valley Park Apartments are subject to the requirements of the City of Denver, Colorado's Denver Ordinance No. 20211310 ("Energize Denver Ordinance"), and the implementing rules for Energize Denver enacted by the Denver Office of Climate Action, Sustainability, and Resiliency, ("OCASR") entitled "Rules & Regulations Governing Energize Denver Building Energy Performance Requirements" ("Energize Denver Regulations") (the Ordinance and Regulations may be collectively referred to as "Energize Denver"), including as modified April 1, 2025.

12.     The 3300 Tamarack Apartments and the Bear Valley Park Apartments are also subject to the requirements of the Colorado Air Quality Control Commission's ("Commission") final regulation entitled Building Benchmarking and Performance Standards, 5 CCR 1001-32 ("Regulation 28") enacting agency regulations directed by the State of Colorado's House Bill 21-1286, including as modified by recently by House Bill 25-1269.

### Benchmarking

13.     MG Properties has conducted "benchmarking" for the 3300 Tamarack Apartments and the Bear Valley Park Apartments as required by Energize Denver and Regulation 28. Benchmarking consists of reviewing utility and energy usage documentation to measure and assess a buildings' energy performance and related direct or indirect greenhouse gas emissions for a reporting year (indirect greenhouse gas emissions are not emitted from the building itself but are calculated from the energy used at the building). Benchmarking does not involve conducting an energy audit to determine what must be done at the building to comply with the performance requirements of Regulation 28 or Energize

4

Denver, such as implementing energy efficiency practices or replacing energy consuming equipment to decrease the amount of energy consumed, or the greenhouse gas emissions produced, by the building's operation.

14.    The 3300 Tamarack Apartments' current Site Energy Use Intensity ("EUI") score is 59.8.  The 3300 Tamarack Apartments' 2019 baseline Site EUI score was 64.6. Under Energize Denver, the 3300 Tamarack Apartments are required to achieve a Site EUI score of 49.8 by 2027, and 44.2 by 2030 under the default pathway.  Under the maximum percentage reduction pathway for Energize Denver (42%), the total reduction would be greater and was not analyzed by MG Properties' energy consultant.  Under Regulation 28, the 3300 Tamarack Apartments are required to achieve a Site EUI of 50.6 by 2026, and 42.1 by 2030 under the energy efficiency compliance pathway, or a 52.051 Site EUI by 2026 and a 42.479 Site EUI by 2030 under the standard percentage reduction pathway.

15.    The Bear Valley Park Apartments' current Site Energy Use Intensity ("EUI") score is 54.3.  The Bear Valley Park Apartments' 2023 baseline Site EUI score was 58.8. Under Energize Denver, the Bear Valley Park Apartments are required to achieve a Site EUI score of 53.1 by 2027, and 46.3 by 2030 under the default pathway.  Under Regulation 28, the Bear Valley Park Apartments are required to achieve a Site EUI of 50.6 by 2026, and 42.1 by 2030 under the energy efficiency compliance pathway. The standard percentage reduction pathway would require greater EUI reductions and was not analyzed by MG Properties' energy consultant.

16.    Based on the benchmarking performed, the 3300 Tamarack Apartments and Bear Valley Park Apartments have EUI scores that do not meet the building performance standards that must be achieved under both Energize Denver and Regulation 28.  As such,

5

the energy consumed at the 3300 Tamarack Apartments and Bear Valley Park Apartments must be significantly reduced to meet the final building performance standards for both Regulation 28 and Energize Denver.

## ASHRAE Energy Auditing and Forced Replacement of Energy Policy and Conservation Act Regulated Equipment

17.    In order to determine what measures must be taken meet the building performance standards of Regulation 28 and Energize Denver, MG Properties had no choice but to conduct Level II ASHRAE Audits, using a protocol developed by the American Society of Heating, Refrigerating, and Air-Conditioning Engineers (ASHRAE) that entails a detailed evaluation of a building's energy use, with the aim of identifying opportunities for improving energy efficiency.   Without this information, MG Properties would have been unable to determine its options for achieving the potential energy reductions necessary to meet the building performance standards of Regulation 28 and Energize Denver.

18.    MG Properties contracted with a qualified energy auditing consultant to conduct a Level II ASHRAE Energy Audit in 2024 for the 3300 Tamarack Apartments and Bear Valley Park Apartments. The ASHRAE Level II Audits were conducted to determine whether the initial benchmarking data was accurate, and to identify what range of energy use reduction options were available in order to comply with Energize Denver and Regulation 28.   This information was used to begin the planning process for making material modifications to MG Properties existing buildings to implement the chosen options, in order to meet the fast-approaching compliance deadlines and corresponding EUI building performance standards under Energize Denver and Regulation 28.

19.    For the 3300 Tamarack Apartments, the Level II ASHRAE Energy Audit concludes that the property cannot not meet the current final building performance

6

standards under Energize Denver and Regulation 28 without implementing significant energy efficiency measures (replacing kitchen and bathroom faucets, showerheads, lighting, and thermostats) <u>and</u> installing demand controllers to fourteen central domestic hot water boilers, replacing the existing boilers' circulation pumps with electronically commutated motors ("ECMs"), replacing two continuous speed pool pumps with variable frequency drive ("VFD") models, and installing new mini-split heat pump systems in 43% of apartments (Energize Denver) or 53% of apartments (Regulation 28).

20.    For example, for the 3300 Tamarack Apartments, energy efficiency measures such as replacing existing replacing kitchen and bathroom faucets, showerheads, lighting, and thermostats will only achieve an estimated 4.5 EUI reduction. From the current Site EUI score of a 59.8, that only results in a 55.3 EUI score, still well short of the 44.2 (Energize Denver) and 42.479 (Regulation 28) 2030 standards.

21.    To that end, the 3300 Tamarack Apartments' Level II ASHRAE energy audit recommends that the building also install demand controllers to fourteen central domestic hot water boilers, replace the existing boilers circulation pumps with ECM motors, replace existing pool pumps with VFD models, and install new mini-split heat pump systems in 43% of apartments to reach the final 2030 targets of Energize Denver and Regulation 28. The Level II ASHRAE energy audit for the 3300 Tamarack Apartments estimates that the cost of installing new mini split heat pumps alone would be $1.091 million (Energize Denver) to $1.345 million (Regulation 28).

22.    The total energy efficiency measures to meet the Energize Denver and Regulation 28 final 2030 standards would cost $1.36 million (Energize Denver) and 1.613 million (Regulation 28)  in installation and equipment costs alone.  Further, these costs do not include design engineering costs, any necessary electrical infrastructure upgrade

7

costs, or any other potential costs or barriers to installation including tenant displacement, lost rent, and building challenges such as asbestos in areas that will be disturbed.

23.    The above-noted costs for the 3300 Tamarack Apartments also don't take into account the lost economic value of replacing perfectly good operating HVAC units that have a long remaining useful life.  Further, these costs do not include other design challenges, including whether there is sufficient clearance for the replacement units or necessary electrical infrastructure.

24.    For the Bear Valley Park Apartments, the Level II ASHRAE Energy Audit concludes that the property cannot not meet the current final building performance standards under Regulation 28 without implementing significant energy efficiency measures (replacing kitchen and bathroom faucets, showerheads, lighting, thermostats, and windows) and replacing the existing gas-fired pool heater and at least 195 existing split system cooling units serving apartments with new 16 SEER split cooling units.

25.    The energy efficiency measures, by themselves, will not bring the Bear Valley Park Apartments into timely compliance: the ASHRAE Level II audits demonstrated that replacement will also be necessary – including replacing a gas-fired pool heater and existing split cooling systems for apartments.

26.    For example, for the Bear Valley Park Apartments, energy efficiency measures such as replacing existing thermostats, faucets, shower heads, lighting, and windows will only achieve an estimated 11.0 EUI reduction.  From the current Site EUI score of a 58.8, that only results in a 47.8 EUI score, still short of the 46.3 (Energize Denver) and 42.1 (Regulation 28) 2030 standards.

27.    To that end, the Bear Valley Park Apartments' Level II ASHRAE energy audit recommends that the building also replace 195 (Energize Denver) and 210 (Regulation

8

28) existing split cooling systems to reach the final 2030 targets of Energize Denver and Regulation 28.

28.    The Level II ASHRAE energy audit for the Bear Valley Park Apartments estimates that the cost of replacing the split cooling systems alone would be $488,000 (Energize Denver) or $525,000 (Regulation 28) with total energy efficiency measures to meet the final 2030 standards at $1.069 (Energize Denver) and $1.077 million (Regulation 28) in installation and equipment costs alone.  Further, these costs do not include design engineering costs, any necessary electrical infrastructure upgrade costs, or any other potential costs or barriers to installation including tenant displacement, lost rent, and building challenges such as asbestos in areas that will be disturbed.

29.    The above-noted costs for the Bear Valley Park Apartments also don't take into account the lost economic value of replacing perfectly good operating HVAC split cooling units that have remaining useful life.  Further, these costs do not include other design challenges, including whether there is sufficient clearance for the replacement units or necessary electrical infrastructure.

30.    Based on the information and evaluation generated by the Level II ASHRAE energy audits discussed above, the forced replacement of existing HVAC equipment will be necessary for the 3300 Tamarack Apartments and Bear Valley Peak Apartment to meet the performance requirements regardless of the compliance pathways chosen under Energize Denver and Regulation 28.

31.    To be able to implement the necessary HVAC replacements in time to comply with the compliance deadlines Regulation 28 and Energize Denver, MG Properties must immediately start the process of hiring design and construction engineering consultants, conducting further solar and electrification studies, developing the plans, specifying and

9

procuring equipment, and the other measures necessary to such disruptive and capital-intensive infrastructure projects.  MG Properties incurring these costs now.   A Level II ASHRAE energy audit does not include the necessary design specifications, including actually sourcing the necessary equipment, determining if building infrastructure modifications are necessary, and determining if existing electrical infrastructure is adequate.

32.    Due to current project lead times on procuring equipment, MG Properties believes it must immediately start on the process of design engineering and product specification in order to have the necessary equipment replacements determined, delivered, and installed by the current final 2030 (or 2032) compliance dates. The lengthy procurement lead times, and equipment supply and costs, will be exacerbated by the sector-wide effect of these requirements, since building owners throughout the State will be seeking similar equipment.  This remains true even if MG Properties' timelines are extended under Regulation 28 or Energize Denver, as extending the timelines to 2031 or 2032 will not make a material difference in the need to start planning for equipment replacement now.

33.    Additionally to replace critical building systems such as the HVAC systems MG Properties expects it will incur additional burdens and expenses in the form of increased time to turn over units during replacements and associated lost revenue.

34.    These costs were not anticipated as a part of MG Properties' regular maintenance and capital outlays for the properties, and will be a significant burden.

10

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury under the laws

of the United States that the foregoing is true and correct to the best of my knowledge,

information, and belief.

Dated:

6/2/2025

_____

By:

_____

Jeff Chan
Asset Manager
MG Properties

11

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:24-cv-01093-RMR

**COLORADO APARTMENT ASSOCIATION et al.**

              Plaintiffs,

**v.**

**JILL HUNSAKER RYAN, in her Official Capacity as the Executive Director of the Colorado Department of Public Health and Environment, et al.**

              Defendants.

**COALITION FOR COMMUNITY SOLAR ACCESS, et al.**

              Intervenor-Defendants.

_____

**Declaration of John Cassell**

I, John Cassell, declare as follows:

1.      My name is John Cassell.  I am over 18 years of age.  The information in this declaration is true and correct to the best of my knowledge, information, and belief and is based on my personal experience.

2.      I live in Overland Park, Kansas.

3.      I am currently the Vice President of Asset Management at DiamondRock Hospitality Company ("DiamondRock").

4.      In my position as the Vice President of Asset Management, I oversee and am familiar with all aspects DiamondRock's capital improvements, regulatory compliance, and renovations to our hotel and resort assets.

5.      As Vice President of Asset Management, I am familiar with the day-to-day and long-term operations of DiamondRock in Colorado, and am qualified and authorized by DiamondRock to speak to the matters discussed in this declaration.

6.      DiamondRock is a member of the Colorado Hotel and Lodging Association, Inc. ("CHLA"), and has been for decades.

7.      As a member of CHLA, DiamondRock relies on CHLA to represent its interests in the City and County of Denver, Colorado and the State of Colorado, including advocating for regulations that comply with state and federal law.

8.      DiamondRock owns two commercial hotel and lodging buildings subject to the requirements of the City of Denver, Colorado's Denver Ordinance No. 20211310 ("Energize Denver Ordinance"), and the implementing rules for Energize Denver enacted by the Denver Office of Climate Action, Sustainability, and Resiliency, ("OCASR") entitled "Rules & Regulations Governing Energize Denver Building Energy Performance Requirements" ("Energize Denver Regulations") (the Ordinance and Regulations may be

2

collectively referred to as "Energize Denver"), including as modified April 1, 2025.

9.      DiamondRock's two commercial hotel and lodging buildings are also subject to the requirements of the Colorado Air Quality Control Commission's ("Commission") final regulation entitled Building Benchmarking and Performance Standards, 5 CCR 1001-32 ("Regulation 28") enacting agency regulations directed by the State of Colorado's House Bill 21-1286, including as modified by recently by House Bill 25-1269.

10.     Those buildings are: (1) the Hotel Clio, 150 Clayton Lane, Denver, Colorado 80206; and (2) the Courtyard Denver Downtown, 934 16th Street Mall, Denver, Colorado 80202.

11.     The Hotel Clio is a 220,728 square foot building originally developed in 2004 and underwent a substantial renovation in 2024.  The Hotel Clio has 199 individual units. Guest room amenities include televisions, coffee makers, mini-fridges, and radios. Common area amenities include a fitness center, business center, an on-site restaurant, and meeting spaces.  The Hotel Clio recently installed new chillers in the 2024 renovation at the property, and already has double-paned windows, LED lighting throughout the building, economizers on Air Handling Units ("AHUs"), a heat exchanger for free cooling during winter months, and variable-frequency drives ("VFDs") on existing pumps and fans.

12.     The Courtyard Denver Downtown is a 151,422 square foot building originally developed in 1893 that went substantial renovations in 1996 and 2020.  The net rentable area of all units is 112,400 square feet, with 177 hotel rooms. Amenities include a business center, shared spaces, and on-site bakery, two kitchens, a restaurant, and on-site central laundry facility, and meeting spaces.  The Courtyard Denver Downtown's existing property improvements include LED lighting in guest rooms and common areas, water-source heat pumps in guest rooms, VFDs on heat pump loop pumps, VFDs on AHU supply fan motors,

3

economizers on AHUs, VFDs on sewage ejection pumps, occupancy sensors in mechanical spaces and common areas, and double glazed windows.

### Benchmarking

13.    DiamondRock conducted "benchmarking" for the Hotel Clio and Courtyard Denver Downtown buildings as required by Energize Denver and Regulation 28 and timely submitted benchmarking under both regulations.  Benchmarking consists of reviewing utility and energy usage documentation to measure and assess a buildings' energy performance and related direct or indirect greenhouse gas emissions for a reporting year (indirect greenhouse gas emissions are not emitted from the building itself but are calculated from the energy used at the building).  Benchmarking does not involve conducting an energy audit to determine what must be done at the building to comply with the performance requirements of Regulation 28 or Energize Denver, such as implementing energy efficiency practices or replacing energy consuming equipment to decrease the amount of energy consumed, or the greenhouse gas emissions produced, by the buildings' operations.

14.    The Hotel Clio's current Site Energy Use Intensity ("EUI") score is 119.1.  The Hotel Clio's 2019 baseline Site EUI score was 124.90.  Under Energize Denver, the Hotel Clio is required to achieve a Site EUI score of 101.0 by 2027, and 72.4 by 2030.  Under Regulation 28, the Hotel Clio is required to achieve a Site EUI of 64.3 by 2026, and 54.3 by 2030 under the energy efficiency compliance pathway; or 108.0 by 2026 and 88.1 by 2030 under the standard percent reduction pathway.  The Hotel Clio's current Greenhouse Gas Intensity ("GHGi") score is 10.4, with a 2026 target under Regulation 28 of 4.0 and a 2030 target of 2.4 under the GHGi target pathway, or a 2026 target of 9.1 and a 2030 target of 7.4 under the GHGi standard percent reduction pathway under Regulation 28.

15.    The Courtyard Denver Downtown's current Site EUI score is 64.2.  The

4

Courtyard Denver Downtown's 2019 baseline Site EUI score was 93.2. Under Energize Denver, the Courtyard Denver Downtown is required to achieve a Site EUI score of 84.4 by 2027 and 61.1 by 2030. Under Regulation 28, the Courtyard Denver Downtown is required to achieve a Site EUI of 64.3 by 2026, and 54.3 by 2030 under the energy efficiency compliance pathway, or 58.38 by 2026 and 47.64 by 2030 under the standard percent reduction pathway. The Courtyard Denver Downtown's current GHGi score is 5.6, with a 2026 target under Regulation 28 of 4.0 and a 2030 target of 2.4 under the GHGi target pathway, or a 2026 target of 4.9 and a 2030 target of 4.0 under the GHGi standard percent reduction pathway under Regulation 28.

16.    Based on the benchmarking performed, the Hotel Clio and Courtyard Denver Downtown have EUI and GHGi scores that do not meet the building performance standards that must be achieved under both Energize Denver and Regulation 28. As such, the energy consumed at the Hotel Clio and Courtyard Denver Downtown must be significantly reduced to meet the final building performance standards, expressed in terms of EUI, for both Regulation 28 or Energize Denver.

### ASHRAE Energy Auditing and Forced Replacement of Energy Policy and Conservation Act Regulated Equipment

17.    In order to determine what measures must be taken meet the building performance standards of Regulation 28 and Energize Denver, DiamondRock must conduct for Level II ASHRAE Audits, using a protocol developed by the American Society of Heating, Refrigerating, and Air-Conditioning Engineers (ASHRAE) that entails a detailed evaluation of a building's energy use, with the aim of identifying opportunities for improving energy efficiency. Without this information, DiamondRock is unable to determine its options for achieving the potential energy reductions necessary to meet the building performance standards of Regulation 28 and Energize Denver.

5

18.     DiamondRock contracted with a qualified energy auditing consultant to conduct Level II ASHRAE energy audits in 2024 at its Hotel Clio and Courtyard Denver Downtown properties. The ASHRAE Level II Audits were conducted to determine whether the initial benchmarking data was accurate, and to identify what range of energy use reduction options were available in order to comply with Energize Denver and Regulation 28. This information was used to begin the planning process for making material modifications to DiamondRocks' buildings to implement the chosen options, in order to meet the fast-approaching compliance deadlines and corresponding EUI building performance standards under Energize Denver and Regulation 28.

19.     These Level II ASHRAE energy audits conclude that each building cannot not meet the current final building performance standards under Energize Denver and Regulation 28 without implementing significant energy efficiency measures (cleaning AHUs, replacing shower heads and faucet aerators, replacing toilets with lower flow models, optimizing HVAC operation, and calibrating thermostats), installing an on-site solar rooftop array at both buildings, and electrifying existing HVAC and domestic water heating equipment.

20.     The energy efficiency and solar measures, by themselves, will not bring these buildings into timely compliance: the ASHRAE Level II audits demonstrated that HVAC and domestic water heating equipment replacement, including electrification of that equipment in lieu of natural gas-fired equipment, will also be necessary.

21.     For example, for the Hotel Clio, energy efficiency measures such as replacing shower heads, faucets, toilets, and cleaning AHU coils will only achieve an estimated 5.8 EUI reduction. Installing a rooftop solar array will only account for another estimated 2.1 point EUI reduction. From the current Site EUI score of a 119.1, that only

6

results in a 111.2 EUI score, still well short of the 72.4 (Energize Denver) and 88.1 (Regulation 28) 2030 standards. For the GHGi pathway under Regulation 28, implementing all of the above efficiency measures and rooftop solar array will only result in a 5.8% GHG emission reduction for the Hotel Clio well short of the 29% standard percent reduction pathway. To that end, the Hotel Clio's Level II ASHRAE energy audit concludes that "Based on our analysis, this building will not meet 2030 compliance requirements without replacement of HVAC and water heating equipment. The cumulative fines for missing the 2030 target is up to $2.3 Million, which creates urgency to enacting a plan to reduce potential penalties."

22.    The Level II ASHRAE energy audit for the Hotel Clio could not estimate a cost for electrifying the HVAC and domestic water heating equipment, as a full electrification study was necessary to assess the building's central heating and water heating plants, gas-fired laundry equipment, and gas-fired cooking equipment. The costs of the energy efficiency measures and solar array alone are estimated to be upwards of $250,000 with a 14.2 year payback. Further, these costs do not include design engineering costs, any necessary electrical infrastructure upgrade costs, or any other potential costs or barriers to installation including tenant displacement, lost rent, and building challenges such as asbestos in areas that will be disturbed.

23.    Similarly, for the Courtyard Denver Downtown, energy efficiency measures such as replacing shower heads, faucets, toilets, and HVAC and thermostat optimization will only achieve an estimated 1.64 EUI reduction. Installing a rooftop solar array will only account for another estimated 3.37 point EUI reduction. From the current Site EUI score of a 64.2, that only results in a 60.83 EUI score, barely within the 61.1 (Energize Denver) 2030 EUI standard. Further, the suitability of a rooftop solar array is not guaranteed by the

7

Level II ASHRAE energy audit, which notes that additional information around utility connections and structural viability may render a rooftop solar array unsuitable at the hotel property.   Further, even if eventually proved feasible, the rooftop solar array has an estimated best-case payback period of 19 years, with a conservative payback period of 21 years.   Thus, the Courtyard Denver Downtown must consider other energy efficiency equipment replacements, including those of existing HVAC and domestic water heating standards to ensure it is compliant with the 2030 targets under Energize Denver.

24.   And for Regulation 28, the Courtyard Denver Downtown is still well short of compliance with the 2030 standards even after implementing the energy efficiency measures and the rooftop solar array (if the array is proven feasible).   From the current Site EUI score of a 64.2, that energy efficiency measures and the rooftop solar array only results in an expected 60.83 EUI score, well short of the 54.3 (Regulation 28) 2030 EUI standard.   For the GHGi pathway under Regulation 28, implementing all of the above efficiency measures and the rooftop solar array will only result in a 7.2% GHG emissions for the property, above the 2030 GHGi reduction requirement of 29% under the standard percentage reduction pathway.   Thus, the Level II ASHRAE energy audit concludes that the Courtyard Denver Downtown can only meet the building performance standards under Regulation 28 by consideration of further building electrification efforts focused on HVAC and domestic water heating equipment.

25.   The energy efficiency measures and the rooftop solar array at the Courtyard Denver Downtown are estimated to cost at least $300,000, with an 11 year payback. Further, these costs do not include design engineering costs, any necessary electrical infrastructure upgrade costs, or any other potential costs or barriers to installation including tenant displacement, lost rent, and building challenges such as asbestos in areas that will

8

be disturbed.

26.     The costs for the Hotel Clio and Courtyard Denver Downtown also don't take into account the lost economic value of replacing perfectly good operating HVAC and domestic water heating units that have a long remaining useful life.  Further, these costs do not include other design challenges, including whether there is sufficient clearance for the replacement units or necessary electrical infrastructure.

27.     Based on the information and evaluation generated by the Level II ASHRAE energy audits discussed above, the forced replacement of the existing HVAC and domestic water heating equipment will be necessary for the Hotel Clio to meet the performance requirements regardless of the compliance pathways chosen under Energize Denver and Regulation 28 – including the default compliance pathway, the standard percentage reduction pathway, or the GHG intensity pathway.  The same is true for the Courtyard Denver Downtown in regards to Regulation 28, and potentially to Energize Denver if further evaluation shows that the rooftop solar array cannot be implemented at the property.

28.     To be able to implement the necessary HVAC and domestic water heating replacements in time to comply with the compliance deadlines in Regulation 28 and Energize Denver, DiamondRock must immediately start the process of hiring design and construction engineering consultants, conducting further solar and electrification studies, developing the plans, specifying and procuring equipment, and the other measures necessary to such disruptive and capital-intensive infrastructure projects.  DiamondRock is incurring these costs now.   A Level II ASHRAE energy audit does not include the necessary design specifications, including actually sourcing the necessary equipment, determining if building infrastructure modifications are necessary, and determining if existing electrical infrastructure is adequate.

9

29.     Due to current project lead times on procuring HVAC and domestic water heating equipment, DiamondRock must immediately start on the process of design engineering and product specification in order to have the necessary equipment replacements determined, delivered, and installed by the current final 2030 compliance dates. The lengthy procurement lead times, and equipment supply and costs, will be exacerbated by the sector-wide effect of these requirements, since building owners throughout the State will be seeking similar equipment.   This remains true even if DiamondRock's timelines are extended under Regulation 28 or Energize Denver, as extending the timelines to 2031 or 2032 will not make a material difference in the need to start planning for equipment replacement now.

30.     Additionally, to replace critical building systems such as the HVAC systems and domestic water heaters, DiamondRock expects it will incur additional burdens and expenses in the form of tenant displacement and lost revenue.

31.     These costs were not anticipated as a part of DiamondRock's regular maintenance and capital outlays for the properties, and will be a significant burden.

10

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: _____

By: _____

John Cassell
Vice President of Asset Management
DiamondRock Hospitality Company

11

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:24-cv-01093-RMR

**COLORADO APARTMENT ASSOCIATION et al.**

Plaintiffs,

**v.**

**JILL HUNSAKER RYAN, in her Official Capacity as the Executive Director of the
Colorado Department of Public Health and Environment, et al.**

Defendants.

**COALITION FOR COMMUNITY SOLAR ACCESS, et al.**

Intervenor-Defendants.

_____

**Declaration of Tom Bardenett**

I, Tom Bardenett, declare as follows:

1.　　My name is Tom Bardenett.  I am over 18 years of age.  The information in this declaration is true and correct to the best of my knowledge, information, and belief and is based on my personal experience.

2.　　I live in Ashburn, Virginia.

3.　　I am currently the Chief Operating Officer and Executive Vice President at RLJ Lodging Trust ("RLJ").

4.　　In my position as the Chief Operating Officer and Executive Vice President, I oversee and am familiar with RLJ's assets and planned capital improvements, regulatory compliance, and renovations to our hotel and resort assets.

5.　　As Chief Operating Officer and Executive Vice President, I am familiar with the day-to-day and long-term operations of RLJ in Colorado, and I am qualified and authorized by RLJ to speak to the matters discussed in this declaration.

6.　　RLJ is a member of the Colorado Hotel and Lodging Association, Inc. ("CHLA"), and has been for decades.

7.　　As a member of CHLA, RLJ relies on CHLA to represent its interests in the City and County of Denver, Colorado and the State of Colorado, including advocating for regulations that comply with state and federal law.

8.　　RLJ owns the Hotel Teatro, 1100 14th Street, Denver, Colorado 80202. The Hotel Teatro is a 116,360 square foot building with 93,000 gross square feet of operable space.  The Hotel Teatro was originally developed in 1911 and underwent a substantial renovation in 1990.  The Hotel Teatro has 110 individual guest rooms.  Common area amenities include an interior lounge area, lobby area, restaurant with bar areas, and a

2

fitness center.  The Hotel Teatro is already updated with LED lighting throughout the building and an Energy Management System ("EMS") providing controllability of HVAC equipment.  Due to the Hotel Teatro's historic construction, the building also has excellent thermal mass for maintaining heating and cooling.

9.     The Hotel Teatro is subject to the requirements of the City of Denver, Colorado's Denver Ordinance No. 20211310 ("Energize Denver Ordinance"), and the implementing rules for Energize Denver enacted by the Denver Office of Climate Action, Sustainability, and Resiliency, ("OCASR") entitled "Rules & Regulations Governing Energize Denver Building Energy Performance Requirements" ("Energize Denver Regulations") (the Ordinance and Regulations may be collectively referred to as "Energize Denver"), including as modified April 1, 2025.

10.    The Hotel Teatro is also subject to the requirements of the Colorado Air Quality Control Commission's ("Commission") final regulation entitled Building Benchmarking and Performance Standards, 5 CCR 1001-32 ("Regulation 28") enacting agency regulations directed by the State of Colorado's House Bill 21-1286, including as modified by recently by House Bill 25-1269.

## Benchmarking

11.    RLJ conducted "benchmarking" for the Hotel Teatro as required by Energize Denver and Regulation 28 and timely submitted benchmarking under both regulations. Benchmarking consists of reviewing utility and energy usage documentation to measure and assess a buildings' energy performance and related direct or indirect greenhouse gas emissions for a reporting year (indirect greenhouse gas emissions are not emitted from the building itself but are calculated from the energy used at the building).  Benchmarking does not involve conducting an energy audit to determine what must be done at the building to

3

comply with the performance requirements of Regulation 28 or Energize Denver, such as implementing energy efficiency practices or replacing energy consuming equipment to decrease the amount of energy consumed, or the greenhouse gas emissions produced, by the building's operation.

12.    The Hotel Teatro's current Site Energy Use Intensity ("EUI") score is 106.0. The Hotel Teatro's 2019 baseline Site EUI score was 130.3.  Under Energize Denver, the Hotel Teatro is required to achieve a Site EUI score of 80.0 by 2027, and 61.1 by 2030 under the default pathway, or a 96.1 Site EUI by 2028 and a 72.6 Site EUI score by 2032 under the maximum percentage reduction pathway.  Under Regulation 28, the Hotel Teatro is required to achieve a Site EUI of 64.3 by 2026, and 54.3 by 2030 under the energy efficiency compliance pathway; or 95.2 by 2026 and 77.7 EUI score by 2030 under the standard percent reduction pathway.  The Hotel Teatro's baseline Greenhouse Gas Intensity ("GHGi") score is 11.00, the current GHGi score is 8.84, with a 2026 target under Regulation 28 of 4.0 and a 2030 target of 2.4 under the GHGi target pathway, or a 2026 target of 9.57 and a 2030 target of 7.81 under the GHGi standard percent reduction pathway under Regulation 28.

13.    Based on the benchmarking performed, the Hotel Teatro has EUI and GHGi scores that do not meet the building performance standards that must be achieved under both Energize Denver and Regulation 28.  As such, the energy consumed at the Hotel Teatro must be significantly reduced to meet the final building performance standards for both Regulation 28 and Energize Denver.

### ASHRAE Energy Auditing and Forced Replacement of Energy Policy and Conservation Act Regulated Equipment

14.    In order to determine what measures must be taken meet the building

4

performance standards of Regulation 28 and Energize Denver, RLJ had no choice but to conduct Level II ASHRAE Audits, using a protocol developed by the American Society of Heating, Refrigerating, and Air-Conditioning Engineers (ASHRAE) that entails a detailed evaluation of a building's energy use, with the aim of identifying opportunities for improving energy efficiency.   Without this information, RLJ is unable to determine its options for achieving the potential energy reductions necessary to meet the building performance standards of Regulation 28 and Energize Denver.

15.    RLJ contracted with a qualified energy auditing consultant to conduct a Level II ASHRAE Energy Audit in 2024 for the Hotel Teatro. The ASHRAE Level II Audit was conducted to determine whether the initial benchmarking data was accurate, and to identify what range of energy use reduction options were available in order to comply with Energize Denver and Regulation 28.  This information was used to begin the planning process for making material modifications to RLJ's building to implement the chosen options, in order to meet the fast-approaching compliance deadlines and corresponding EUI building performance standards under Energize Denver and Regulation 28.

16.    The Level II ASHRAE Energy Audit concludes that the Hotel Teatro cannot not meet the current final building performance standards under Energize Denver and Regulation 28 without implementing significant energy efficiency measures (replacing shower heads, replacing thermostats, and disconnecting from the Denver District Steam Loop and installing replacement boilers), installing an on-site solar rooftop array, and replacing and electrifying existing heating and domestic water heating systems.

17.    The energy efficiency and solar measures, by themselves, will not bring the Hotel Teatro into timely compliance: the ASHRAE Level II audits demonstrated that HVAC and domestic water heating equipment replacement will also be necessary – including

5

choosing electrified HVAC and domestic water heating equipment in lieu of existing equipment utilizing the Denver District Steam Loop and natural gas-fired equipment.

18.    For example, for the Hotel Teatro, energy efficiency measures such as replacing existing thermostats, shower heads, and adding variable-frequency drives ("VFDs") to existing chillers and hot water pumps will only achieve an estimated 7.5 EUI reduction.  Installing a rooftop solar array will only account for another estimated 3.9 point EUI reduction.  From the current Site EUI score of a 106.0, that only results in a 94.6 EUI score, still well short of the 72.6 (Energize Denver) and 77.7 (Regulation 28) 2030 standards.  For the GHGi pathway under Regulation 28, implementing all of the above efficiency measures and rooftop solar array will only result in a 7% GHG emission reduction for the Hotel Teatro well short of the 29% standard percent reduction pathway.

19.    The Level II ASHRAE Energy Audit for the Hotel Teatro thus also recommended disconnecting the Hotel Teatro from the Denver District Steam Loop and installing five new domestic hot water low footprint boilers.  However, this measure would only account for an additional 16.3 EUI reduction (or a 8% GHGi reduction), resulting in an estimated EUI score of 78.3, still short of the 72.6 (Energize Denver) and 77.7 (Regulation 28) 2030 compliance standards.

20.    To that end, the Hotel Teatro's Level II ASHRAE energy audit concludes "[a]fter 2027, significant upgrades are needed to reach targets in 2030 including Building electrification and energy contracts with actual costs undetermined from list report and would require a professional building electrification study to quantify. To be clear, the building cannot achieve the 2030 target (or 2032 if ownership chooses the extended timeline option) without major building systems upgrades."

21.    The Level II ASHRAE energy audit for the Hotel Teatro could not estimate a

6

cost for electrifying the HVAC and domestic water heating equipment, as a full electrification study was necessary to assess the building's central heating and water heating plants, gas-fired laundry equipment, and gas-fired cooking equipment. The costs of the energy efficiency measures, solar array, and boiler replacements alone are estimated to be upwards of $360,000. Further, these costs do not include design engineering costs, any necessary electrical infrastructure upgrade costs, or any other potential costs or barriers to installation including tenant displacement, lost rent, and building challenges such as asbestos in areas that will be disturbed.

22.    The above-noted costs for the Hotel Teatro also don't take into account the lost economic value of replacing perfectly good operating HVAC and domestic water heating units that have a long remaining useful life. Further, these costs do not include other design challenges, including whether there is sufficient clearance for the replacement units or necessary electrical infrastructure.

23.    Based on the information and evaluation generated by the Level II ASHRAE energy audits discussed above, the forced replacement of the existing HVAC and domestic water heating equipment will be necessary for the Hotel Teatro to meet the performance requirements regardless of the compliance pathways chosen under Energize Denver and Regulation 28 – including the default compliance pathway, the standard percentage reduction pathway, or the GHG intensity pathway.

24.    To be able to implement the necessary HVAC and domestic water heating replacements in time to comply with the compliance deadlines Regulation 28 and Energize Denver, RLJ must immediately start the process of hiring design and construction engineering consultants, conducting further solar and electrification studies, developing the plans, specifying and procuring equipment, and the other measures necessary to such

7

disruptive and capital-intensive infrastructure projects. RLJ is incurring these costs now. A Level II ASHRAE energy audit does not include the necessary design specifications, including actually sourcing the necessary equipment, determining if building infrastructure modifications are necessary, and determining if existing electrical infrastructure is adequate.

25.     Due to current project lead times on procuring boiler equipment, RLJ must immediately start on the process of design engineering and product specification in order to have the necessary equipment replacements determined, delivered, and installed by the current final 2030 compliance dates. The lengthy procurement lead times, and equipment supply and costs, will be exacerbated by the sector-wide effect of these requirements, since building owners throughout the State will be seeking similar equipment. This remains true even if RLJ's timelines are extended under Regulation 28 or Energize Denver, as extending the timelines to 2031 or 2032 will not make a material difference in the need to start planning for equipment replacement now.

26.     Additionally to replace critical building systems such as the HVAC systems and domestic water heaters, RLJ expects it will incur additional burdens and expenses in the form of tenant displacement and lost revenue.

27.     These costs were not anticipated as a part of RLJ's regular maintenance and capital outlays for the properties, and will be a significant burden.

8

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:

_____06.03.2025_____

By:

_____*Tom Bardenett*_____

Tom Bardenett
Chief Operating Officer &
Executive Vice President
RLJ Lodging Trust

9

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:24-cv-01093-RMR

**COLORADO APARTMENT ASSOCIATION et al.**

Plaintiffs,

**v.**

**JILL HUNSAKER RYAN, in her Official Capacity as the Executive Director of the Colorado Department of Public Health and Environment, et al.**

Defendants.

**COALITION FOR COMMUNITY SOLAR ACCESS, et al.**

Intervenor-Defendants.

_____

**Declaration of Walter Isenberg**

I, Walter Isenberg, declare as follows:

1.     My name is Walter Isenberg.  I am over 18 years of age.  The information in this declaration is true and correct to the best of my knowledge, information, and belief and is based on my personal experience.

2.     I live in Denver, Colorado.

3.     I am currently the Chief Executive Officer and Co-Founder of Sage Hospitality Resources ("Sage Hospitality).

4.     In my position as the Chief Executive Officer, I oversee and am familiar with Sage Hospitality's assets and planned capital improvements, regulatory compliance, and renovations to our hotel and resort assets.

5.     As Chief Executive Officer, I am familiar with the day-to-day and long-term operations of Sage Hospitality in Colorado, and I am qualified and authorized by Sage Hospitality to speak to the matters discussed in this declaration.

6.     Sage Hospitality is a member of the Colorado Hotel and Lodging Association, Inc. ("CHLA"), and has been since for decades.

7.     As a member of CHLA, Sage Hospitality relies on CHLA to represent its interests in the City and County of Denver, Colorado and the State of Colorado, including advocating for regulations that comply with state and federal law.

8.     Sage Hospitality is the General Partner and operator for the Curtis Hotel at 1405 Curtis Street, Denver, Colorado 80202. The Curtis Hotel is a 252,300 square foot building a gross building area of 370,670 square feet.  The Curtis Hotel was originally developed in 1972 and underwent a substantial renovation in 2008.  This renovation included converting the existing pool and fitness center in to meeting spaces, and adding

2

a third floor kitchen. Additionally, the domestic water pumps were replaced in 2018. The Curtis Hotel has 336 hotel rooms, and offers 28,000 square feet of meeting space, a business center, a fitness center, and two kitchens. The Curtis Hotel is already updated with LED lighting throughout the building, occupancy sensors in stairwells, variable-frequency drives ("VFD") controlling pumps and fans, double-paned windows on the first three floors, demand-controlled ventilation for the kitchen hoods, and Energy Star rated kitchen equipment.

9.    The Curtis Hotel is subject to the requirements of the City of Denver, Colorado's Denver Ordinance No. 20211310 ("Energize Denver Ordinance"), and the implementing rules for Energize Denver enacted by the Denver Office of Climate Action, Sustainability, and Resiliency, ("OCASR") entitled "Rules & Regulations Governing Energize Denver Building Energy Performance Requirements" ("Energize Denver Regulations") (the Ordinance and Regulations may be collectively referred to as "Energize Denver"), including as modified April 1, 2025.

10.    The Curtis Hotel is also subject to the requirements of the Colorado Air Quality Control Commission's ("Commission") final regulation entitled Building Benchmarking and Performance Standards, 5 CCR 1001-32 ("Regulation 28") enacting agency regulations directed by the State of Colorado's House Bill 21-1286, including as modified by recently by House Bill 25-1269.

## Benchmarking

11.    Sage Hospitality conducted "benchmarking" for the Curtis Hotel as required by Energize Denver and Regulation 28 and timely submitted benchmarking under both regulations. Benchmarking consists of reviewing utility and energy usage documentation to measure and assess a buildings' energy performance and related direct or indirect

3

greenhouse gas emissions for a reporting year (indirect greenhouse gas emissions are not emitted from the building itself but are calculated from the energy used at the building). Benchmarking does not involve conducting an energy audit to determine what must be done at the building to comply with the performance requirements of Regulation 28 or Energize Denver, such as implementing energy efficiency practices or replacing energy consuming equipment to decrease the amount of energy consumed, or the greenhouse gas emissions produced, by the building's operation.

12.    The Curtis Hotel's current Site Energy Use Intensity ("EUI") score is 94.8. The Curtis Hotel's 2019 baseline Site EUI score was 116.8. Under Energize Denver, the Curtis Hotel is required to achieve a Site EUI score of 75.6 by 2027, and 60.1 by 2030 under the default pathway, or a 60.7 Site EUI score by 2030 under the maximum percentage reduction pathway. Under Regulation 28, the Curtis Hotel is required to achieve a Site EUI of 64.3 by 2026, and 54.3 by 2030 under the energy efficiency compliance pathway; or 101.6 by 2026 and 82.98 EUI score by 2030 under the standard percent reduction pathway. The Curtis Hotel's current Greenhouse Gas Intensity ("GHGi") score is 9.47, with a 2026 target under Regulation 28 of 4.0 and a 2030 target of 2.4 under the GHGi target pathway, or a 2026 target of 8.23 and a 2030 target of 6.72 under the GHGi standard percent reduction pathway under Regulation 28.

13.    Based on the benchmarking performed, the Curtis Hotel has EUI and GHGi scores that do not meet the building performance standards that must be achieved under both Energize Denver and Regulation 28. As such, the energy consumed at the Curtis Hotel must be significantly reduced to meet the final building performance standards for both Regulation 28 and Energize Denver.

**ASHRAE Energy Auditing and Forced Replacement of Energy Policy and Conservation**

4

## **Act Regulated Equipment**

14.    In order to determine what measures must be taken meet the building performance standards of Regulation 28 and Energize Denver, Sage Hospitality had no choice but to conduct Level II ASHRAE Audits, using a protocol developed by the American Society of Heating, Refrigerating, and Air-Conditioning Engineers (ASHRAE) that entails a detailed evaluation of a building's energy use, with the aim of identifying opportunities for improving energy efficiency.   Without this information, Sage Hospitality is unable to determine its options for achieving the potential energy reductions necessary to meet the building performance standards of Regulation 28 and Energize Denver.

15.    Sage Hospitality contracted with a qualified energy auditing consultant to conduct a Level II ASHRAE Energy Audit in 2024 for the Curtis Hotel. The ASHRAE Level II Audit was conducted to determine whether the initial benchmarking data was accurate, and to identify what range of energy use reduction options were available in order to comply with Energize Denver and Regulation 28.  This information was used to begin the planning process for making material modifications to Sage Hospitality's building to implement the chosen options, in order to meet the fast-approaching compliance deadlines and corresponding EUI building performance standards under Energize Denver and Regulation 28.

16.    The Level II ASHRAE Energy Audit concludes that the Curtis Hotel cannot not meet the current final building performance standards under Energize Denver and Regulation 28 without implementing significant energy efficiency measures (replacing shower heads and bathroom aerators, replacing toilets, adding insulation to existing hot water piping, installing LED lights, and replacing windows), installing an on-site 50 kW DC solar rooftop array, _and_ replacing existing electric water heaters with hybrid heat pump

5

water heaters, retro-commissioning existing HVAC and domestic water heating equipment, and electrifying other HVAC and domestic water heating equipment at the hotel.

17.    The energy efficiency and solar measures, by themselves, will not bring the Curtis Hotel into timely compliance: the ASHRAE Level II audits demonstrated that HVAC and domestic water heating equipment replacement will also be necessary – replacing existing electric water heaters with hybrid heat pump water heaters, retro-commissioning existing HVAC and domestic water heating equipment, and electrifying other HVAC and domestic water heating equipment at the hotel.

18.    For example, for the Curtis Hotel, energy efficiency measures such as replacing shower heads and bathroom aerators, replacing toilets, adding insulation to existing hot water piping, installing LED lights, and replacing windows will only achieve an estimated 5.83 EUI reduction.  Installing a rooftop solar array will only account for another estimated .74 point EUI reduction.  From the current Site EUI score of 94.6, that only results in a 88.97 EUI score, still well short of the 60.7 (Energize Denver) and 82.98 (Regulation 28) 2030 standards.  For the GHGi pathway under Regulation 28, implementing all of the above efficiency measures and rooftop solar array will only result in a GHGi score of 8.77, well short of the 6.72 GHGi target under the GHGi standard percent reduction pathway for Regulation 28 .

19.    The Level II ASHRAE Energy Audit for the Curtis Hotel thus also recommends replacing existing electric water heaters with hybrid heat pump water heaters, retrocommissioning existing HVAC and domestic water heating equipment, and electrifying other HVAC and domestic water heating equipment at the hotel.   Even if all of these changes are made, the Curtis Hotel's expected EUI Score would be an 83.20, still well short of the 60.7 (Energize Denver) and barely within the 82.98 (Regulation 28) 2030

6

standards.

20.      To that end, the Curtis Hotel's Level II ASHRAE energy audit concludes that additional building electrification efforts will be required for the Curtis Hotel to meet Energize Denver's 2030 standards, "including but not limited to electrification of gas-consuming equipment."

21.      The Level II ASHRAE energy audit for the Curtis Hotel could not estimate a cost for electrifying the heating and domestic water heating equipment, as a full electrification study was necessary to assess the building's central heating and water heating, gas-fired laundry equipment, and gas-fired cooking equipment.  The costs of the energy efficiency measures, solar array, and boiler replacements alone are estimated to be upwards of $692,000.  Further, these costs do not include design engineering costs, any necessary electrical infrastructure upgrade costs, or any other potential costs or barriers to installation including tenant displacement, lost rent, and building challenges such as asbestos in areas that will be disturbed.

22.      The above-noted costs for the Curtis Hotel also don't take into account the lost economic value of replacing perfectly good operating gas-utilizing heating and domestic water heating units that have a long remaining useful life.  Further, these costs do not include other design challenges, including whether there is sufficient clearance for the replacement units or necessary electrical infrastructure.

23.      Based on the information and evaluation generated by the Level II ASHRAE energy audits discussed above, the forced replacement of the existing HVAC and domestic water heating equipment will be necessary for the Curtis Hotel to meet the performance requirements regardless of the compliance pathways chosen under Energize Denver and Regulation 28 – including the default compliance pathway, the standard percentage

7

reduction pathway, or the GHG intensity pathway.

24.      To be able to implement the necessary HVAC and domestic water heating
replacements in time to comply with the compliance deadlines Regulation 28 and Energize
Denver, Sage Hospitality must immediately start the process of hiring design and
construction engineering consultants, conducting further solar and electrification studies,
developing the plans, specifying and procuring equipment, and the other measures
necessary to such disruptive and capital-intensive infrastructure projects.  Sage Hospitality
is incurring these costs now.   A Level II ASHRAE energy audit does not include the
necessary design specifications, including actually sourcing the necessary equipment,
determining if building infrastructure modifications are necessary, and determining if
existing electrical infrastructure is adequate.

25.      Due to current project lead times on procuring electric heating and domestic
water heating equipment, Sage Hospitality must immediately start on the process of design
engineering and product specification in order to have the necessary equipment
replacements determined, delivered, and installed by the current final 2030 compliance
dates. The lengthy procurement lead times, and equipment supply and costs, will be
exacerbated by the sector-wide effect of these requirements, since building owners
throughout the State will be seeking similar equipment.  This remains true even if Sage
Hospitality's timelines are extended under Regulation 28 or Energize Denver, as extending
the timelines to 2031 or 2032 will not make a material difference in the need to start
planning for equipment replacement now.

26.      Additionally to replace critical building systems such as the gas-utilizing
building heating and domestic water heating eqiupment, Sage Hospitality expects it will
incur additional burdens and expenses in the form of tenant displacement and lost revenue.

8

27.    These costs were not anticipated as a part of Sage Hospitality's regular maintenance and capital outlays for the properties and will be a significant burden.

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:

6·3·25

By:

Walter Isenberg
Chief Executive Officer and Co-Founder
Sage Hospitality Resources

9

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-01093-RMR

**COLORADO APARTMENT ASSOCIATION et al.**

Plaintiffs,

**v.**

**JILL HUNSAKER RYAN, in her Official Capacity as the Executive Director of the Colorado Department of Public Health and Environment, et al.**

Defendants.

**COALITION FOR COMMUNITY SOLAR ACCESS, et al.**

Intervenor-Defendants.

_____

**Declaration of Kory Kramer**

I, Kory Kramer, declare as follows:

1.      My name is Kory Kramer.  I am over 18 years of age.  The information in this declaration is true and correct to the best of my knowledge, information, and belief and is based on my personal experience.

2.      I live in Newport Beach, California.

3.      I am currently a Partner at Eagle Four Partners, LLC and Eagle Four Denver, LLC, (collectively "Eagle Four") California-based private equity groups specializing in strategic hospitality, hotel and resort, golf, lifestyle residential, and sports entertainment investments.

4.      In my position as Partner, I oversee and am familiar with Eagle Four's assets and planned capital improvements, regulatory compliance, and renovations to our hotel and resort assets across the country, including in Colorado.

5.      As Partner, I am familiar with the day-to-day and long-term operations of Eagle Four in Colorado, and I am qualified and authorized by Eagle Four to speak to the matters discussed in this declaration.

6.      Eagle Four, through its ownership in the Sheraton Denver Downtown Hotel, is a member of the Colorado Hotel and Lodging Association, Inc. ("CHLA"), and has been since 2018.

7.      As a member of CHLA, Eagle Four relies on CHLA to represent its interests in the City and County of Denver, Colorado and the State of Colorado, including advocating for regulations that comply with state and federal law.

8.      Eagle Four through its affiliate entity Denver HS-EF Court Place, LLC owns the Sheraton Denver Downtown Hotel at 1550 Court Place, Denver, Colorado 80202 (the

"Sheraton Downtown"). The Sheraton Downtown is a 1,555,058 square foot hotel and convention center, with 861,609 square feet of hotel space, 375,923 square feet of convention center space, 196,854 square feet of office space, and 413,640 square feet of enclosed underground parking.  The Sheraton Downtown consists of three main buildings: the 22-story Tower Building, the 8-story Plaza Building, and the Cleveland Office Building. The three buildings have 1,231 guest rooms in total (758 in the Tower building and 473 in the Plaza building). The Sheraton Downtown was originally developed in 1957, and underwent a substantial renovation in 1996 and 1997, in which most building windows, HVAC systems, storefronts, and revolving doors were replaced.

9.      The Sheraton Downtown is subject to the requirements of the City of Denver, Colorado's Denver Ordinance No. 20211310 ("Energize Denver Ordinance"), and the implementing rules for Energize Denver enacted by the Denver Office of Climate Action, Sustainability, and Resiliency, ("OCASR") entitled "Rules & Regulations Governing Energize Denver Building Energy Performance Requirements" ("Energize Denver Regulations") (the Ordinance and Regulations may be collectively referred to as "Energize Denver"), including as modified April 1, 2025.

10.      The Sheraton Downtown is also subject to the requirements of the Colorado Air Quality Control Commission's ("Commission") final regulation entitled Building Benchmarking and Performance Standards, 5 CCR 1001-32 ("Regulation 28") enacting agency regulations directed by the State of Colorado's House Bill 21-1286, including as modified by recently by House Bill 25-1269.

## Benchmarking

11.      Sheraton Downtown conducted "benchmarking" for the Sheraton Downtown

3

as required by Energize Denver and Regulation 28 and timely submitted benchmarking under both regulations. Benchmarking consists of reviewing utility and energy usage documentation to measure and assess a buildings' energy performance and related direct or indirect greenhouse gas emissions for a reporting year (indirect greenhouse gas emissions are not emitted from the building itself but are calculated from the energy used at the building). Benchmarking does not involve conducting an energy audit to determine what must be done at the building to comply with the performance requirements of Regulation 28 or Energize Denver, such as implementing energy efficiency practices or replacing energy consuming equipment to decrease the amount of energy consumed, or the greenhouse gas emissions produced, by the building's operation.

12.     The Sheraton Downtown's current Site Energy Use Intensity ("EUI") score is 122.2. The Sheraton Downtown's 2019 baseline Site EUI score was 142.3. Under Energize Denver, the Sheraton Downtown is required to achieve a Site EUI score of 83.2 by 2027, and 61.1 by 2030 under the default pathway, or a 82.53 Site EUI score by 2030 under the maximum percentage reduction pathway (42% maximum reduction under Energize Denver). Under Regulation 28, the Sheraton Downtown is required to achieve a Site EUI of 64.3 by 2026, and 54.3 by 2030 under the energy efficiency compliance pathway; or 123.80 by 2026 and a 101.03 EUI score by 2030 under the standard percent reduction pathway (13% by 2026, and 29% by 2030).

13.     Based on the benchmarking performed, the Sheraton Downtown has EUI scores that do not meet the building performance standards that must be achieved under both Energize Denver and Regulation 28. As such, the energy consumed at the Sheraton Downtown must be significantly reduced to meet the final building performance standards

4

for both Regulation 28 and Energize Denver.

## ASHRAE Energy Auditing and Forced Replacement of Energy Policy and Conservation Act Regulated Equipment

14.    In order to determine what measures must be taken meet the building performance standards of Regulation 28 and Energize Denver, Sheraton Downtown had no choice but to conduct Level II ASHRAE Audits, using a protocol developed by the American Society of Heating, Refrigerating, and Air-Conditioning Engineers (ASHRAE) that entails a detailed evaluation of a building's energy use, with the aim of identifying opportunities for improving energy efficiency.  Without this information, Sheraton Downtown is unable to determine its options for achieving the potential energy reductions necessary to meet the building performance standards of Regulation 28 and Energize Denver.

15.    Sheraton Downtown contracted with a qualified energy auditing consultant to conduct a Level II ASHRAE Energy Audit in 2024 for the Sheraton Downtown. The ASHRAE Level II Audit was conducted to determine whether the initial benchmarking data was accurate, and to identify what range of energy use reduction options were available in order to comply with Energize Denver and Regulation 28.  This information was used to begin the planning process for making material modifications to the Sheraton Downtown to implement the chosen options, in order to meet the fast-approaching compliance deadlines and corresponding EUI building performance standards under Energize Denver and Regulation 28.

16.    The Level II ASHRAE Energy Audit concludes that the Sheraton Downtown cannot not meet the current final building performance standards under Energize Denver and Regulation 28 without implementing significant energy efficiency measures (reducing

5

equipment runtime, optimizing temperature controls, replacing existing fluorescent lights with LED lighting, tuning economizer operations for cooling systems, and optimizing variable frequency drive (VFD) supply fan speeds), replacing/repairing existing steam piping that serves the three existing 40,000 MBTU natural gas-fired boilers providing steam for building heating and domestic water, and replacing the existing shell tube heat exchangers that use steam from the buildings natural-gas boilers to provide domestic hot water for the building with heat pump water exchangers.

17.    The energy efficiency and steam piping repair measures, by themselves, will not bring the Sheraton Downtown into timely compliance: the ASHRAE Level II audits demonstrated that heat pump replacement of the existing domestic hot water shell tube heat exchangers will be necessary.

18.    For example, for the Sheraton Downtown, energy efficiency measures such as reducing equipment runtime, optimizing temperature controls, replacing existing fluorescent lights with LED lighting, tuning economizer operations for cooling systems, and optimizing variable frequency drive (VFD) supply fan speeds will only achieve an estimated 12.8 point EUI reduction.  From the current Site EUI score of 122.2, that only results in a 109.4 EUI score, still well short of the 82.53 (Energize Denver) and 101.03 (Regulation 28) 2030 standards.  Steam piping replacement/repair is only estimated to achieve another 9.4 EUI reduction, resulting in an EUI Score of 100, still well short of the 82.53 (Energize Denver) 2030 compliance standard, and barely within the 101.03 (Regulation 28) 2030 standards.   And for Regulation 28, because the Level II ASHRAE Audit cannot guarantee estimated energy reductions, the Sheraton Downtown will still need to implement additional energy reductions to ensure it has a buffer to meeting the 2030 standards and avoiding

6

penalties.

19.    To that end, the Sheraton Downtown's Level II ASHRAE energy audit concludes that replacing the existing domestic hot water shell tube heat exchangers with heat pump water exchangers will be required to meet the 2030 compliance standards of Energize Denver and Regulation 28.

20.    The Level II ASHRAE energy audit for the Sheraton Downtown could not estimate the cost of the simple energy efficiency measures.    The steam pipe repair/replacement will cost an estimated additional $13.3 million.  Further, the heat pump retrofit for domestic water heating will cost an estimated $10 million.  Further, these costs do not include design engineering costs, any necessary electrical infrastructure upgrade costs, or any other potential costs or barriers to installation including an inability to rent guest rooms, tenant displacement from office space, and building challenges such as asbestos in areas that will be disturbed.

21.    The above-noted costs for the Sheraton Downtown also do not take into account the lost economic value of replacing perfectly good operating domestic water heating units.  Further, these costs do not include other design challenges, including whether there is sufficient clearance for the replacement units or necessary electrical infrastructure.

22.    Based on the information and evaluation generated by the Level II ASHRAE energy audits discussed above, the forced replacement of the existing HVAC and domestic water heating equipment will be necessary for the Sheraton Downtown to meet the performance requirements regardless of the compliance pathways chosen under Energize Denver and Regulation 28, chiefly because the maximum percentage reduction pathways

7

already provide the most favorable pathways to meeting the final 2030 standards.

23.     To be able to implement the necessary HVAC and domestic water heating replacements in time to comply with the compliance deadlines Regulation 28 and Energize Denver, Sheraton Downtown must immediately start the process of hiring design and construction engineering consultants, conducting further solar and electrification studies, developing the plans, specifying and procuring equipment, and the other measures necessary to such disruptive and capital-intensive infrastructure projects.   Sheraton Downtown is incurring these costs now.  A Level II ASHRAE energy audit does not include the necessary design specifications, including actually sourcing the necessary equipment, determining if building infrastructure modifications are necessary, and determining if existing electrical infrastructure is adequate.

24.     Due to current project lead times on procuring electric heating and domestic water heating equipment, Sheraton Downtown must immediately start on the process of design engineering and product specification in order to have the necessary equipment replacements determined, delivered, and installed by the current final 2030 compliance dates. The lengthy procurement lead times, and equipment supply and costs, will be exacerbated by the sector-wide effect of these requirements, since building owners throughout the State will be seeking similar equipment.  This remains true even if Sheraton Downtown's timelines are extended under Regulation 28 or Energize Denver, as extending the timelines to 2031 or 2032 will not make a material difference in the need to start planning for equipment replacement now.

25.     Additionally to replace critical building systems such as the domestic water heating equipment, Sheraton Downtown expects it will incur additional burdens and

8

expenses in the form of potential tenant displacement and lost revenue.

26.     These government regulations and resulting anticipated costs were not anticipated as a part of Eagle Four's investment in the Sheraton Downtown or regular maintenance and capital outlays for the property, and will be a significant burden causing extreme financial hardship.

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:

6/6/2025
_____

By:

_____

Kory Kramer
Partner
Eagle Four Partners, LLC and
Eagle Four Denver, LLC

9

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-01093-RMR

**COLORADO APARTMENT ASSOCIATION et al.**

    Plaintiffs,

**v.**

**JILL HUNSAKER RYAN, in her Official Capacity as the Executive Director of the Colorado Department of Public Health and Environment, et al.**

    Defendants.

**COALITION FOR COMMUNITY SOLAR ACCESS, et al.**

    Intervenor-Defendants.

_____

**Declaration of Steve Fletcher**

I, Steve Fletcher, declare as follows:

1.      My name is Steve Fletcher.  I am over 18 years of age.  The information in this declaration is true and correct to the best of my knowledge, information, and belief and is based on my personal experience.

2.      I live in Highlands Ranch, Colorado.

3.      I am currently a Commercial Real Estate Broker specializing in industrial and commercial buildings.  I am also the Managing Partner at RBF Family Limited Partnership ("RBF"), which owns several industrial properties in Colorado.

4.      In my position as the Managing Partner, I oversee and am familiar with all aspects RBF's capital improvements, regulatory compliance, and renovations to our industrial properties.

5.      As such, I am familiar with the day-to-day and long-term operations of the industrial and commercial buildings RBF owns in Colorado, and I am qualified to speak to the matters discussed in this declaration.

6.      RBF is a small owner of commercial industrial buildings, controlled and benefitting myself and direct family members, including being the sole source of income for one family member.  As such, my family depends on the income of RBF, and the capital expenditures that Energize Denver will require to meet the 2030 building performance standards will materially and significantly impact all of RBF's partners.

7.      RBF is a member of the NAIOP, The Commercial Real Estate Development Association, Colorado Chapter ("NAIOP Colorado"), and has been since November 2023.

8.      As a member of NAIOP Colorado, I rely on NAIOP Colorado to represent my interests in the City and County of Denver, Colorado and the State of Colorado, including

2

advocating for regulations that comply with state and federal law.

9.      The buildings RBF owns and operates are subject to the requirements of the City of Denver, Colorado's Denver Ordinance No. 20211310 ("Energize Denver Ordinance"), and the implementing rules for Energize Denver enacted by the Denver Office of Climate Action, Sustainability, and Resiliency, ("OCASR") entitled "Rules & Regulations Governing Energize Denver Building Energy Performance Requirements" ("Energize Denver Regulations") (the Ordinance and Regulations may be collectively referred to as "Energize Denver"), including as modified April 1, 2025.

10.    One such building is a commercial warehouse located at 4010 Holly Street, Denver, Colorado 80216 (the "Holly Street Property").

## Benchmarking

11.    RBF conducted "benchmarking" for the Holly Steet Property as required by Energize Denver and timely submitted benchmarking.  Benchmarking consists of reviewing utility and energy usage documentation to measure and assess a buildings' energy performance and related direct or indirect greenhouse gas emissions for a reporting year (indirect greenhouse gas emissions are not emitted from the building itself but are calculated from the energy used at the building).  Benchmarking does not involve conducting an energy audit to determine what must be done at the building to comply with the performance requirements of Energize Denver, such as implementing energy efficiency practices or replacing energy consuming equipment to decrease the amount of energy the building consumes or the greenhouse gas emissions produced by the building's operation.

12.    Based on the benchmarking, the Holly Steet Property has Energy Use Intensity ("EUI") scores that do not meet the building performance standards that must be achieved under Energize Denver.

3

13.     The Holly Steet Property is a 45,110 square foot one-story warehouse that has historically housed four tenants (although that number varies depending on lease vacancies).   The Holly Street Property contains both warehouse and office dedicated space.  Tenant activities are typically warehouse storage, shipping, and office functions with small manufacturing operations within the warehouse storage spaces.  The offices at the Holly Street Property are served by a single zone, single speed rooftop units (RTUs) equipped with mechanical cooling and gas heating, which were installed new in 2019, 2021, and 2022, and have significant remaining useful life.

14.     The Holly Street Property's current Site EUI score is 62.3.  The Holly Street Property's baseline Site EUI score was 74.4.  Under Energize Denver, the Holly Street Property is required to achieve a Site EUI score of 51.7 by 2027, and 43.2 by 2030.

15.     The energy consumed at RBF's Holly Street Property must be significantly reduced to meet the final building performance standards for Energize Denver.

**ASHRAE Energy Auditing and Forced Replacement of Energy Policy and Conservation Act Regulated Equipment**

16.     In order to determine what measures must be taken meet the building performance standards of Energize Denver, it was necessary for RBF to conduct a Level II ASHRAE Energy Audit, using a protocol developed by the American Society of Heating, Refrigerating, and Air-Conditioning Engineers (ASHRAE) that entails a detailed evaluation of a building's energy use, with the aim of identifying opportunities for improving energy efficiency.   Without this information, RBF is unable to determine its options for achieving the potential energy reductions necessary to meet the building performance standards of Energize Denver.

17.     RBF contracted with a qualified energy auditing consultant to conduct Level

4

II ASHRAE Energy Audit in 2024 at its Holly Street Property. The ASHRAE Level II Energy Audit was conducted to determine whether the initial benchmarking data was accurate, and to identify what range of energy use reduction options were available in order to comply with Energize Denver.  This information was used to begin the planning process for making material modifications to RBF's Holly Street Property to implement the chosen options, in order to meet the fast-approaching compliance deadlines and corresponding EUI building performance standards under Energize Denver.

18.    The Level II ASHRAE Energy Audit has been completed, and concludes that the Holly Street Property cannot not meet the current final building performance standards under Energize Denver without implementing significant energy efficiency measures (tenant specific heating and cooling scheduling, LED light replacements, occupancy sensors, and water fixture upgrades), installing an on-site solar rooftop array, and electrifying existing HVAC equipment.

19.    The energy efficiency and solar measures, by themselves, will not bring these buildings into timely compliance: the ASHRAE Level II audit demonstrated that HVAC equipment replacement and electrification will also be necessary.

20.    For example, for the Holly Street Property, energy efficiency measures such as tenant specific heating and cooling scheduling, LED light replacements, occupancy sensors, and water fixture upgrades will only achieve an estimated 6.0 EUI reduction. Installing a rooftop solar array will only account for another estimated 6.1 point EUI reduction.  From the current Site EUI score of a 62.3, that only results in a 50.2 EUI score, still well short of the 43.2 EUI standard in 2030 required by Energize Denver.

21.    The Level II ASHRAE energy audit for the Holly Street Property thus concluded that replacing the single speed RTUs equipped with mechanical cooling and

5

gas heating, over half of which were installed new within the several years, will be required for the property to meet the 2030 building performance standards under Energize Denver.

22.    The energy efficiency measures, the rooftop solar array, and replacing the RTUs with heat pumps at the Holly Street Property are estimated to cost at least $175,000 according to the Level II ASHRAE Energy Audit, with a 14-year payback.  This is a significant burden for a small family-owned partnership such as RBF, which budgets out building maintenance and equipment replacements years into the future, and has limited funds in the near term for such forced equipment replacement.

23.    Further, these costs do not include detailed engineering costs, any necessary electrical infrastructure upgrade costs, or any other potential costs or barriers to installation including tenant displacement, lost rent, and building challenges such as asbestos in areas that will be disturbed.  When I personally sought a bid for a solar installation on an adjacent property, the expected cost for a similarly sized rooftop array *inclusive* of federal tax credits was $260,000, significantly more expensive than estimated by my Level II ASHRAE Energy Audit.

24.    The costs for the Holly Street Property also don't take into account the lost economic value of replacing perfectly good operating HVAC RTUs that have a long remaining useful life.  Further, these costs do not include other design challenges, including whether there is sufficient electrical infrastructure to run the new equipment.

25.    Based on the information and evaluation generated by the Level II ASHRAE energy audits discussed above, the forced replacement of the existing HVAC equipment will be necessary for the Holly Street Property to meet the performance requirements regardless of the compliance pathways chosen under Energize Denver – including the default compliance pathway, the standard percentage reduction pathway.

6

26.    To be able to implement the necessary HVAC replacements in time to comply with the compliance deadlines in Energize Denver, I anticipate that RBF must immediately start the process of hiring design and construction engineering consultants, conducting further solar and electrification studies, developing the plans, specifying and procuring equipment, and the other measures necessary to such disruptive and capital-intensive infrastructure projects. A Level II ASHRAE energy audit does not include the necessary design specifications, including actually sourcing the necessary equipment, determining if building infrastructure modifications are necessary, and determining if existing electrical infrastructure is adequate. To that end, RBF has already received a quote for an electrification feasibility report, which will cost RBF $7,500, additional capital outside of RBF's planned budgeting.

27.    Due to current project lead times on procuring HVAC equipment, RBF also anticipates it must immediately start on the process of design engineering and product specification in order to have the necessary equipment replacements determined, delivered, and installed by the current final 2030 compliance dates. The lengthy procurement lead times, and equipment supply and costs, will be exacerbated by the sector-wide effect of these requirements, since building owners throughout the State will be seeking similar equipment. This remains true even if RBF's timelines are extended under Energize Denver, as extending the timelines to 2032 will not make a material difference in the need to start planning for equipment replacement now.

28.    Additionally, to replace critical building systems such as the RTU HVAC systems, RBF expects it will incur additional burdens and expenses in the form of tenant displacement and lost revenue.

29.    These costs were not anticipated as a part of RBF's regular maintenance

7

and capital outlays for the properties and will be a significant burden. RBF already budgets to keep its industrial properties updated and in good working condition, and these additional costs threaten RBF's continued financial future.

30.     For example, RBF budgeted and saved for years to replace a roof at an existing property due to the limited nature of its rental income streams, and the further expenses required by Energize Denver will significantly upend RBF's existing planned capital outlays for its existing properties.

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:

June 4, 2025
_____

By: _____

Steve Fletcher
Managing Partner
RBF Family Limited Partnership

8

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:24-cv-01093-RMR

**COLORADO APARTMENT ASSOCIATION et al.**

Plaintiffs,

**v.**

**JILL HUNSAKER RYAN, in her Official Capacity as the Executive Director of the
Colorado Department of Public Health and Environment, et al.**

Defendants.

**COALITION FOR COMMUNITY SOLAR ACCESS, et al.**

Intervenor-Defendants.

_____

**Declaration of Buck Blessing**

I, Buck Blessing, declare as follows:

1.    My name is Buck Blessing.  I am over 18 years of age.  The information in this declaration is true and correct to the best of my knowledge, information, and belief and is based on my personal experience.

2.    I live in Denver, Colorado.

3.    I am the founder and current Chief Executive Officer ("CEO") of Griffis/Blessing, Inc. ("Griffis/Blessing"), a real estate investment and property management company, which is the largest property management firm in Colorado. Griffis/Blessing manages commercial assets in Colorado valued in excess of $2 billion, representing over 6.5 million square feet of office, retail, medical, and industrial space and over 10,000 apartment units.

4.    In my position as the CEO, I oversee and am familiar with all aspects Griffis/Blessing's capital improvements, regulatory compliance, and renovations to our commercial and industrial building assets.

5.    As CEO of Griffis/Blessing, I am familiar with the day-to-day and long-term operations of Griffis/Blessing in Colorado and am qualified and authorized by Griffis/Blessing to speak to the matters discussed in this declaration.

6.    Griffis/Blessing is a member of NAIOP, The Commercial Real Estate Development Association, Colorado Chapter ("NAIOP Colorado").

7.    As a member of NAIOP Colorado, Griffis/Blessing relies on NAIOP Colorado to represent its interests in the City and County of Denver, Colorado and the State of Colorado, including advocating for regulations that comply with state and federal law.

8.    Griffis/Blessing manages many commercial buildings subject to the requirements of the Colorado Air Quality Control Commission's ("Commission") final

2

regulation entitled Building Benchmarking and Performance Standards, 5 CCR 1001-32 ("Regulation 28") enacting agency regulations directed by the State of Colorado's House Bill 21-1286, including as modified by recently by House Bill 25-1269.

9. Two exemplary buildings are: (1) the Griffis/Blessing Corporate Headquarters at 102 N. Cascade Ave, Colorado Springs, Colorado 80903 (the "Corporate Headquarters"); and (2) the U.S. Bank Building at 6 S. Tejon Street, Colorado Springs, Colorado 80903 (the "U.S. Bank Building"). The Corporate Headquarters building is owned by 102 N. Cascade, LLC. The U.S. Bank Building is owned by Tejon & Pikes Peak Partners, LLLP . Griffis/Blessing manages and operates both the Corporate Headquarters and U.S. Bank Building, and is authorized to speak as to those buildings about the matters discussed in this declaration.

10. The Corporate Headquarters is a 67,507 square foot office building originally developed in 1971 and which has undergone renovations to individual tenant spaces continually since that time as tenants move out of existing leases. The Corporate Headquarters has stucco panels on the exterior building envelop, and double-glazed aluminum frame windows. HVAC is provided by two air handling units ("AHUs") for cooling and ventilation, and hydronic hot water ("HHW") baseboard heaters for space heating. This HVAC equipment is controlled by direct digital control ("DDC") accessible from the building management system ("BMS"). There is an existing cooling plant which consists of a 225 ton water-cooled chiller supplying chilled water to the AHU cooling coils. The heating plant consists of two standard, four-stage HHW natural gas-fired boilers manufactured in 2015. The building interior lighting consists of both fluorescent and LED lighting. The building's existing domestic hot water ("DHW") system is served by one central natural gas-fired water heater.

11.      The U.S. Bank Building is a 51,601 square foot eight-story office building originally developed in 1920 and which has undergone renovations to individual tenant spaces continually since that time as tenants move out of existing leases.  The U.S. Bank Building has retail spaces in the ground floor, with office spaces in the remaining floors.  The U.S. Bank Building has a stone façade and single glazed windows with a second gazing panel fastened to window interiors.    All floors have a water-source heat pump ("HP") connected to the building water ("BW") loop for heating and cooling.  BW is delivered by two 7.5 horsepower pumps to HPs throughout the building.  Hydronic hot water ("HHW") is generated by two 550 thousand BTU units to natural gas-fired condensing boilers.  DHW is provided by a 225 BTU natural gas-fired storage tank water heater.

### Benchmarking

12.      Griffis/Blessing conducted "benchmarking" for the Corporate Headquarters and U.S. Bank buildings as required by Regulation 28 and timely submitted benchmarking.  Benchmarking consists of reviewing utility and energy usage documentation to measure and assess a buildings' energy performance and related direct or indirect greenhouse gas emissions for a reporting year (indirect greenhouse gas emissions are not emitted from the building itself but are calculated from the energy used at the building).  Benchmarking does not involve conducting an energy audit to determine what must be done at the building to comply with the performance requirements of Regulation 28, such as implementing energy efficiency practices or replacing energy consuming equipment to decrease the amount of energy consumed, or the greenhouse gas emissions produced, by the buildings' operations.

13.      The Corporate Headquarters' current Site Energy Use Intensity ("EUI") score is 127.2.  The Corporate Headquarters 2021 baseline Site EUI score was 125.9.  Under Regulation 28, the Corporate Headquarters is required to achieve a Site EUI of 57.2 by

4

2026, and 46.9 by 2030 under the energy efficiency compliance pathway; or 105.53 by 2026 and 89.39 by 2030 under the standard percent reduction pathway. The Corporate Headquarters' current Greenhouse Gas Intensity ("GHGi") score is 12.0, and the 2021 baseline GHGi score was an 11.5. The Corporate Headquarters has a 2026 target under Regulation 28 of 3.5 and a 2030 target of 2.1 under the GHGi target pathway, or a 2026 target of 10.0 and a 2030 target of 8.17 under the GHGi standard percent reduction pathway under Regulation 28. To that end, the ASHRAE Level II Audit recommends pursing the standard percent reduction EUI pathway as the it requires the lowest energy reductions for the Corporate Headquarters.

14.    The U.S. Bank Building's current Site EUI score is 126.3, and the 2021 baseline Site EUI score was 133.7. Under Regulation 28, the U.S. Bank Building is required to achieve a Site EUI of 57.2 by 2026, and 46.9 by 2030 under the energy efficiency compliance pathway; or 116.32 by 2026 and 94.93 by 2030 under the standard percent reduction pathway. The U.S. Bank Building's current GHGi score is 11.7, and the 2021 baseline GHGi score was 13.1. The U.S. Bank Building's 2026 GHGi target under Regulation 28 is 3.5, and the 2030 GHGi target is 2.1 under the GHGi target pathway, or a 2026 target of 11.4 and a 2030 target of 9.3 under the GHGi standard percent reduction pathway under Regulation 28. To that end, the ASHRAE Level II Audit recommends pursing the standard percent reduction EUI pathway as the it requires the lowest energy reductions for the U.S. Bank Building.

15.    Based on the benchmarking performed, the Corporate Headquarters and U.S. Bank buildings have EUI and GHGi scores that do not meet the building performance standards that must be achieved under Regulation 28. As such, the energy consumed at the Corporate Headquarters and the U.S. Bank Building must be significantly reduced to

5

meet the final building performance standards, expressed in terms of EUI, for Regulation
28.

## ASHRAE Energy Auditing and Forced Replacement of Energy Policy and Conservation Act Regulated Equipment

16.     In order to determine what measures must be taken meet the building
performance standards of Regulation 28, Griffis/Blessing had no choice but to conduct
Level II ASHRAE Audits, using a protocol developed by the American Society of Heating,
Refrigerating, and Air-Conditioning Engineers (ASHRAE) that entails a detailed evaluation
of a building's energy use, with the aim of identifying opportunities for improving energy
efficiency.   Without this information, Griffis/Blessing is unable to determine its options for
achieving the potential energy reductions necessary to meet the building performance
standards of Regulation 28.

17.     Griffis/Blessing contracted with a qualified energy auditing consultant to
conduct Level II ASHRAE energy audits in 2024 at its Corporate Headquarters and U.S.
Bank buildings. The ASHRAE Level II Audits were conducted to determine whether the
initial benchmarking data was accurate, and to identify what range of energy use reduction
options were available in order to comply with Regulation 28.  This information was used
to begin the planning process for making material modifications to Griffis/Blessings'
buildings to implement the chosen options, in order to meet the fast-approaching
compliance deadlines and corresponding EUI building performance standards under
Regulation 28.

18.     These Level II ASHRAE energy audits conclude that each building cannot
not meet the current final building performance standards under Regulation 28 without
implementing significant energy efficiency measures (replacing faucet aerators, LED light
retrofits, installing variable-frequency drives ("VFDs") on existing pumps and fans,

6

modifying existing building controls, installing lighting occupancy sensors, and installing timer controls on DHW circulation pumps) and replacing and electrifying existing HVAC and domestic water heating equipment.

19.     The energy efficiency measures, by themselves, will not bring these buildings into timely compliance: the ASHRAE Level II audits demonstrated that HVAC and domestic water heating equipment replacement, including electrification of that equipment in lieu of natural gas-fired equipment, will also be necessary.

20.     For example, for the Corporate Headquarters, energy efficiency measures such as replacing faucet aerators, LED light retrofits, installing variable-frequency drives ("VFDs") on existing pumps and fans, installing lighting occupancy sensors, and modifying existing building controls, will only achieve an estimated 5% EUI or GHGi reduction.  This is well short of the 13% reduction required by the standard percent reduction pathway under Regulation 28, and immensely short of the 29% reduction required under the standard percent reduction pathway.  To that end, the Corporate Headquarters' Level II ASHRAE energy audit concludes that replacement of the existing chiller with a high efficiency model and replacement of the existing HHW natural gas-fired boilers manufactured in 2015 with high-efficiency models will be required just to meet the 2026 EUI or GHGi targets of Regulation 28 (bringing the total estimated EUI reductions to 17%), even under the most favorable standard percent reduction pathway.  To meet the 2030 targets, the Corporate Headquarters will be required to conduct additional forced HVAC and DHW equipment replacement, including electrifying the existing equipment, and potentially pursue renewable energy options such as rooftop solar or renewable energy contracts.

21.     The Level II ASHRAE energy audit for the Corporate Headquarters estimated

7

that the cost of solely meeting the 2026 target, including all energy efficiency measures and the chiller and boiler replacements, would have installation costs of over $300,000 with a 16 year payback. Further, these costs do not include design engineering costs, any necessary electrical infrastructure upgrade costs, or any other potential costs or barriers to installation including tenant displacement, lost rent, and building challenges such as asbestos in areas that will be disturbed.

22.    Similarly, for the U.S. Bank Building, energy efficiency measures such as replacing faucet aerators, LED light retrofits, installing variable-frequency drives ("VFDs") on existing pumps and fans, modifying existing building controls, and installing timer controls on DHW circulation pumps will only achieve an estimated 7.6% EUI or GHGi reduction. This is well short of the 13% reduction required by the standard percent reduction pathway under Regulation 28, and immensely short of the 29% reduction required under the standard percent reduction pathway. To that end, the U.S. Bank Building's Level II ASHRAE energy audit concludes that replacement of the existing HVAC rooftop units ("RTUs") with heat pump RTUs will be required to comply with the 2026 compliance standards of Regulation 28, even under the most favorable standard percent reduction pathway. To meet the 2030 targets, the U.S. Bank Building will be required to conduct additional forced HVAC and DHW equipment replacement, including electrifying the existing equipment, and potentially pursue renewable energy options such as rooftop solar or renewable energy contracts.

23.    The energy efficiency measures and the HVAC RTU replacements at the U.S. Bank Building are estimated to cost at least $110,000. Further, these costs do not include design engineering costs, any necessary electrical infrastructure upgrade costs, or any other potential costs or barriers to installation including tenant displacement, lost rent,

8

and building challenges such as asbestos in areas that will be disturbed.

24.    The costs for the Corporate Headquarters and the U.S. Bank Building also don't take into account the lost economic value of replacing perfectly good operating HVAC and domestic water heating units that have a long remaining useful life.  Further, these costs do not include other design challenges, including whether there is sufficient clearance for the replacement units or necessary electrical infrastructure.

25.    Based on the information and evaluation generated by the Level II ASHRAE energy audits discussed above, the forced replacement of the existing HVAC and domestic water heating equipment will be necessary for the Corporate Headquarters and the U.S. Bank Building to meet the performance requirements regardless of the compliance pathways chosen under Regulation 28 – including the default compliance pathway, the standard percentage reduction pathway, or the GHG intensity pathway.

26.    To be able to implement the necessary HVAC and domestic water heating replacements in time to comply with the compliance deadlines in Regulation 28, Griffis/Blessing, on behalf of the ownership of both buildings, must immediately start the process of hiring design and construction engineering consultants, conducting further solar and electrification studies, developing the plans, specifying and procuring equipment, and the other measures necessary to such disruptive and capital-intensive infrastructure projects.  Griffis/Blessing, and the ownership of both buildings, is incurring these costs now. A Level II ASHRAE energy audit does not include the necessary design specifications, including actually sourcing the necessary equipment, determining if building infrastructure modifications are necessary, and determining if existing electrical infrastructure is adequate.

27.    Due to current project lead times on procuring HVAC and domestic water

9

heating equipment, Griffis/Blessing, on behalf of the ownership of both buildings, must immediately start on the process of design engineering and product specification in order to have the necessary equipment replacements determined, delivered, and installed by the current final 2030 compliance dates. The lengthy procurement lead times, and equipment supply and costs, will be exacerbated by the sector-wide effect of these requirements, since building owners throughout the State will be seeking similar equipment.  This remains true even if the buildings' timelines are extended under Regulation 28, as extending the timelines to 2031 will not make a material difference in the need to start planning for equipment replacement now.

28.    Additionally, to replace critical building systems such as the HVAC systems and domestic water heaters, Griffis/Blessing expects the ownership of both buildings will incur additional burdens and expenses in the form of tenant displacement and lost revenue.

29.    These costs were not anticipated as a part of Griffis/Blessing's regular maintenance and capital outlays for the properties, and will be a significant burden to the ownership of both buildings.

Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:

_6/5/25_____

By:

_____

Buck Blessing
Founder and CEO
Griffis/Blessing, Inc.

11

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.  **1:24-cv-01093-RMR**

**COLORADO APARTMENT ASSOCIATION; APARTMENT ASSOCIATION OF METRO DENVER; COLORADO HOTEL AND LODGING ASSOCIATION, INC.; AND NAIOP COLORADO CHAPTER;**

                Plaintiffs,

**v.**

**JILL HUNSAKER RYAN, in her Official Capacity as the Executive Director of the Colorado Department of Public Health and Environment, MICHAEL OGLETREE, in his Official Capacity as the Director of the Colorado Air Pollution Control Division; AND WILL TOOR, in his Official Capacity as the Executive Director of the Colorado Energy Office; AND**

**THE CITY AND COUNTY OF DENVER; THE DENVER CITY COUNCIL; DENVER MAYOR MIKE JOHNSTON; THE DENVER OFFICE OF CLIMATE ACTION, SUSTAINABILITY, AND RESILIENCY; AND ELIZABETH BABCOCK, in her Official Capacity as the Executive Director of the Denver Office of Climate Action, Sustainability, and Resiliency.**

                Defendants.

**AND**

**COALITION FOR COMMUNITY SOLAR ACCESS, COLORADO SOLAR AND STORAGE ASSOCIATION, NATURAL RESOURCES DEFENSE COUNCIL, AND SIERRA CLUB**

                **Intervenor-Defendants.**

---

**[PROPOSED] FIRST AMENDED COMPLAINT**

---

**INTRODUCTION**

1.      Plaintiffs Colorado Apartment Association and Apartment Association of Metro Denver ("CAA" and "AAMD"), the Colorado Hotel and Lodging Association, Inc. ("CHLA"), and the NAIOP Colorado Chapter ("NAIOP Colorado") seek declaratory and injunctive relief under federal law against enforcement of:

a.      The Colorado Air Quality Control Commission's ("Commission") final regulation entitled Building Benchmarking and Performance Standards, 5 CCR 1001-32 ("Regulation 28") enacting regulations directed by the State of Colorado's House Bill 21-1286 **and as modified by recent House Bill 25-1269**; and

b.      The City and County of Denver, Colorado's Denver Ordinance No. 20211310 ("Energize Denver Ordinance"), and the implementing rules for Energize Denver enacted by the Denver Office of Climate Action, Sustainability, and Resiliency, ("Denver OCASR") entitled "Rules & Regulations Governing Energize Denver Building Energy Performance Requirements" ("Energize Denver Regulations") (the Ordinance and Regulations may be collectively referred to as "Energize Denver"), **as last amended on April 1, 2025**.

2.      Both Regulation 28 and Energize Denver purport to establish and impose energy conservation standards on buildings and the appliances and equipment within those buildings.  However, the Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§ 6201-6422, **as amended by the National Appliance Energy Conservation Act of 1987 ("NAECA"), Public Law No. 100-12, and the Energy Policy Act of 1992**

2

**("EPACT"), Public Law No. 102-486,**[1] preempts these standards on appliances and equipment, instead placing primary jurisdiction under the U.S. Department of Energy ("DOE").    **Specifically, EPCA preempts any "State regulation concerning the energy efficiency, energy use, or water use of such" appliances and equipment. 42 U.S.C. § 6297(c); 42 U.S.C. § 6316.**    Plaintiffs bring this action seeking to have Regulation 28 and Energize Denver declared unlawful and void due to EPCA's express preemption provision.

3.    Regulation 28 sets "building performance standards" ~~for~~**that required** "covered buildings" (commercial and multifamily buildings over 50,000 square feet) ("Covered Buildings") ~~that require Covered Buildings~~ to reduce the energy consumption or greenhouse gas emissions associated with **the use of** consumer and commercial equipment and appliances in the buildings to meet the building performance standards with compliance deadlines beginning in 2026.  ~~Regulation 28 directly regulates "Covered Products"¹regulated by the DOE under EPCA.~~

4.    Energize Denver sets "building performance standards" ~~for~~**which require** "Covered Buildings" (commercial, multifamily, and certain industrial buildings over 25,000 square feet) ~~which require Covered Buildings~~ to reduce the energy consumption

---

[1] **Hereinafter, EPCA and all its subsequent amendments under NAECA and EPACT will be collectively referred to as EPCA.**
~~¹ Under EPCA, the term "covered product" is used to described *consumer* equipment preempted under 42 U.S.C. § 6291 *et seq*.  The term "covered equipment" is used to describe *commercial* equipment preempted under 42 U.S.C. § 6311 *et seq*.  For simplicity, the term "Covered Product" is used to reference all covered products and covered equipment regulated by EPCA.~~

3

of Covered ~~Products~~**Buildings associated with the use of consumer and commercial appliances in the buildings** to meet the building performance standards with compliance deadlines beginning in 2024.  ~~Energize Denver directly regulates equipment in Covered Buildings regulated by the DOE under the EPCA.~~

5.    **The consumer and commercial appliances used in the Covered Buildings that are affected by Regulation 28 and Energize Denver are considered "Covered Products".  Under EPCA, the term "covered product" is used to described consumer equipment preempted under 42 U.S.C. § 6291 *et seq.*  The term "covered equipment" is used to describe commercial equipment preempted under 42 U.S.C. § 6311 *et seq.*   For simplicity, the term "Covered Product" is used to reference all covered products and covered equipment regulated by EPCA herein.**

6.    **The building performance standards in both Regulation 28 and Energize Denver "concern" the energy efficiency of "Covered Products" because they require a Covered Building to reduce the energy used by the Covered Building, without regards to whether the energy is attributable to a Covered, or Non-Covered Product.**

7.    ~~5.~~   The building performance standards in both Regulation 28 and Energize Denver ~~effectively~~**also** require and force Covered Building owners to replace existing **EPCA compliant** Covered Products ~~(or in the context of new construction to choose Covered Products) that exceed current~~**that comply with** federal **EPCA** energy efficiency standards ~~under EPCA.~~**.   This is true regardless of whether those**

4

**Covered Products still have a remaining useful life.**

~~6. Regulation 28 and Energize Denver thus regulate the energy efficiency of~~
~~Covered Products that are subject to regulation under, and thus are preempted by, the~~
~~EPCA, 42 U.S.C. §§ 6201-6422, as amended by the National Appliance Energy~~
~~Conservation Act of 1987 ("NAECA"), Public Law No. 100-12, and the Energy Policy Act~~
~~of 1992 ("EPACT"), Public Law No. 102-486.[2]~~

8.    **By requiring the removal and replacement of functioning and compliant Covered Products based on their energy efficiency performance, Regulation 28 and Energize Denver thus further regulate the energy efficiency of Covered Products that are subject to regulation under, and thus are preempted by EPCA.**

9.    ~~7.~~EPCA was born out of the ~~oil~~**energy** crises of the 1970s and embodied Congress' ~~concerns~~**national framework for** with energy independence, domestic **energy** supply, and national security.  EPCA requires a consistent national and practical approach to energy regulation, maintaining neutrality on energy sources**,** and recognizing the need for a diverse energy supply.  Congress intended EPCA to preempt patchwork state or local laws that are unworkable, ~~that~~ undercut a coordinated national energy ~~policy, that overlook~~**strategy, disregard** the public's need for reliable and resilient energy, and ~~that~~ deny consumer choice.

~~8. EPCA sets appliance efficiency standards which are design requirements or~~

---

~~[2] Hereinafter, EPCA and all its subsequent amendments under NAECA and EPACT will be collectively referred to as EPCA.~~

5

efficiency requirements for both consumer and commercial Covered Products.

10. 9. The purposes of the **EPCA establishes a** federal energy conservation program for Covered Products **are, the purpose of which is** to "provide Federal energy conservation standards applicable to covered products" and to "authorize the Secretary [of Energy] to prescribe amended or new energy conservation standards for each type (or class) of covered product" (42 U.S.C. § 6295(a)) in order to "conserve the energy resources of the Nation" (42 U.S.C. § 6312(a)).

11. 10. EPCA contains express preemption provisions that bar, with limited exceptions, any "[s]tate regulation, or revision thereof, concerning the energy efficiency, energy use, or water use of the covered products. . . ." 42 U.S.C. § 6297(c).

12. 11. EPCA **reflects embodies** Congress's decision that the nation's energy policy cannot be dictated by state and local governments; such patchwork approach would be the antithesis of a national energy policy.

13. 12. Numerous provisions of Regulation 28 and Energize Denver challenged in this action conflict with and are preempted by EPCA by:

a. **Requiring owners of Covered Buildings to comply with building performance standards requiring reductions in the Covered Building's energy usage without regard to whether the Covered Building's energy usage is attributable to Covered, or Non-Covered Products, thus necessarily requiring energy efficiency measured to be implemented for Covered Products;**

6

**b.** ~~a.~~ Requiring existing Covered Building owners to replace existing ~~EPCA~~ **EPCA-**regulated Covered Products (both consumer and commercial) ~~with products that exceed the federal~~**in order to meet the building performance** standards ~~that DOE established under EPCA~~**of Regulation 28 and Energize Denver**, even if the Covered Products ~~currently used~~ are fully functional**, have a remaining existing life,** and meet current EPCA standards; **and**

~~b. Forcing new buildings in Colorado to use EPCA-regulated Covered Products that exceed federal DOE standards for both consumer and commercial Covered Products; and~~

c.    Creating energy conservation standards that are not **"**energy source neutral**"**, forcing the replacement of **compliant** Covered Products that use natural gas or other fossil fuels with ~~electric~~**the favored electric-powered** Covered Products.

14.    ~~13.~~ As a result, these challenged regulations are preempted by EPCA and violate the Supremacy Clause of Article VI of the United States Constitution.

15.    ~~14.~~ Defendants' efforts to establish far-reaching energy requirements and building standards conflict with federal law, are contrary to the public interest, and impose irreparable harm on Plaintiffs' members.  Plaintiffs, on behalf of their members, bring this action seeking a declaration that Regulation 28, the Energize Denver Ordinance, and the Energize Denver Regulations**,** are void and unenforceable**,** and ~~seeking~~**seek** to enjoin their enforcement.

**JURISDICTION**

7

16. ~~15.~~ This Court has authority to grant the relief sought under 28 U.S.C. §§ 1331, 1343, and 2201, 42 U.S.C. §§ 1983 and 1988, and 42 U.S.C. § 6306(c).

**VENUE**

17. ~~16.~~ Venue is proper in this Court under 28 U.S.C. § 1391 because Defendants all have offices in this District, all Defendants reside in or are entities formed in this State of Colorado, and at least one of the individual Defendants performs their official duties in this District and so resides here for the purpose of § 1391. Venue is also proper because the acts and events giving rise to the claims occurred at least in part in this District, and the regulations at issue will be enforced in this District.

**PARTIES**

18. ~~17.~~ Plaintiff CAA is a Colorado nonprofit corporation authorized to conduct business in the State of Colorado (ID Number 19871275058).

a.    Plaintiff CAA is a leading nonprofit, trade association representing the multifamily housing industry, including owners, developers, management companies, and vendors.  Plaintiff CAA is comprised of four local affiliates from across the state.  Plaintiff CAA represents over 3,600 members who own and manage over 350,000 apartments, which total more than $98 billion in assets.

b.    Plaintiff CAA's members own Covered Buildings that are~~, and plan to construct new buildings that will be,~~ subject to both Regulation 28 and Energize Denver, and will be harmed by Regulation 28 and Energize Denver. *See* ~~Attachment~~**Exhibit** 1, Decl. of **R**~~E~~. ~~Rogers; Attachment~~**Schloss; Exhibit** 2,

8

Decl. of J. Lorenzen; ~~Attachment~~**Exhibit** 3, Decl. of C. Lessard; ~~Attachment~~**Exhibit** 4, Decl. of J. ~~Mason; Attachment 5, Decl. of K. Egelston~~**Chan**.

19. ~~18.~~ Plaintiff AAMD is a Colorado nonprofit corporation authorized to conduct business in the State of Colorado (ID Number 19871274473).

    a.   Plaintiff AAMD is an association of local apartment building owners that promotes the multi-family rental housing industry in the Denver metropolitan area, including seeking improvements in the techniques of ownership and management.

    b.   Plaintiff AAMD's members own Covered Buildings that are~~, and plan to construct new buildings that will be,~~ subject to both Regulation 28 and Energize Denver, and will be harmed by Regulation 28 and Energize Denver. *See* ~~Attachments~~**Exhibits** 1-~~5~~**4**.

20. ~~19.~~ Plaintiff CHLA is a Colorado nonprofit corporation authorized to conduct business in the State of Colorado (ID Number 19871239063).

    a.   Plaintiff CHLA is a professional trade association that promotes the hotel and lodging industry in Colorado and advocates on behalf its hotel and lodging business members.

    b.   Plaintiff CHLA's members own Covered Buildings that are~~, and plan to construct new buildings that will be,~~ subject to both Regulation 28 and Energize Denver, and will be harmed by Regulation 28 and Energize Denver. *See* ~~Attachment~~**Exhibit 5, Decl. of J. Cassell; Exhibit** 6, Decl. of ~~A~~**T**. ~~Dunn; Attachment~~**Bardenett; Exhibit** 7, Decl. of ~~J~~**W**. ~~Damioli; Attachment~~**Isenberg;**

9

**Exhibit** 8, Decl. of ~~W~~**K**. ~~Isenberg; Attachment 9, Decl. of N. Dimond~~**Kramer**.

21.    ~~20.~~ Plaintiff NAIOP Colorado is a Colorado nonprofit corporation authorized to conduct business in the State of Colorado (ID Number 19991185328).

a.    Plaintiff NAIOP Colorado is a commercial real estate development association that promotes and advocates on behalf of its commercial real estate industry members in Colorado.

b.    Plaintiff NAIOP Colorado's members own Covered Buildings that are~~, and plan to construct new buildings that will be,~~ subject to both Regulation 28 and Energize Denver, and will be harmed by Regulation 28 and Energize Denver.  *See* ~~Attachment~~**Exhibit 9, Decl. of S. Fletcher; Exhibit** 10, Decl. of ~~D~~**B**. ~~Supple; Attachment 11, Decl. of T. Carlson~~**Blessing**.

~~21. The building benchmarking and performance standards of both Regulation 28 and Energize Denver have already required Plaintiffs' members to submit benchmarking reports to the State of Colorado and the City and County of Denver for existing buildings, to begin immediately to conduct energy audits, create engineering plans, and begin the planning process for making material modifications to their Covered Buildings in order to meet the fast-approaching compliance deadlines of both regulations, all at significant expense to their members.~~

~~a. These material modifications will irreparably change the physical systems of most of Plaintiffs' members' buildings subject to Regulation 28 and Energize Denver by forcing the removal of Covered Products utilizing fossil fuels such as natural gas and replacing them with electrified Covered Products.~~

10

b. For example, Plaintiffs' members already completed preliminary energy audits that determined that their Covered Buildings cannot meet either regulation's building performance standards without replacing the fossil-fueled, EPCA regulated Covered Products in their existing buildings with electric Covered Products that exceed EPCA standards, and determined that replacement of the Covered Products will require the removal and replacement of the buildings' energy systems.

c. The building performance standard requirements of these regulations will also require Plaintiffs' members to make significant capital expenditures, altering their existing financing contracts and impairing contractual obligations for the maintenance and upkeep of the EPCA Covered Products currently used that now must be replaced prior to the end of their useful life.

d. The building performance standard requirements of both regulations will decrease Plaintiffs' members' competitiveness because other similarly situated buildings under either the 50,000 square feet (Regulation 28) or 25,000 square feet (Energize Denver) thresholds will not bear these expenses, while Covered Buildings making these material modifications costs will all be reflected in increased operating costs (and will translate to either increased rental rates, lodging rates, etc.) and may result in reductions in net operating income and deteriorated property values when compared to similarly situated buildings.

e. Plaintiffs' members' plans to build new buildings that are subject to both Regulation 28 and Energize Denver are negatively impacted because the members

11

who have existing land, leases or contracts, financing agreements, substantially complete plans, permitting timeline restraints, and already purchased Covered Products, will need to change those plans to comply with the Regulations, causing harm to Plaintiffs.

f. Plaintiffs' members accordingly are experiencing or will imminently experience harm in the form of economic injuries, altered business practices, and compliance burdens because of the regulations challenged here.

22. Therefore, all Plaintiffs have one or more members that own or operate buildings (or plan to build new buildings) subject to both Regulation 28 and Energize Denver; do business in Colorado, and the City and County of Denver; and are suffering or will imminently suffer harm to their revenues and business operations as a result of Regulation 28 and Energize Denver.

22. 23. Defendant Jill Hunsaker Ryan is the Executive Director of the Colorado Department of Public Health and Environment ("CDPHE"). The Colorado Department of Public Health and Environment ("CDPHE") is the Colorado regulatory Department with jurisdiction and authority to implement the Colorado Air Pollution Prevention and Control Act ("Colorado APPCA"), C.R.S. § 25-7-101, *et seq*. This includes implementation of Regulation 28 through oversight of the Colorado Air Pollution Control Division.

23. 24. Defendant Michael Ogletree is the Director of the Colorado Air Pollution Control Division ("Division"), which is a Division of the CDPHE that is tasked with air quality control and compliance under Colorado APPCA. *See* C.R.S. §

12

25-7-103(2), (9); C.R.S. § 25-7-115.  The Division is specifically tasked with enforcement of Regulation 28 pursuant to C.R.S. § 25-7-122, as well as approving calculation methodologies under Regulation 28.

24.    25. Defendant Will Toor is the Executive Director of the Colorado Energy Office ("CEO"), which was created pursuant to C.R.S. § 24-38.5-101 and within the office of the Governor of Colorado.  The CEO is charged with administering Regulation 28 pursuant to C.R.S. §§ 24-38.5-112(1) and 24-38.5-112(1)(a).  Under Regulation 28, the CEO is also responsible for the implementation and continuation of Regulation 28.

25.    26. Defendant Jill Hunsaker Ryan, through CDPHE and the Division, and Defendant Will Toor, through the CEO, are charged with the enforcement and administration of Regulation 28 as adopted by the Commission.

26.    27. Defendant the City and County of Denver is a home rule municipality incorporated in the State of Colorado. COLO. CONST., Art. XX.

27.    28. Defendant Denver City Council is established pursuant to Article III of the Charter of the City of Denver.

a.    The Denver City Council is vested with "all legislative powers possessed by the City and County of Denver, conferred by Article XX of the Constitution of the State of Colorado, or contained in the Charter of the City and County of Denver."  DENVER, CITY AND CTY., CHARTER, art. III, part 2, § 3.2.1.

b.    The Denver City Council also has general police power "to enact and provide for the enforcement of all ordinances" in the City and County of Denver. *Id.* § 3.2.3.

13

c.      The Denver City Council adopted the Energize Denver Ordinance

by Council Bill No. CB21-1310 on November 22, 2021, as later signed by then

Denver Mayor Michael B. Hancock on November 24, 2021.

28.      29. Defendant Mike Johnston is the presiding Mayor of the City and

County of Denver.

29.      30. Defendant Denver OCASR is a regulatory office created under the

Office of the Denver Mayor pursuant to the Denver Revised Municipal Code

("D.R.M.C."), Article XIX, § 2-401 *et seq*.  The Energize Denver Ordinance vests the

Denver OCASR with creating rules governing building performance standards in

Denver.  The Denver OCASR promulgated the Energize Denver Regulations,

implementing the Energize Denver Ordinance.

30.      31. Defendant Elizabeth Babcock is the Executive Director of the Denver

OCASR.  The Executive Director of the Denver OCASR is charged under the Energize

Denver Ordinance with promulgating the Energize Denver Regulations and enforcing

any violations of the Energize Denver Regulations.


**STANDING**


31.      **Many of Plaintiffs' members have conducted comprehensive Level II**

**American Society of Heating, Refrigerating and Air- Conditioning Engineers**

**("ASHRAE") Energy Audits for their Covered Buildings.  These Level II ASHRAE**

**Energy Audits, although not explicitly required by either Regulation 28 or**

14

Energize Denver (unless a Covered Building owner is seeking alternative relief from either regulation), were necessary for Plaintiffs' members to determine what energy reductions would be required, at what specific building equipment, in order to meet the building performance standards of both Regulation 28 and Energize Denver.

32.    Many of Plaintiffs' members' ASHRAE Level II Energy Audits determined that the only way to meet the building performance standards of Regulation 28 and Energize Denver is by, among other things, targeting Covered Products within their buildings.  *See* Exhibits 1-10. This often includes targeting the replacement of existing and compliant Covered Products with remaining useful life. *Id.*

33.    For example, Plaintiff CAA's members' Level II ASHRAE Audits have determined that low-cost energy efficiency measures such as installing LED lights, modifying building envelopes (through windows or insulation), and installing on-site solar rooftop arrays, by themselves, will not be sufficient to achieve the building performance standards of Regulation 28 and Energize Denver.  Instead, even if such measures are implemented, it will be necessary to remove and replace existing and functioning EPCA-compliant Covered Products, such as: replacing shower heads and faucets,[2] replacing existing gas-fired

[2] "Showerheads," "faucets," "water closets," and "urinals" are explicitly defined as consumer "Covered Products" under EPCA.  42 U.S.C. § 6292(a)(15)-(18). While they concern water usage, reducing water usage corresponds to a reduction in energy usage in a building due to less domestic hot water heating

15

domestic water heaters with electrified heat-pump water heaters, and gas-fired hot water boilers used for building heat with electrified heat-pump water heating boilers (Exhibit 1 at ¶¶ 19-23); replacing a natural gas heating water boiler with a high efficiency boiler with a variable frequency drive ("VFD") motor, upgrading existing baseboard heaters to include hydronic fan convectors, adding a central air-source reversible chiller (heat pump) to the building's existing water heating system, and replacing the building's natural gas domestic water heating boiler with a high efficiency modulating condensing water heater (Exhibit 2 at ¶¶ 21-24); replacing gas-fired domestic water heaters with a centralized electric heat pump water heater (Exhibit 3 at ¶¶ 18-20); installing demand controllers to fourteen central domestic hot water boilers, replacing boiler circulation pumps with ECM motors, replace pool pumps with VFD models and replacing cooling and heating systems with new electric powered mini-split heat pump systems (Exhibit 4 at ¶¶ 20-30).

34.     Similarly, Plaintiff CHLA's members' Level II ASHRAE Audits have determined that other energy efficiency measures, such as installing LED lights, modifying building envelopes (through windows or insulation), and installing on-site solar rooftop arrays, will not by themselves allow them to achieve the building performance standards of Regulation 28 and Energize Denver. Instead,

being necessary. To that end, EPCA also preempts state regulations "concerning the energy efficiency, energy use, *or water use* of such Covered Products." 42 U.S.C. § 6297(c) (emphasis added).

16

it will be necessary to, in addition to any other measures to remove and replace existing and functioning EPCA-compliant Covered Products, such as: replacing showerheads and faucets, replacing natural gas fired HVAC and domestic water heating equipment with electric powered equipment (Exhibit 5 at ¶¶ 19-24); installing five new domestic hot water low footprint boilers and electrifying a significant portion of the buildings existing HVAC equipment (Exhibit 6 at ¶¶ 18-23); replacing existing electric resistance water heaters with electric hybrid heat pump water heaters, and replacing other gas-powered equipment such as HVAC and domestic water heating equipment with electric-powered equipment (Exhibit 7 at ¶¶ 16-20); and replacing existing shell tube heat exchangers that use steam from a buildings natural-gas boilers to provide domestic hot water with electric heat pump water exchangers (Exhibit 8 at ¶¶ 16-19).

35.    Plaintiff NAIOP Colorado's members' Level II ASHRAE Audits have determined that other efficiency measures such as installing LED lights, modifying building envelopes (through windows or insulation), and installing on-site solar rooftop arrays, will not, by themselves, allow them to achieve the building performance standards of Regulation 28 and Energize Denver. Instead, in addition to any other measures, it will be necessary to remove and replace existing, functioning, and EPCA-compliant Covered Products such as: replacing shower heads and faucets, replacing existing and recently installed gas-powered HVAC rooftop units ("RTUs") with electric-powered heat pumps (Exhibit 9 at ¶¶ 18-21); and replacing a 225-ton building chiller with a high efficiency model,

17

replacing natural gas-fired hydronic hot water ("HHW") boilers manufactured in 2015 with electric-powered models, and replacing existing natural gas HVAC RTUs with electric heat pump RTUs (Exhibit 10 at ¶¶ 19-22).

36.    The building benchmarking and performance standards of both Regulation 28 and Energize Denver have already required Plaintiffs' members to submit benchmarking reports to the State of Colorado and the City and County of Denver for existing buildings and to immediately begin the process for making material modifications to their Covered Buildings in order to meet the fast-approaching compliance deadlines of both regulations, all at significant expense to their members.

a.    These material modifications will irreparably change the physical systems of most of Plaintiffs' members' Covered Buildings by forcing the removal of Covered Products utilizing fossil fuels such as natural gas and replacing them with either newer Covered Products or electrified Covered Products.

b.    The building performance standard requirements of these regulations will require Plaintiffs' members to make significant capital expenditures, force them to seek amendment of their existing financing contracts and impairing contractual obligations for the maintenance and upkeep of the EPCA Covered Products currently used that now must be replaced prior to the end of their useful life. These material costs will increase capital, financing and operating costs, which will result in

18

increased lease, rental or lodging rates, and may result in reductions in net
operating income and deteriorated property values. These increased lease
and rental rates will be harmful to both Plaintiffs' member and the public at
large, during a time when Colorado is facing a housing crisis.

c.    The building performance standard requirements of both
regulations will decrease Plaintiffs' members' competitiveness because
similarly situated buildings that are not Covered Buildings under either the
50,000 square feet (Regulation 28) or 25,000 square feet (Energize Denver)
thresholds will not bear these burdens and expenses. This is contrary to
the uniform playing field that EPCA requires for all buildings using Covered
Products.

d.    Plaintiffs' members accordingly are experiencing or will
imminently experience harm in the form of economic injuries, altered
business practices and opportunities, and compliance burdens because of
the regulations challenged here.

37.    Therefore, all Plaintiffs have one or more members that own or
operate buildings  subject to both Regulation 28 and Energize Denver; do
business in Colorado, and the City and County of Denver; and are suffering or
will imminently suffer harm to their revenues and business operations as a result
of Regulation 28 and Energize Denver through the forced replacement of Covered
Products preempted from regulation by Defendants under EPCA.  Plaintiffs thus
have associational standing to challenge Regulation 28 and Energize Denver.

19

## THE CHALLENGED REGULATIONS

### I.    COLORADO HOUSE BILL 21-1286

38.    ~~32.~~ Colorado House Bill 21-1286 declares that the "Commission has both the statutory authority and the obligation to require a reduction of greenhouse gas emissions in the State in every sector including buildings."

39.    ~~33.~~ Colorado House Bill 21-1286 requires that the owners of Covered Buildings over 50,000 sq/ft shall submit a benchmarking report of their energy usage for the previous calendar year by June 1st of each year, starting on December 1, 2022.

40.    ~~34.~~ Further, Colorado House Bill 21-1286 directs that the Commission "shall promulgate" rules for Covered Buildings owners to achieve a reduction in greenhouse gas emissions associated with their Covered Buildings' operations of seven percent by 2026 and twenty percent by 2030 as compared to 2021 levels.  *See* C.R.S. § 25-7-142(1), (8).

41.    ~~35.~~ Colorado House Bill 21-1286 authorizes CDPHE, through the Division, to collect civil penalties of up to five hundred dollars ($500) for a first violation and up to two thousand dollars ($2,000) for each subsequent violation of a Covered Building owners' failure to submit benchmarking data, and civil penalties of up to two thousand dollars ($2,000) for a first violation and up to five thousand dollars ($5,000) for each subsequent violation of a Covered Building owners' failure to meet the building performance standards adopted by the Commission.

20

II.    **COLORADO REGULATION 28**

42.    ~~36.~~ Regulation 28 as adopted by the Commission **on August 17, 2023,**

**under the direction of HB 21-1286,** sets "building performance standards" for Covered

Buildings (commercial and multifamily buildings over 50,000 square feet) ~~which require~~

~~the owners of Covered Buildings to meet certain building performance standards~~**that**

**must be met** by 2026 and 2030.

43.    ~~37.~~ Regulation 28 applies to ~~both~~ existing **and~~or~~** new Covered Buildings~~,~~

~~regardless of whether the Covered Buildings are undergoing any renovations or~~

**(including those under** construction **or being renovated)**.    Thus Regulation 28

regulates and imposes restrictions on existing and installed EPCA regulated Covered

Products ~~as well as newly installed Covered Products~~.

44.    ~~38.~~ There are two building performance standards under Regulation 28:

(1) an energy-use intensity ("EUI") score, which is calculated from a building's total site

energy use per square foot per year; and (2) a greenhouse gas intensity ("GHG

Intensity") score, which is calculated by the carbon dioxide equivalent ("CO2e")

measured in kilograms of CO2e per square foot (kg/Co2e per sq/ft) emitted per year

associated with the operations of a Covered Building.

45.    ~~39.~~ Regulation 28 sets compliance deadlines of 2026 and 2030 for a

Covered Building to meet the performance standards through the implementation of

energy efficiency measures, greenhouse gas intensity reductions, or combinations of

both those options.

46.    ~~40.~~ Covered Building owners must demonstrate they have either (1) met

21

the applicable building performance standard EUI score or (2) met the applicable GHG

Intensity score.

47.    41. The EUI and GHG Intensity compliance targets are set on a "property

type" basis, meaning that standards will differ depending on the property type of the

Covered Building (e.g. office buildings, multifamily housing, and restaurants all have

different EUI score and GHG Intensity targets).

48.    42. Covered Building owners are then given four main "compliance

pathways" for meeting the 2026 and 2030 building performance standards.

a.    First, Covered Building owners can opt to achieve the 2026 and

2030 EUI building performance standard targets for their property type **by

reducing the annual energy usage at their buildings to be withing the target

EUI scores**.

b.    Second, Covered Building owners can opt to reduce their EUI

score by a flat percentage from their 2021 EUI baseline score, of 13% by 2026

and 29% by 2030. **This pathway is intended for Covered Buildings with

existing EUI scores higher than 29% off of the standard EUI targets.**

c.    Third, Covered Building owners can opt to achieve the 2026 and

2030 GHG Intensity score **(i.e., not the EUI standard)** set for their property type

by reducing "greenhouse gas emissions attributable to the building's energy use

through energy efficiency or replacing fossil fuel equipment with high-efficiency

electric equipment".

d.    Fourth, Covered Building owners can opt to reduce their GHG

22

Intensity score by a flat percentage from their 2021 GHG Intensity Score baseline, of 13% by 2026 and 29% by 2030. **This pathway is intended for Covered Buildings with existing GHG Intensity scores higher than 29% off of the standard GHG Intensity targets.**

49. ~~43.~~ In order to reduce the EUI score of a Covered Building, the building owner must reduce the total amount of energy the building uses on a calendar year basis.

50. ~~44.~~ In order to reduce a GHG Intensity score of a Covered Building, the building owner must reduce the total amount of greenhouse gas emissions attributable to energy use on a calendar year basis.

51. ~~45.~~ Regulation 28 also allows a Covered Building owner to meet the building performance standards by purchasing Renewable Energy Credits ("RECs"). In order to qualify for the use of RECs, a Covered Building owner must submit an energy audit confirming they have "exhausted cost-effective energy efficiency and electrification measures for the [C]overed [B]uilding."

52. ~~46.~~ Finally, Regulation 28 allows Covered Building owners to modify their 2026 and 2030 compliance obligations by applying to the CEO for an adjusted EUI score, adjusted GHG intensity target, or an adjusted compliance timeline.

~~47. The EUI and GHG intensity building performance standard obligations are not equivalent.~~

~~48. In creating the two building performance standards, the Division admitted that its overarching goal was to reduce the greenhouse gas emissions associated with the~~

23

~~building sector, and thus, the target methodologies for the EUI score and the GHG intensity scores were focused on reducing greenhouse gas emissions, not energy use.~~

53. ~~49. The final target methodology disclosed by the Division confirmed its aim of setting building performance standards that would meet the greenhouse gas reduction goals of Colorado:__Though__ both the EUI score and GHG Intensity score targets are based on the percent of greenhouse gas emissions reductions attributable to energy use reductions~~**., the EUI and GHG intensity building performance standards are not equivalent: i.e., meeting the EUI-based standard does not ensure compliance with the GHG intensity standard.**

~~50. Further indicating the ulterior motive for the regulation, in that final target methodology, the 2026 and 2030 EUI score and GHG Intensity score targets were quantified in terms of the metric tons of CO2e expected to be reduced if the building performance standards were achieved on a sector wide basis.~~

54. **Regardless, the EUI and GHG Intensity scores of Regulation 28, despite being based on GHG emissions, _de facto_ regulate the energy efficiency of Covered Products because the only sources of GHG emissions are the energy consuming equipment within a Covered Building.**

55. ~~51.__ Both the EUI score and GHG Intensity score have been set so stringently as to effectively require Covered Building owners to ~~choose electric__**remove existing, functioning and EPCA compliant** Covered Products ~~that exceed federal DOE standards__**and replace them with new, often electric-powered, Covered Products**.

56. ~~52. The__**Extensive Level II ASHRAE Energy Audits conducted by**

24

**Plaintiffs' members demonstrate that the** only feasible way for the vast majority of Covered Buildings to meet the energy reduction EUI score or the GHG Intensity score ~~is to install electrified~~**standards by the applicable compliance dates is to replace existing, EPCA compliant** Covered Products that ~~exceed federal DOE standards set under Section 6295 of EPCA (and in the case of existing Covered Buildings, remove fossil fueled Covered Products that meet EPCA standards and the related building systems infrastructure).~~**have a remaining useful life (in addition to whatever other energy efficiency measures may be taken).  That is because EPCA regulated Covered Products such as HVAC and domestic water heating systems are responsible for the vast majority of energy used in, and emissions generated by, Covered Buildings.  In most cases, the most effective (but not cost effective) way for Covered Buildings to meet the building performance standards of Regulation 28 is to target the removal fossil fuel utilizing Covered Products, as those products have the greatest associated GHG emissions at the Covered Buildings.**

57.    ~~53.~~ Regulation 28 therefore both strongly favors electric Covered Products and effectively requires that a Covered Building owner ~~install~~**replace existing, EPCA compliant** Covered Products ~~that exceed federal DOE energy efficiency standards~~.

58.    ~~54.~~ The procedures in Regulation 28 allowing for ~~a~~**the adjustment of** compliance timeline or building performance standard**s** ~~adjustment~~ further emphasize**s** that Regulation 28 is intended to force Covered Building owners into ~~choosing~~**replacing existing EPCA complaint Covered Products with** electric Covered Products ~~that~~

25

~~exceed federal DOE efficiency standards~~.

59. ~~55.~~ In order to apply for an adjusted compliance timeline, a Covered Building owner must submit documentation to the CEO including an "inventory of the natural gas equipment in the building including the age of the equipment and the energy savings associated with electrification of the equipment" and "[d]ocumentation demonstrating collaboration with the building's utility(ies) related to updating the electrical distribution infrastructure." 5 CCR 1001-32, Part C, II.A.1.

60. ~~56.~~ Categories of Covered Building owners able to apply for a timeline adjustment include: affordable housing and under-resourced buildings; buildings undergoing major renovations that will still achieve the EUI or GHG Intensity building performance standards; buildings that can demonstrate they plan to replace existing heating and cooling systems at the end of their system of life if that end of life occurs after the compliance period; and buildings that require updates to the electrical distribution infrastructure that cannot be timely completed to meet the performance standard deadline.

61. ~~57.~~ For a building performance standard target adjustment, Covered Building owners must submit on a "CEO approved form" which at a minimum must include 2021 through the present annual benchmarking data with third-party verification and a list of property category types (e.g. allocation of square footage to multifamily, retail, gym, etc.) at the Covered Building.

62. ~~58.~~ In order to adjust the building performance standards for "under resourced buildings", the CEO requires documentation that the building has examined

26

"the feasibility of gas and electric beneficial electrification and/or gas or electric demand side management programs."

63. 59. "Beneficial electrification" is defined in Regulation 28 as "converting the energy source of a customer's end use from a nonelectric fuel source to a high-efficiency electric source, or avoiding the use of nonelectric fuel sources in new construction or industrial applications" in order to reduce net greenhouse gas emissions over the lifetime of the conversion to meet building performance standards. **Thus the compliance schedule adjustment process is targeted at fossil fuel powered Covered Products and achieving building electrification.**

60. Under Regulation 28, there are no timelines governing the CEO's initial consideration of an adjustment request.  If the CEO denies a Covered Building owner's adjustment request, the Covered Building owner can apply to the CEO's executive director to review the denial determination within 90 days, and the executive director is then obligated to make a recommendation on the adjustment request within 120 days of the requested review.

64. 61. Failure to meet the 2026 and 2030 building performance standard compliance obligations subjects a Covered Building owner to fines and civil injunctive relief **of up to $5,800 per 30 days of violation,** including orders to meet the Regulation 28 building performance standards.

62. All of the above "compliance pathways" a Covered Building owner can pursue to meet the building performance standards require a Covered Building owner to replace existing EPCA regulated Covered Products (and in many instances, the Covered Building

27

~~owner cannot meet the building performance standards in Regulation 28 by simply replacing existing Covered Products with Covered Products that meet current EPCA standards, instead having to choose electric Covered Products that exceed the federal efficiency standards of EPCA regulated products set by the DOE).~~

65.    **Regardless of the "compliance pathway" chosen to meet the building performance standards, Level II ASHRAE Energy Audits conducted by Plaintiffs' members demonstrate that most Covered Building owners will be required to remove and replace existing EPCA-compliant Covered Products, regardless of whether those Covered Products have remaining useful life. In many instances, the Covered Building owner will not be able meet the building performance standards in Regulation 28 by simply replacing existing compliant Covered Products with similarly fueled, but higher efficiency, Covered Products, instead being forced to purchase electric Covered Products). *See* Exhibit 1 at ¶¶ 25-34; Exhibit 2 at ¶¶ 26-31; Exhibit 3 at ¶¶ 23-28; Exhibit 4 at ¶¶ 29-31; Exhibit 5 at ¶¶ 28-31; Exhibit 6 at ¶¶ 24-27; Exhibit 7 at ¶¶ 22-27; Exhibit 8 at ¶¶ 24-26; Exhibit 9 at ¶¶ 23-30; Exhibit 10 at ¶¶ 24-29.**

66.    ~~63.~~ Regulation 28 thus contains building performance standards that regulate and concern the energy efficiency and energy use of EPCA ~~preempted~~ Covered Products.

**III.    COLORADO HOUSE BILL 25-1269**

67.    **Colorado House Bill 25-1269 was passed by the Colorado Legislature on May 7, 2025, and signed into law by Governor Polis on May 20,**

28

2025.

68.      Colorado House Bill 25-1269 made changes to the requirements of Colorado House Bill 21-1286 and the regulatory requirements of Regulation 28 that are relevant here.

69.      Specifically, House Bill 25-1269 now defines an "Operator" of a Covered Building as a "owner, tenant, or other individual or entity", significantly expanding the universe of those liable for failure to comply with Regulation 28's benchmarking requirements to owners, tenants, and managers of Covered Buildings.

70.      House Bill 25-1269 also allows a Covered Building owner to elect to choose their 2019 calendar year as an alternative baseline year (instead of 2021) to determine the Covered Building's compliance obligations.

71.      House Bill 25-1269 also makes the 2026 building performance standards adopted in Regulation 28 permissive (i.e., not mandatory), but only if a Covered Building owner submits benchmarking reports to the CEO that track the Covered Building's progress towards compliance with the building performance standards' (new) 2031 deadline and: (1) respond to any questions from the CEO; (2) indicate whether technical assistance or guidance would be helpful; and (3) provide any additional nonproprietary information requested by the CEO that the CEO believes is relevant to understanding implementation trends or common barriers to compliance.  Thus, under House Bill 25-1269, the 2026 building performance standards remain mandatory unless the above conditions are met.

29

72.    **House Bill 25-1269 modifies Regulation 28 by extending the 2030 building performance standards compliance date by one year, until 2031. House Bill 25-1269 thus does not remove or revise the building compliance standards, but only extends the compliance data by one year, to 2031.**

73.    **House Bill 25-1269 also increased penalties for noncompliance with Regulation 28 up to five hundred dollars ($577) for a first violation and up to two thousand dollars ($2,300) for each subsequent violation of a Covered Building owners' failure to submit benchmarking data. House Bill 25-1269 also increased civil penalties amounts to up to two thousand three hundred dollars ($2,300) for the first thirty days of violation and up to five thousand eight hundred dollars ($5,800) for each subsequent thirty days of violation of a Covered Building owners' failure to meet the building performance standards adopted by the Commission after 2030.**

74.    **House Bill 25-1269 is self-executing: it does not require the Commission to revise any rules adopted prior to July 1, 2025 (such as Regulation 28).**

## IV.    ~~III.~~ THE ENERGIZE DENVER ORDINANCE

75.    ~~64.~~ The Energize Denver Ordinance establishes a building performance program which requires Covered Building (commercial, multifamily buildings, and certain industrial buildings over 25,000 square feet) to meet energy use performance targets in calendar years 2024, 2027, and 2030.

76.    ~~65.~~ The Energize Denver Ordinance directs the Denver OCASR to

30

establish rules by which every Covered Building is assigned a building type and EUI building performance standard target such that 30% total energy savings across all Covered Buildings is achieved by 2030.

77. ~~66.~~ Under the Energize Denver Ordinance, Covered Building owners are subject to civil penalties for violating any provision of the Ordinance of up to $0.70 per year for each required kBtu reduction that the Covered Building owner fails to achieve in that year.[3]

78. ~~67.~~ Failure to pay any civil penalty within one hundred and eighty (180) days is considered a debt to the City and County of Denver until paid in full, and the debt represents a perpetual lien on the property superior to all other liens, except for liens for general taxes and prior special assessments.

## V. ~~IV.~~ THE ENERGIZE DENVER REGULATIONS

79. ~~68.~~ The Energize Denver Regulations, as adopted by the Denver OCASR under the direction of the Energize Denver Ordinance, set 2030 "building performance standards" for Covered Buildings (commercial, multifamily, and certain industrial buildings over 25,000 square feet) which require the owners of Covered Building to meet certain building performance standards by 2024, 2027, and 2030 compliance

---

[3] OCASR's April 1, 2025 "Technical Guidance" for Energize Denver purports to authorize OCASR to charge lesser penalty rates in certain circumstances. Available at: https://denvergov.org/Government/Agencies-Departments-Offices/Agencies-Departments-Offices-Directory/Climate-Action-Sustainability-and-Resiliency/Cutting-Denvers-Carbon-Pollution/Efficient-Commercial-Buildings/Denver-Building-Regulations/Energize-Denver-Building-Performance-Policy/Buildings-25000-sq-ft-or-Larger/Technical-Guidance-25k-or-more (last visited June 6, 2025).

31

deadlines.

80.    ~~69.~~ The Energize Denver Regulations apply to ~~both *existing* and *new*~~**all** Covered Buildings, regardless of whether the Covered Buildings are undergoing any renovations or construction.

81.    ~~70.~~ Like Regulation 28, Covered Buildings under the Energize Denver Regulations are given a target EUI performance score for the 2030 deadline, set by "property type".

82.    ~~71.~~ The 2024 and 2027 interim EUI building performance standards in the Energize Denver Regulations are then set drawing a "straight line" from the Covered Building's 2019 EUI **benchmarking** score to the 2030 EUI building performance standard to determine interim targets for the 2024 and 2027 compliance year deadlines.[34]

83.    ~~72. Also l~~**L**ike Regulation 28, the EUI ~~building performance standards in the Energize Denver Regulations are set so stringently as to effectively require~~**scores of Energize Denver, despite being based on GHG emissions, *de facto* regulate the energy efficiency of Covered Products because the only sources of GHG emissions are the energy consuming equipment and fixtures within** a Covered Building ~~owner to install Covered Products that exceed federal DOE efficiency standards.[4]~~**.**

---

[34] Certain property type categories, such as Aquariums, Convention Centers, Ice Rinks, and Indoor Arenas are given a flat 30% EUI reduction requirement by 2030 rather than an EUI building performance standard score.
~~[4] The EUI targets for most categories of property types are essentially identical between Regulation 28 and the Energize Denver Regulations. For example, the "multifamily housing" property type, which applies to CAA's and AAMD's members buildings, has a 2030 EUI target in Regulation 28 of 42.1, and a 2030 EUI target in the Energize Denver Regulations of 44.2, essentially a negligible difference.~~

32

84. ~~73. In other words~~ Also like Regulation 28, the EUI building performance ~~pathway has been set~~ standards in the Energize Denver Regulations are so stringent~~ly~~ that the only feasible way for ~~a~~ the vast majority of Covered Building~~s~~ to ~~meet the energy reduction EUI goals is to install electrified~~ comply is, in addition to implementing any other energy efficiency measures, to remove existing, EPCA compliant Covered Products ~~that exceed federal DOE standards set under Section 6295 of EPCA.~~ with remaining useful life and replaced them with higher efficiency, typically electric, Covered Products.[5] That is because EPCA regulated Covered Products such as HVAC and domestic water heating systems are responsible for the vast majority of energy used, and emissions generated, in Covered Buildings. In most cases, the most effective (but not cost effective) way for Covered Buildings to meet these building performance standards is to target the removal of fossil fuel utilizing Covered Products, as those products have the greatest GHG associated emissions at the Covered Buildings

85. ~~74.~~ The Energize Denver Regulations therefore ~~both favor electric~~ effectively require the removal and replacement of existing EPCA-compliant Covered Products ~~and effectively require that the~~ with remaining useful life in Covered ~~Products a Covered~~ Building~~s~~ ~~owner installs exceed federal DOE~~ in

---

[5] The EUI targets for most categories of property types are essentially identical between Regulation 28 and the Energize Denver Regulations. For example, the "multifamily housing" property type, which applies to CAA's and AAMD's members buildings, has a 2030 EUI target in Regulation 28 of 42.1, and a 2030 EUI target in the Energize Denver Regulations of 44.2, essentially identical.

33

D̲env̲er ~~gy efficiency standards~~.

86.   ~~75.~~ The Energize Denver Regulations allow compliance timeline and building performance standard target adjustments, but these adjustments do not affect this conclusion.  Instead, the procedures for allowing ~~a compliance timeline or building performance standard~~**these** adjustment**s** further emphasize that the Energize Denver Regulations are intended to force Covered Building owners into ~~choosing electrified~~**removing existing, EPCA compliant** Covered Products ~~and Covered Products that exceed federal DOE efficiency standards~~.

87.   **For example, a Covered Building owner may seek adjustments of their final target, such as the baseline year, or selecting a maximum percent energy reduction pathway that requires a 42% energy reduction from the Covered Building's baseline year.  Yet for Plaintiffs' members, regardless of the target adjustment or compliance pathway chosen, Energize Denver still results in the forced replacement of EPCA complaint covered products in their buildings.  *See* Exhibit 1 at ¶¶ 25-34; Exhibit 2 at ¶¶ 26-31; Exhibit 3 at ¶¶ 23-28; Exhibit 4 at ¶¶ 29-31; Exhibit 5 at ¶¶ 28-31; Exhibit 6 at ¶¶ 24-27; Exhibit 7 at ¶¶ 22-27; Exhibit 8 at ¶¶ 24-26; Exhibit 9 at ¶¶ 23-30; Exhibit 10 at ¶¶ 24-29.**

88.   ~~76. For example, the~~**The** Energize Denver Regulations **also** allow a 10% ~~increase~~**adjustment** to the 2030 EUI building performance standard target**, but only** for Covered Buildings that have ~~re~~ach**iev**ed ~~a~~ 80% **"**whole building electrification**"** (meaning 80% of the building's systems are electrified).

89.   ~~77.~~ Under the Energize Denver Regulations, Covered Building owners

34

can seek a timeline adjustment option (changing the 2024, 2027, or 2030 compliance deadlines) by submitting an application with a qualifying energy audit**, and** a retrofitting plan ~~that~~**, but this package must** include~~s~~ an evaluation of the electrification feasibility for natural gas equipment, and supporting documentation validating the reason for a timeline adjustment.

90.    **Additionally, under the April 1, 2025 changes to the Energize Denver Regulations, Covered Building owners can submit an exemption request in the 2025 reporting year that will shift the 2024 target to 2028, eliminate the 2027 target, and shift the 2030 target to 2032.  However, providing additional *time* for Covered Buildings to achieve the stringent EUI targets does not change that the final targets (either in 2030 or 2032) still require the replacement of existing Covered Products in Covered Buildings.**

91.    ~~78.~~ Covered ~~b~~**B**uilding owners can also seek credit for using renewable power that can be applied towards a building's total energy use (minimum five-year purchase contract).   Separately, short term renewable contracts may be used for up to 20% of a buildings' electricity usage through ~~2026, or 10% from 2027 through~~ 2030**1**.

92.    **Finally, Covered Building owners can seek custom target adjustments if, after all other applicable target adjustments are applied, the Covered Building still does not have a viable path to reach the final EUI targets.  Under this custom target adjustment option, Covered Building owners must first have completed the standard target adjustment process and must submit an application to OCASR that includes an energy audit that meets the minimum**

35

requirements of the technical guidance (which generally require ASHRAE equivalent audits). If approved, the Covered Building owner will be granted a custom target that will result in a compliance notice that will require (1) energy efficiency measures with less than a 20-year simply payback; (2) improving the leakage of the Covered Building's envelope if identified in the energy audit; (3) replacing or upgrading existing building equipment a necessary to reach the final target at the end of the equipment's useful service life (as defined by OCASR, and not the Covered Building owner); and implementing viable renewable energy options.

93. 79. All Regardless of the above "compliance pathways" a Covered Building owner can pursue to meet the building performance standards still require a chooses, Level II ASHRAE Energy Audits completed by Plaintiffs' members demonstrate that Covered Building owners to replace are forced to remove existing EPCA regulated and compliant Covered Products and replace them with new Covered Products that exceed efficiency standards of EPCA regulated under Energize Denver (and in most cases electric in lieu of existing fossil fuel utilizing Covered Products set by the DOE. ). See Exhibit 1 at ¶¶ 25-34; Exhibit 2 at ¶¶ 26-31; Exhibit 3 at ¶¶ 23-28; Exhibit 4 at ¶¶ 29-31; Exhibit 5 at ¶¶ 28-31; Exhibit 6 at ¶¶ 24-27; Exhibit 7 at ¶¶ 22-27; Exhibit 8 at ¶¶ 24-26; Exhibit 9 at ¶¶ 23-30; Exhibit 10 at ¶¶ 24-29.

94. 80. The Energize Denver Ordinance and Energize Denver Regulations thus contain building performance standards that regulate and concern the energy

36

efficiency and energy use of EPCA ~~preempted~~ Covered Products.

**FEDERAL LAW GOVERNING STATE AND LOCAL ENERGY REGULATIONS**

**I.    THE ENERGY POLICY AND CONSERVATION ACT**

95.    ~~81.~~ EPCA regulates the energy efficiency of both residential (or consumer) (42 U.S.C. § 6291 *et seq*) and industrial (or commercial) Covered Products (42 U.S.C. § 6311 *et seq*) and explicitly preempts state and local regulations "concerning the energy efficiency" and "energy use" of the Covered Product[56] for which DOE sets energy efficiency standards under EPCA.  42 U.S.C. § 6297(c); 42 U.S.C. § 6316(b)(2).

96.    ~~82.~~ The Covered Products regulated by EPCA include consumer appliances such as air conditioners, water heaters, furnaces, clothes washers and dryers, ~~and~~ stoves**, pool heaters, faucets and showerheads, and toilets** (*see* 42 U.S.C. §§ 6292; 6295)**,** and commercial equipment such as air conditioners, furnaces, water heaters, and clothes washers**, as well as ancillary or related equipment, such as motors, pumps, etc.** (*see* 42 U.S.C. §§ 6311(1); 6313).

97.    ~~83. Those definitions are~~**The regulatory status of this equipment is** not tied to who is using the Covered Products.    A ~~product qualifying as a~~ "consumer product" ~~but~~ used in a commercial enterprise is still a ~~"consumer~~**Covered p**P~~roduct."~~**roduct.**

---

[56] *See* ~~footnote 1~~**paragraph 5**, *supra*, noting that the use of "Covered Product" herein applies to both "Covered Products" meaning *consumer* equipment preempted under EPCA, 42 U.S.C. § 6291 *et seq*. and "Covered Equipment", meaning *commercial* equipment preempted under EPCA, 42 U.S.C. § 6311 *et seq*.

37

*See id.* §§ 6291(2), 6929(a), 6311(2)(A)(iii).  EPCA covered consumer heating and cooling equipment and water heaters are often installed in commercial establishments, in addition to their typical consumer (residential) installations.

98. ~~84.~~ EPCA preempts any "energy conservation standard" set by a state or local government for consumer and commercial Covered Products.  42 U.S.C. § 6297(b)**, (c)**; 42 U.S.C. § 6316(a)(10)**, (e)(3)(A), (e)(4)(B), (f)(1)(A)(ii), (f)(2)(A)(ii), (f)(3)(B), (g)(1)(B)**.

99. ~~85.~~ "Energy use" is defined as "the quantity of energy directly consumed by a consumer or commercial product at point of use." 42 U.S.C. § 6291(4); 42 U.S.C. § 6311(4).  "Energy" is defined as "electricity, or fossil fuels," such as natural gas or propane.  42 U.S.C. § 6291(3); 42 U.S.C. § 6311(7).

100. ~~86.~~ EPCA defines an "energy conservation standard" as "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use."  42 U.S.C. § 6291(6)(A); 42 U.S.C. § 6311(18).

101. ~~87.~~ The express preemption provision in EPCA states that "on the effective date of an energy conservation standard established in or prescribed under [42 U.S.C. § 6295] for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product unless the regulation" falls within certain enumerated exceptions.  42 U.S.C. § 6297(c); 42 U.S.C. § 6316(a)(8), (b)(2)(A) **(preempting "any State or local regulation concerning the energy efficiency or energy use of a**

38

**product for which" there is a federal standard in regard to commercial Covered Products)**.

102. ~~88.~~ Putting these definitions together, EPCA preempts **state or local laws or** regulations relating to "the quantity of [fossil fuel] directly consumed by" (42 U.S.C. § 6291(4); 42 U.S.C. § 6311(4)) covered consumer and commercial Covered Products at the place where those Covered Products are used.

### A. Limited Exceptions to Preemption for Federal Energy Efficiency and Energy Use Standards for Consumer Covered Products.

103. ~~89.~~ EPCA provides a single exception for state ~~building codes~~**energy efficiency regulations** regulating consumer Covered Products in *existing construction*~~:~~ ~~a.   A~~ state may only regulate consumer Covered Products **present in existing construction** if the state applies for a waiver to the Secretary of DOE**,** and the Secretary, through a stringent ~~rulemaking~~**public petition** process, finds that the state has established that the state regulation is needed to meet "unusual or compelling [s]tate or local energy or water interests," which are defined as interests "substantially different in nature or magnitude than those prevailing in the United States generally." 42 U.S.C. § 6297(d).**(1)(C).  Even then, the Secretary may not allow a waiver if the Secretary finds that "such State regulation will significantly burden manufacturing, marketing, distribution, sale, *or servicing* of the covered product on a national basis."  *Id.* at (d)(3) (emphasis added).**

104. ~~90.~~ To Plaintiffs' knowledge, none of the Defendants have applied for or obtained a waiver of preemption for their regulations as they relate to *existing*

39

*construction*.

105. ~~91.~~ For *new construction*, EPCA provides narrow exceptions for certain building codes regulating consumer Covered Products.  42 U.S.C. § 6297(f)(3).

~~92. For consumer Covered Products in *new construction*, a state "energy conservation standard" will be exempted from preemption if it meets one of three sets of enumerated requirements:~~

~~a. Under the first option to avoid preemption, a performance-based building code must meet all of the following guidelines: a) the code may depend on a baseline building design and its associated energy consumption, to which all other building designs will be compared (42 U.S.C. § 6297(f)(3)(D)); b) the baseline building design must not require consumer Covered Products to have a greater efficiency than the federal standard unless the State has received a waiver from DOE (42 U.S.C. § 6297 (f)(3)(B)); and c) any trade-off using a consumer Covered Product must be on a one-for-one equivalent energy use basis (42 U.S.C. § 6297(f)(3)(C)) (e.g. one energy source or type of equipment is not favored over another).~~

~~b. Under the second option to avoid preemption a performance-based building code can, alternatively, establish one or more optional "packages" (referred to in EPCA as "combinations of items") which meets the baseline building design.  42 U.S.C. § 6297(f)(3).  However, in each case where a package includes a consumer Covered Product for which the efficiency standard exceeds the federal standard, the code must also include as an alternative a package in which that consumer Covered Product just meets, but does not exceed, the applicable federal~~

40

standard.  42 U.S.C. § 6297(f)(3)(E).  Neither Regulation 28 nor the Energize Denver Ordinance and Energize Denver Regulations establish "packages" based on building baseline designs.  Therefore, this exemption does not apply.

c. Third and finally, DOE can grant a waiver of preemption to a state for a building code governing new construction if the state appeals to the Secretary of DOE and the Secretary, through a stringent rulemaking process, finds that the state has established that the state regulation is needed to meet "unusual or compelling [s]tate or local energy or water interests," which are defined as interests "substantially different in nature or magnitude than those prevailing in the United States generally." 42 U.S.C. § 6297(d). To Plaintiffs' knowledge, none of the Defendants have applied for a waiver of preemption for their regulations as they relate to *new construction*.

93. These requirements, taken together, are intended to only allow codes for *new construction* that use consumption objectives and give builders a choice over how to increase overall building efficiency, ensuring an even-handed policy that does not force builders to choose one type of appliance or energy source over another. *See* S. Rep. 100-6 at 10-11 (1987); *see also id* at 26 (The provisions of § 6297(f)(3) "are designed to ensure that performance-based codes cannot expressly or effectively" require installation of higher-efficiency products).

94. Energy performance standards in building codes that force builders to choose one type of consumer Covered Product (or energy source) over another in *new construction* are thus preempted under EPCA.

41

95. Further, EPCA's exceptions from preemption for performance-based building codes apply only to new construction, not to existing buildings or building renovations or replacements of existing systems, and do not allow the retroactive imposition of new **code** requirements on existing systems.  42 U.S.C. § 6297(f)(1**c**).

106. 96. In the design of new construction, trade-offs can be made in the efficiencies or projected **during the design process regarding a building's** energy consumption of various building features, including the building envelope, wall and ceiling insulation **and other materials selections**, window area, lighting, HVAC equipment, and water heating equipment, to reach**onsite and offsite energy sources, etc. to achieve** a desired overall building energy consumption objective.  However, when various components of an existing building are being altered or renovated, there is nothing to trade off against because the building envelope, insulation, lighting, etc. **and systems** are already in place.  These adverse impacts**challenges** are amplified for existing buildings when there are no plans to alter or renovate, and the renovations are due solely to the retroactive imposition of new requirements on existing systems.  Performance-based building codes contemplate the entire building and all of its systems as a single design and cannot be applied retroactively in a piecemeal fashion, such as to renovations or replacements of systems or equipment.

107. 97. Both Regulation 28 and Energize Denver apply to existing *Covered Buildings as well as new* Covered Buildings and do not qualify for any of the exemptions from EPCA preemption, forcing building owners to choose **remove existing EPCA compliant** consumer Covered Products that exceed federal standards and to

42

prioritize**and replace them with new, typically** electri~~fiedc   consumer,~~ Covered Products ~~over fossil fuel-powered consumer~~**in most of their** Covered ~~Products~~**Buildings**.

### B. Limited Exemptions to Preemption for Federal Energy Efficiency and Energy Use Standards Governing Commercial Covered Products.

108. ~~98.~~ With limited exceptions, federal standards for commercial Covered Products preempt any state or local regulations concerning the energy efficiency or energy use of such Covered Products. 42 U.S.C. § 6316(b)(2).

109. ~~99.~~ For state regulations governing commercial Covered Products in *existing construction*, the single exemption from preemption is identical to that for consumer Covered Products: the DOE can grant a waiver of preemption to a state (or locality) if the DOE, through a stringent rulemaking process, finds that the state (or locality) has established that the state regulation is needed to meet "unusual or compelling [s]tate or local energy or water interests," which are defined as interests "substantially different in nature or magnitude than those prevailing in the United States generally."  42 U.S.C. §§ 6297(d) and 6316(b)(2)(D).

110. ~~100.~~ To Plaintiffs' knowledge, none of the Defendants have applied for or obtained a waiver of preemption for their regulations as they relate to *existing construction*.

111. ~~101.~~ There is also a limited exception from preemption for energy efficiency standards for commercial Covered Products in state or local building codes for *new construction*.  42 U.S.C. § 6316(b)(2)(B)~~.~~**.  However, that exemption does**

43

not apply to the application of Regulation 28 and Energize Denver challenged here, which is in *existing* construction.

a. Only in the event that the American Society of Heating, Refrigerating and Air- Conditioning Engineers ("ASHRAE") amends standards contained in ASHRAE Standard 90.1 respecting any of the commercial Covered Products to specify a more stringent efficiency standard does EPCA permit a state or local building code to adopt that more stringent standard for those consumer Covered Products in *new* construction.  42 U.S.C. § 6316(b)(2)(B).  In other words, a state may only adopt standards for commercial Covered Products in *new construction* that meet, but do not exceed, current federal ASHRA 90.1 standards.

102. Upon information and belief, neither Regulation 28 nor Energize Denver specifically adopt the ASHRAE Standard 90.1, but instead effectively mandate the installation of commercial Covered Products whose performance exceeds the ASHRAE standard by setting the energy conservation standards so stringently that they can only be met by installation of commercial Covered Products that exceed the ASHRAE Standard 90.1.

112. ~~103.~~ Further, EPCA provides no exception from preemption for performance-based building codes (energy conservation standards) for commercial Covered Products, unlike the exception from preemption for consumer Covered Products at 42 U.S.C. § 6297(f)(3).

113. ~~104.~~ Regulation 28 and Energize Denver apply to *existing* Covered Buildings ~~as well as *new* Covered Building, force building owners to choose commercial~~

44

~~Covered Products that exceed federal standards, do not have a one-to-one energy equivalent energy use~~, and force building owners to ~~prioritize electrified~~**remove existing EPCA compliant** commercial Covered Products ~~over fossil fuel-powered commercial~~**and replace them with new, and typically electric,** Covered Products **in most of their Covered Buildings**.

## ALLEGATIONS

### I.  COLORADO REGULATION 28 AND ENERGIZE DENVER REGULATE COVERED PRODUCTS PREEMPTED BY EPCA

114.  ~~105.~~Both Regulation 28 and Energize Denver impose energy efficiency building performance standards that (1) regulate **and concern the energy efficiency and energy use of** consumer and commercial Covered Products in ~~both~~*existing* ~~and new construction~~**buildings**; (2) effectively require **the removal and** replacement of **existing, EPCA compliant** Covered Products ~~that exceed federal DOE energy efficiency and energy use standards~~; and (3) conflict in fundamental ways with the standards passed by Congress and regularly updated by DOE by effectively requiring **the installation and use of** electri~~fied~~**c** Covered Products ~~over~~**and the removal of** fossil fuel utilizing Covered Products **in most Covered Buildings**.

115.  ~~106.~~During the ~~pendency of the~~Regulation 28 rulemaking proceedings, and after Energize Denver was finalized, the United States Court of Appeals for the Ninth Circuit invalidated the City of Berkeley's comparable, though less stringent, building code which prohibited gas piping in new buildings (unlike Regulation 28 and Energize Denver, Berkeley's ordinance applied only to *new* construction and not *existing*

buildings).  *Cal. Rest. Ass'n v. City of Berkeley*, 65 F.4th 1045 (9th Cir. 2023).  Later, on

a petition for rehearing en banc, the Ninth Circuit denied the petition for rehearing and

issued an amended opinion in *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th

Cir., Jan. 2, 2024).

116.    ~~107.~~ In the amended opinion, the Ninth Circuit held that "[b]y its plain text

and   structure,   EPCA's   preemption   provision   also   encompasses   building   codes

concerning the energy use of [C]overed [P]roducts."  *Id.* at 1099.[7]

117.    ~~108.~~ Both Regulation 28 and Energize Denver do exactly what the Ninth

Circuit  concluded  was  preempted  –  regulate  the  energy  use  (natural  gas  use)  of

EPCA-regulated Covered Products by requiring Covered Building owners to ~~choose~~ **(1)**

**examine the energy usage of Covered Products in their buildings; and (2) reduce**

**the energy usage of those Covered Products to meet the building performance**

**standards  of  Regulation  28  and  Energize  Denver.    This  alone  is  enough  to**

**implicate EPCA's preemption provisions, which preempt any "State regulation**

**concerning the energy efficiency, energy use, or water use of such [C]overed**

**[P]roduct."  42 U.S.C. § 6297(c); 42 U.S.C. § 6316.**

118.    **In  many  cases,  Regulation  28  and  Energize  Denver  also  require**

---

**[7] Recently, a Court in the S.D. of New York reached a contrary opinion in regards to a local law which prohibited the use of fossil fuels in *new* construction.  *Assoc. of Contracting Plumbers of City of New York, Inc. v. City of New York*, 2025 WL 843619 (S.D. N.Y. March 18, 2025).   That case is distinguishable here, because Plaintiffs are challenging regulations that impact e*xisting* Covered Products in *existing* Covered Buildings, forcing building owners at a very high cost to retrofit existing functioning buildings.**

46

**Covered Building owners to remove existing EPCA compliant Covered Products and replace them with** more efficient Covered Products, with a built-in bias towards electric over corresponding fossil fuel utilizing Covered Products.

119. ~~109.~~ Regulation 28 and Energize Denver **also** effectively and *de facto* prohibit **or severely limits** the use of natural gas appliances in **most** existing and new **Covered b**Buildings by setting the energy conservation standards so stringent**ly** so as to provide Covered Building owners with no ~~effective choice in reducing their energy consumption or greenhouse gas emissions other than to install electric~~**alternative other than replace existing, EPCA compliant** Covered Products ~~that exceed federal DOE standards~~**with new, and in most cases electric, Covered Products**.

120. ~~110.~~ Despite the express preemption provisions of EPCA, Defendants seek to impose their own energy efficiency standards for **existing** Covered Products, both consumer and commercial, on Plaintiffs, their members, and all other similarly situated Covered Building owners in Colorado and Denver.

121. ~~111. Neither set of regulations~~**None of the Defendants** have obtained the single and limited waiver from EPCA preemption for regulating Covered Products in *existing* construction.

~~112. Neither set of regulations have met the statutory standards for exemption from EPCA preemption for *new construction* building codes.~~

~~113. Nor have defendants obtained a waiver from preemption for their energy conservation standards regulating *new construction*. Regulation 28 and Energize Denver do not meet the statutory requirements for a waiver of EPCA preemption for *new*~~

47

construction and on information and belief, neither the State of Colorado, the Commission, the City and County of Denver, nor the Denver OCASR have applied for a waiver from preemption.

122. 114. Plaintiffs accordingly bring this action seeking a declaration that Regulation 28 and Energize Denver are preempted by EPCA and therefore unenforceable, as well as seeking an injunction to prevent enforcement of the regulations.

## II. A. Colorado Regulation 28 Mandates Energy Efficiency Standards for Covered Products and is Preempted by EPCA.

123. 115. Regulation 28 requires existing and new Covered Buildings to meet building performance standards by 2026 and 2030 regardless of whether the *existing* covered buildings are undergoing renovations or changing out equipment.

124. 116. By its plain terms, Regulation 28 is a "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use" (42 U.S.C. § 6291(6)(A)) and is preempted by EPCA as a "regulation concerning the energy efficiency, energy use, or water use" of Covered Products (42 U.S.C. § 6297(c)).

125. 117. More specifically, Regulation 28 requires a Covered Building owner to "reduce the energy consumption of the building through the implementation of energy efficiency measures and/or technologies to meet the applicable property type weather-normalized site EUI target" or GHG Intensity score target.

126. 118. As set forth in paragraphs 36-6354, *supra*, Regulation 28 and the

48

~~target methodology for setting the EUI and GHG Intensity score targets were clearly set to achieve a reduction in greenhouse gas emissions and are focused on achieving those targets by reducing a Covered Building's use~~**concerns the energy efficiency** of Covered Products ~~that utilize fossil fuels~~**because the building performance standards focus on whole building energy usage – and the Covered Products within existing buildings make up the vast majority of their energy usage**.

<u>127.</u> ~~119.~~Plaintiffs' members have determined that **for most of their Covered Buildings,** the only way to meet the prescriptive building performance standards in Regulation 28 ~~is to replace EPCA-regulated Covered Products in their buildings with Covered Products exceeding federal DOE~~**, in addition to other available** energy efficiency ~~standards. Simply put~~**measures, is to remove EPCA-compliant Covered Products and replace them with new, typically electric, Covered Products. For most Covered Buildings**, there is no combination of ~~non-EPCA Covered Products replacements~~**other energy efficiency measures** (e.g. changing insulation, replacing non-EPCA-regulated lights, etc.) that**, by themselves,** will allow ~~a Covered Building~~**Plaintiffs** to meet the building performance standards of Regulation 28~~—~~**.** ~~o~~**O**nly **the removal and** replacement of ~~EPCA-regulated~~**existing EPCA-compliant** Covered Products ~~with products that exceed federal DOE energy efficiency standards~~ can achieve the building performance standards of Regulation 28.

**A.** ~~i.~~**Colorado Regulation 28 Regulates the Energy Efficiency of Covered Products in Existing Covered Buildings.**

49

128. ~~120. Upon information and belief~~**As demonstrated by the Level II ASHRAE Energy Audits conducted by Plaintiffs' members**, there is no feasible way for Plaintiffs' members to meet the building performance standards in **most of** their existing buildings under Regulation 28 unless they **target the energy efficiency of Covered Products in their buildings, often being required to** replace both consumer and commercial **existing, EPCA compliant** Covered Products ~~regulated under EPCA with new products that exceed the EPCA standards set by DOE.  *See* e.g. Attachment 3, Decl. of C. Lessard at ¶ 16; Attachment 7, Decl. of J. Damioli at ¶ 15.~~**in their buildings with new, and typically electric, Covered Products.  *See* e.g. Exhibit 1 at ¶¶ 19-23; Exhibit 2 at ¶¶ 21-24; Exhibit 3 at ¶¶ 18-20; Exhibit 4 at ¶¶ 20-30; Exhibit 5 at ¶¶ 19-24; Exhibit 6 at ¶¶ 18-23; Exhibit 7 at ¶¶ 16-20; Exhibit 8 at ¶¶ 16-19; Exhibit 9 at ¶¶ 18-21; Exhibit 10 at ¶¶ 19-22.  This true regardless of the compliance pathways chosen and the implementation of other energy efficiency measures.  *See id.*

~~121. Further, upon information and belief, Plaintiff's members will be required to replace commercial Covered Products (which are compliant with EPCA and DOE energy efficiency standards) with equipment that exceeds the energy efficiency standards required under the federal ASHRAE 90.1 standard.~~

129. ~~122. Upon information and belief~~**As demonstrated by the Level II ASHRAE Energy Audits conducted by Plaintiffs' members**, "low hanging" energy efficiency measures involving non-EPCA Covered Products such as LED lights,

50

windows, and other building envelop items, ~~in and of~~**by** themselves, are not sufficient ~~for the Covered Buildings~~ to achieve the building performance standards of Regulation 28.  **Nor are measures such as installing rooftop solar arrays sufficient to meet the compliance targets.  _See id._**

~~123. For Plaintiffs' members, the preliminary estimates for the costs of compliance with Regulation 28 by replacing Covered Products would cost significant capital, often in the millions of dollars.~~

130.    **Preliminary estimates show that compliance with Regulation 28 to retrofit existing Covered Buildings by removing and replacing Covered Products will require significant capital expenditures, from hundreds of thousands to millions of dollars at each Covered Building.  Exhibit 1 at ¶¶ 22, 24; Exhibit 2 at ¶ 25; Exhibit 3 at ¶¶ 21-22; Exhibit 4 at ¶¶ 21-22, 28; Exhibit 5 at ¶¶ 22, 25; Exhibit 6 at ¶ 21; Exhibit 7 at ¶ 21; Exhibit 8 at ¶ 20; Exhibit 9 at ¶ 22; Exhibit 10 at ¶¶ 21, 23**

131.    ~~124.~~ In addition, the existing ~~HVAC infrastructure that would have to be~~**EPCA compliant Covered Products that will have to be removed and** replaced frequently ~~has~~**have** a long remaining useful life and ~~is~~**may** still ~~being paid off~~**be subject to financing**, imposing ~~an~~ additional and unnecessary financial burden~~s~~.  **(not to mention the waste of natural resources caused by removing from service tens of thousands of functioning EPCA-compliant Covered Products that have remaining useful lives).  _Id._**

132.    ~~125.~~ Regulation 28 ~~would~~**has** cause**d** Plaintiffs' members to immediately ~~need to~~ begin expending additional resources to hire consultants or conduct energy

51

audits and begin the process of planning the engineering work necessary to remove existing infrastructure and install the new systems in order to meet the 2026 and 2030 compliance deadlines for Regulation 28.  *See* ~~Attachments 1-10~~**Exhibit 1 at ¶¶ 25-34; Exhibit 2 at ¶¶ 26-31; Exhibit 3 at ¶¶ 23-28; Exhibit 4 at ¶¶ 29-31; Exhibit 5 at ¶¶ 28-31; Exhibit 6 at ¶¶ 24-27; Exhibit 7 at ¶¶ 22-27; Exhibit 8 at ¶¶ 24-26; Exhibit 9 at ¶¶ 23-30; Exhibit 10 at ¶¶ 24-29**.

133.    ~~126.~~There are significant technical challenges as well, as entire building systems would need to be renovated, likely displacing residents/tenants for prolonged periods of times in Plaintiffs' members' buildings.  ***Id.*  Removing fossil-fueled Covered Products and replacing them with electric Covered Products is not a simple matter of exchanging equipment: it requires removing and replacing extensive systems that are integrated and buried into the building's physical infrastructure. In most cases this disruptive, and potentially long-lasting, work will require tenants to be removed from the areas where this mandated demolition and renovation work is being conducted. This imposes financial burdens on building owners and financial and physical hardships on displaced tenants.**

134.    ~~127.~~Further, **at least some of** these **significant** compliance costs would be ~~passed down to~~**borne by** residents/tenants through significant rent increases, causing economic hardship to residents/tenants and making Plaintiffs' members' Covered Buildings less competitive with buildings not covered by Regulation 28, ultimately harming their business and rental/tenant prospects in Colorado.  Requiring

52

**the removal and** replacement of **perfectly good and functioning** EPCA-regulated Covered Products would thus waste already expended capital, waste the resources **used** for the manufacture of the current Covered Products~~,~~ **that would have to be removed despite having remaining useful life, and** require additional resources for disposal of the Covered Products, displace residents, and increase rents. ***Id.***

~~ii. Regulation 28 Regulates Covered Products in New Covered Buildings.~~

~~128. Upon information and belief, there is no feasible way for Plaintiffs' members to meet the building performance standards in their planned new buildings under Regulation 28 unless they rework building designs to replace both consumer and commercial Covered Products regulated under EPCA with new products that exceed the EPCA standards. *See* Attachment 1, Decl. of R. Rogers at ¶¶ 17-18; Attachment 8, Decl. of W. Isenberg at ¶¶ 17-18; Attachment 9, Decl. of N. Dimond at ¶¶ 16-17.~~

~~129. Upon information and belief, given the disparities between the reductions required by choosing the EUI score compliance pathway versus the GHG Intensity score compliance pathway, Plaintiffs' members are forced to choose electric Covered Products over fossil fuel powered Covered Products in new Covered Buildings.~~

~~130. This conclusion is unchanged by Regulation 28 offering several different "pathways" towards compliance with the building performance standards — all of the compliance pathways in Regulation 28 mandate meeting standards that impose a "minimum level of energy efficiency or a maximum quantity of energy use" as described in 42. U.S.C. § 6291(6)(A) that are preempted by EPCA.~~

**B. Colorado Regulation 28 Does Not Meet Any of EPCA's Exemptions to Preemption.**

53

135.    ~~131.~~ Regulation 28 does not meet any of EPCA's exemptions to preemption.

136.    ~~132.~~ First, to Plaintiffs' knowledge, Defendants have not applied for or obtained the required waiver under EPCA, 42 U.S.C. § 6297(d), for the application of Regulation 28 to either *existing* ~~or *new* construction~~**Covered Buildings**.

137.    ~~133.~~ Second, EPCA provides no exemption for energy conservation standards in building codes regulating Covered Products (consumer or commercial) in *existing* buildings.  Because Regulation 28 imposes energy conservation standards on all existing and new Covered Buildings in the State of Colorado, it is preempted to the extent it regulates *existing* buildings because no waiver has been obtained.

~~134. Third, as to *consumer* Covered Products in *new* Covered Buildings, Regulation 28 has not met the preemption exceptions for *consumer* Covered Products in new building codes under 42 U.S.C. § 6297(f) because Regulation 28 requires Covered Building owners to select Covered Products with energy efficiencies that exceed applicable energy conservation standards under Section 6295 of EPCA, in violation of 42 U.S.C. § 6297(f)(3)(B).~~

~~135. Fourth, as to *commercial* Covered Products, Regulation 28 has not met the preemption exceptions for *commercial* Covered Products in *new* Covered Buildings under 42 USCA § 6316(b)(2)(B) because, upon information and belief, Regulation 28 effectively requires that Covered Building owners select commercial Covered Products that exceed the ASHRAE Standard 90.1.~~

### III.    ~~B.~~ Energize Denver Mandates Energy Efficiency Standards for Covered

54

**Products and is Preempted By EPCA.**

138. ~~136.~~ Energize Denver applies to all *existing ~~and new~~* Covered Buildings in the City and County of Denver and requires existing ~~and new~~ Covered Buildings to meet building performance standards by 2024, 2027, and 2030 **(or 2028 and 2032 if a Covered Building applies for extensions)** regardless of whether the *existing* Covered Buildings are undergoing renovations or changing out equipment ~~with existing useful life~~.

139. ~~137.~~ By its plain terms, Energize Denver sets "performance standard[s] which prescribes a minimum level of energy efficiency or a maximum quantity of energy use" (42 U.S.C. § 6291(6)(A)), and by doing so is preempted by EPCA **(42 U.S.C. § 6297(c))**.

140. ~~138.~~ More specifically, Energize Denver requires a Covered Building owner "to meet energy performance targets in calendar years 2024, 2027, and 2030" and to "maintain the interim targets each subsequent year and shall maintain the final energy performance target indefinitely."

141. ~~139.~~ As set forth in paragraph~~s 64-80~~**83**, *supra*, Energize Denver ~~was clearly set to achieve a reduction in greenhouse gas emissions, and is focused on achieving those targets (a) by replacing a Covered Building's use of~~**concerns** Covered Products ~~that utilize fossil fuels by forcing Covered Building owners to choose one energy source (electric Covered Products) over another (fossil fuel utilizing Covered Products) and (b) by providing incentives for electrified buildings, like the 10% increase in~~**because the** building performance standards ~~when a building is 80% electrified and the energy offsets~~

55

~~for RECs~~**focus on whole building energy usage – and the Covered Products within existing buildings make up the vast majority of their energy usage**.

142. ~~140.~~ Despite offering several different "pathways" towards compliance with the building performance standards, Energize Denver is a performance standard that ~~requires existing and new~~**, because other available energy efficiency measures will not, by themselves, achieve compliance, requires most existing** Covered Buildings in Colorado to replace EPCA compliant Covered Products with **new Covered ~~p~~P**roducts ~~exceeding the DOE's energy efficiency standards~~ in order to meet a "minimum level of energy efficiency or a maximum quantity of energy use" under 42. U.S.C. § 6291(6)(A) that is preempted by EPCA.

~~141. EPCA does not provide an exemption from preemption for performance-based building codes for *existing* construction. *See* 42 U.S.C. § 6297(f); 42 U.S.C. § 6316(b)(2).~~

143. **Plaintiffs' members have determined that the only way to meet the prescriptive building performance standards in Energize Denver in most of their Covered Buildings is, in addition to other energy efficiency measures, to replace EPCA-compliant Covered Products in their buildings with new Covered Products, and in most cases with electric Covered Products. There is no combination of non-EPCA Covered Products replacements (e.g. changing insulation, replacing non EPCA-regulated lights, etc.) that, by themselves, will allow Plaintiffs to meet the performance standards of Energize Denver in most of their Covered Buildings – only the removal and replacement of EPCA-compliant Covered Products with can achieve compliance.**

56

**A. i. Energize Denver Regulates the Energy Efficiency of Covered Products in Existing Covered Buildings.**

144. As demonstrated by the Level II ASHRAE Energy Audits conducted by Plaintiffs' members, there is no feasible way for Plaintiffs' members to meet the building performance standards in most of their existing buildings under Energize Denver unless they target the energy efficiency of Covered Products in their buildings, often being required to replace both consumer and commercial existing, EPCA compliant Covered Products in their buildings with new, and typically electric, Covered Products. *See* e.g. Exhibit 1 at ¶¶ 19-23; Exhibit 2 at ¶¶ 21-24; Exhibit 3 at ¶¶ 18-20; Exhibit 4 at ¶¶ 20-30; Exhibit 5 at ¶¶ 19-24; Exhibit 6 at ¶¶ 18-23; Exhibit 7 at ¶¶ 16-20; Exhibit 8 at ¶¶ 16-19; Exhibit 9 at ¶¶ 18-21; Exhibit 10 at ¶¶ 19-22. This true regardless of the compliance pathways chosen. *See id.*

142. Upon information and belief, there is no feasible way for Plaintiffs' members to meet the building performance standards in their existing buildings under Energize Denver unless they replace both consumer and commercial Covered Products regulated under EPCA with new products that exceed the EPCA standards set by DOE. *See* e.g. Attachment 3, Decl. of C. Lessard at ¶ 16.

143. Further, upon information and belief, Plaintiff's members will be required to replace commercial Covered Products (which are compliant with EPCA and DOE energy efficiency standards) with equipment that exceeds the energy efficiency standards required under the federal ASHRAE 90.1 standard.

57

145. ~~144. ~~Due to ~~the preference (and credit for 80% building~~**Energize Denver's** electrification~~)~~ **bias**, Plaintiffs' members have determined **that in most of their Covered Buildings,** they must ~~replace~~**remove** EPCA compliant fossil fuel-fired heating and cooling equipment **and replace it** with electric HVAC equipment, such as heat pumps, in order to meet the building performance standards in Energize Denver. *Id.* **Energize Denver thus further concerns the energy efficiency of EPCA compliant covered products because generally the only source of fossil fuel using equipment in Covered Buildings are Covered Products such as HVAC and domestic water heating equipment, or kitchen equipment.**

146. ~~145. Upon information and belief~~**As demonstrated by the Level II ASHRAE Energy Audits conducted by Plaintiffs' members**, "low hanging" energy efficiency measures involving non-EPCA Covered Products such as LED lights, windows, and other building envelop items, ~~in and of~~**by** themselves are not sufficient ~~for the Covered Buildings~~ to achieve the building performance standards of Energize Denver~~.~~ **in most Covered Buildings. Nor are measures such as installing rooftop solar arrays sufficient to meet the compliance targets. *See* Exhibit 1 at ¶¶ 19-23; Exhibit 2 at ¶¶ 21-24; Exhibit 3 at ¶¶ 18-20; Exhibit 4 at ¶¶ 20-30; Exhibit 5 at ¶¶ 19-24; Exhibit 6 at ¶¶ 18-23; Exhibit 7 at ¶¶ 16-20; Exhibit 8 at ¶¶ 16-19; Exhibit 9 at ¶¶ 18-21; Exhibit 10 at ¶¶ 19-22.**

~~146. As with Regulation 28, these retrofitting costs cause immediate and irreparable harms to Plaintiffs' members. In many cases, the existing HVAC infrastructure not only is primarily already highly energy efficient, but also still has a long remaining useful life~~

58

and is still being paid off.

147.    Preliminary estimates show that compliance with Energize Denver will require significant capital expenditures, from hundreds of thousands to millions of dollars for each Covered Building.  Exhibit 1 at ¶¶ 22, 24; Exhibit 2 at ¶ 25; Exhibit 3 at ¶¶ 21-22; Exhibit 4 at ¶¶ 21-22, 28; Exhibit 5 at ¶¶ 22, 25; Exhibit 6 at ¶ 21; Exhibit 7 at ¶ 21; Exhibit 8 at ¶ 20; Exhibit 9 at ¶ 22; Exhibit 10 at ¶¶ 21, 23.

148.    In addition, the existing EPCA compliant Covered Products that will have to be removed and replaced frequently have a long remaining useful life and may still be subject to financing, imposing  additional and unnecessary financial burdens (not to mention the waste of natural resources caused by removing from service tens of thousands of functioning EPCA-compliant Covered Products that have remaining useful lives).  *Id.*

149.    147. Energize Denver would thus has caused Plaintiffs' members to immediately need to begin expending additional monies in order resources to hire consultants or conduct energy audits and to begin the process of planning the engineering work necessary to remove existing infrastructure and install these the new systems by in order to meet the 2024, 2027, and 2030 (or if extended 2028 and 2032) compliance deadlines for Energize Denver.  See Exhibit 1 at ¶¶ 25-34; Exhibit 2 at ¶¶ 26-31; Exhibit 3 at ¶¶ 23-28; Exhibit 4 at ¶¶ 29-31; Exhibit 5 at ¶¶ 28-31; Exhibit 6 at ¶¶ 24-27; Exhibit 7 at ¶¶ 22-27; Exhibit 8 at ¶¶ 24-26; Exhibit 9 at ¶¶ 23-30; Exhibit 10 at ¶¶ 24-29.

59

150. 148. There are significant technical challenges as well, as entire building systems would need to be renovated. The renovations would, likely displaceing residents/tenants for prolonged periods of times in Plaintiffs' members Covered Buildings, decreasing the revenue the members typically receive from rent.' buildings. *Id.* Removing fossil-fueled Covered Products and replacing them with electric Covered Products is not a simple matter of exchanging equipment: it requires removing and replacing extensive systems that are integrated and buried into the building's physical infrastructure. In most cases this disruptive, and potentially long-lasting, work will require tenants to be removed from the areas where this mandated demolition and renovation work is being conducted. This imposes financial burdens on building owners and financial and physical hardships on displaced tenants.

151. 149. Further, costs to change the building infrastructure would be passed down at least some of these significant compliance costs would be borne by residents/tenants through significant rent increases, causing economic hardship to residents/tenants, and making Plaintiffs' members' Covered Buildings less competitive on the market with other buildings not covered by Energize Denver. Requiring full electrification at this time, ultimately harming their business and rental/tenant prospects in Colorado. Requiring the removal and replacement of perfectly good and functioning EPCA-regulated Covered Products would thus waste already expended capital, waste the resources used for the manufacture of the current Covered Products that would have to be removed despite having

60

**remaining useful life, and require additional resources for disposal of the**
**Covered Products,** displace residents/~~tenants~~, and increase rents. ***Id.***

~~ii. Energize Denver Regulates Covered Products in New Covered Buildings.~~
~~150. Upon information and belief, there is no feasible way for Plaintiffs' members
to meet the building performance standards in their planned new buildings under
Energize Denver unless they rework building designs to replace both consumer and
commercial Covered Products regulated under EPCA with new products that exceed the
EPCA standards. *See* Attachment 1, Decl. of R. Rogers at ¶¶ 17-18; Attachment 8, Decl.
of W. Isenberg at ¶¶ 17-18; Attachment 9, Decl. of N. Dimond at ¶¶ 16-17; Attachment 11,
Decl. of T. Carlson at ¶¶ 13-14.~~

~~151. Upon information and belief, given the disparities between the reductions
required by choosing the EUI score compliance pathway versus the GHG Intensity score
compliance pathway, Plaintiffs' members are forced to choose electric Covered Products
over fossil fuel powered Covered Products in new Covered Buildings.~~

~~152. Further, given Energize Denver's preferential treatment to buildings that have
achieved 80% electrification, the member example calculates that it is under further
pressure to choose electric Covered Products over fossil fuel powered Covered Products.~~

~~153. Therefore, Energize Denver regulates Covered Products in new construction.~~

**B.** ~~C.~~ **Energize Denver Does Not Meet Any of EPCA's Exemptions to
Preemption.**

152. ~~154.~~ Energize Denver does not meet any of EPCA's exemptions to
preemption. Energize Denver imposes energy conservation standards on all existing
~~and new~~ Covered Buildings in the City and County of Denver requiring replacement of

61

**existing, EPCA compliant,** *consumer* and *commercial* Covered Products ~~for ones that exceed federal DOE energy efficiency standards and exceed ASHRAE Standard 90.1~~.

153. ~~155.~~ First, to Plaintiffs' knowledge, Defendants have not applied for or obtained the required waiver under EPCA, 42 U.S.C. § 6297(d) for *existing* construction.  Without waiver, regulations that are more stringent than the federal regulations are preempted.  Thus, because Energize Denver imposes more stringent requirements and because no waiver has been obtained, Energize Denver is preempted to the extent they regulate existing buildings.

154. ~~156.~~ Second, EPCA provides no exemption for energy conservation standards regulating Covered Products in *existing* buildings.    Because Energize Denver imposes energy conservation standards on all existing Covered Buildings in ~~the State of Colorado~~ **Denver**, it is preempted to the extent it regulates *existing* buildings because no waiver has been obtained.

**IV.**    **Plaintiffs' and Their Members are Injured by Regulation 28 and Energize Denver.**
~~157. Third, as to~~ *new* ~~construction, Energize Denver has not met the preemption exceptions for~~ *consumer* ~~Covered Products in~~ *new* ~~building codes under 42 U.S.C. § 6297(f) because:~~
155.    **Plaintiffs, and their members, are injured by Regulation 28 and Energize Denver, and will be irreparably harmed if Regulation 28 and Energize Denver are not enjoined.**

156.    **Plaintiffs, and their members, have already experienced and will continue to experience harms in the form of economic injuries, altered business practices, and compliance burdens under Regulation 28 and Energize Denver.**

62

157.    Plaintiffs' members have determined, using Level II ASHRAE Energy Audits, that they will be forced to replace functioning EPCA Compliant Covered Products with remaining useful life in their buildings to meet the building performance standards of Regulation 28 and Energize Denver.  *See* Exhibit 1 at ¶¶ 19-23; Exhibit 2 at ¶¶ 21-24; Exhibit 3 at ¶¶ 18-20; Exhibit 4 at ¶¶ 20-30; Exhibit 5 at ¶¶ 19-24; Exhibit 6 at ¶¶ 18-23; Exhibit 7 at ¶¶ 16-20; Exhibit 8 at ¶¶ 16-19; Exhibit 9 at ¶¶ 18-21; Exhibit 10 at ¶¶ 19-22.

158.    Plaintiffs' members have incurred the costs to contract for and complete Level II ASHRAE Energy Audits which were necessary to determine which Covered Product replacements will be necessary at their Covered Buildings in order to comply with Regulation 28 and Energize Denver.  Level II ASHRAE Energy Audits are not required by either Regulation 28 or Energize Denver (a Covered Building owner could simply comply with the building performance standards), but are critically necessary for a Covered Building owner to determine how to lower their building energy usage to meet the final building performance standards of either regulation.   Plaintiffs' members have incurred these costs under the threat of penalty and enforcement action from Defendants.  *See* Exhibits 1-10.

159.    Plaintiffs must incur the design and engineering costs now to start the process of these Covered Product replacements, because otherwise they risk not meeting the fast-approaching compliance deadlines under Regulation 28 and Energize Denver and being subject to penalty and enforcement actions from

63

Defendants. *See* Exhibit 1 at ¶¶ 25-34; Exhibit 2 at ¶¶ 26-31; Exhibit 3 at ¶¶ 23-28; Exhibit 4 at ¶¶ 29-31; Exhibit 5 at ¶¶ 28-31; Exhibit 6 at ¶¶ 24-27; Exhibit 7 at ¶¶ 22-27; Exhibit 8 at ¶¶ 24-26; Exhibit 9 at ¶¶ 23-30; Exhibit 10 at ¶¶ 24-29.  That is because substantial lead time is necessary to effectuate the replacement of Covered Products by even the farthest out deadline of 2032.

160.    Plaintiffs' members will also imminently experience harms from the loss of competitiveness in rental rates compared to similarly situated buildings that are below the Covered Building thresholds of Regulation 28 and Energize Denver, or buildings located in adjacent states without similar (preempted) energy efficiency standards.

161.    Plaintiffs' members' are also experiencing harms to their business planning, infrastructure investments, hiring decisions, jobs, and livelihoods.  Plaintiffs' members must now replace existing and functioning EPCA compliant Covered Products with remaining useful life, often where that equipment is not even fully paid off.  These costs impair Plaintiffs' members Covered Buildings and the operation and business planning for those Covered Buildings.

162.    Plaintiffs, and their members, have no adequate remedy at law for these irreparable harms.  Unless the Defendants are enjoined from effectuating and enforcing Regulation 28 and Energize Denver, Plaintiffs and their members will continue to be denied their legal rights and the protection against patchwork energy efficiency regulations that EPCA was designed to prevent.

163.    There will be no significant harm to Defendants from an injunction

64

because Defendants have no legitimate interest in enforcing invalid laws and regulations.

164.    The balance of harms thus favors injunctive relief.

165.    An injunction is also in the public interest. The public interest is not served by enforcing invalid laws.  Moreover, EPCA embodies a strong public interest in the uniform national regulation of energy conservation and use policy, encouraging diverse domestic supply of energy, and protecting consumer choice, all of which is undermined by conflicting state regulation of these matters, exemplified by Regulation 28 and Energize Denver.

166.    In short, both Regulation 28 and Energize Denver are already causing substantial adverse consequences for Plaintiffs and the public.  The Defendants' efforts to bypass federal law to implement their own energy policies violate EPCA, are contrary to the public interest, and cause irreparable harm to Plaintiffs and their members.

a. Energize Denver requires Covered Building owners to select Covered Products whose energy efficiencies exceed applicable energy conservation standards under Section 6295 of EPCA, in violation of 42 U.S.C. § 6297(f)(3)(B);
b. Energize Denver does not provide a one-for-one equivalent energy use or equivalent cost basis for Covered Products that exceed the energy conservation standards established under Section 6295 of EPCA in violation of 42 U.S.C. § 6297(f)(3)(C) because Energize Denver forces Covered Building owners to choose electrified Covered Products over the use of fossil fuel Covered Products by incentivizing electrification by reducing the building performance standards for

65

Covered Buildings that achieve 80% electrification and by providing direct energy credits for Covered Buildings purchasing RECs;

e. The energy consumption or conservation objectives of Energize Denver are not specified in terms of fuel-neutral total consumption of energy, but are instead based on the total emissions of greenhouse gas emissions in violation of 42 U.S.C. § 6297(f)(3)(F) because the regulations force the adoption of Covered Products that use low-emitting or non-emitting fuel sources and by providing the incentives mentioned above to electrify the Covered Building.

158. Fourth, as to *commercial* Covered Products, Energize Denver has not met the preemption exceptions for commercial Covered Products under 42 USCA § 6316(b)(2)(B) in *new* Covered Buildings because Energize Denver effectively requires that Covered Building owners select commercial Covered Products exceeding the ASHRAE Standard 90.1.

## CAUSES OF ACTION:

### First Cause of Action

Colorado Regulation 28 is Preempted by EPCA as to Existing Covered Buildings
159. Plaintiffs re-allege the preceding paragraphs as though set forth fully herein.

160. Regulation 28 concerns the energy efficiency and energy use of EPCA regulated Covered Products in existing buildings in Colorado.

161. Regulation 28 requires greater energy efficiency and energy use standards than EPCA compliant consumer and commercial Covered Products in existing Covered Buildings and effectively prohibits the use of certain classes of EPCA compliant Covered Products

66

(fossil fuel utilizing Covered Products), and is thus preempted by EPCA under 42 U.S.C. § 6297(b).

162. Regulation 28 does not fall within the exceptions to preemption in EPCA for Covered Products in existing buildings because:

a. The State of Colorado has not applied for a waiver from preemption.

b. None of the applicable exemptions for *new* building codes for *consumer* or *commercial* Covered Products apply to *existing* buildings.

163. Regulation 28 therefore violates the Supremacy Clause of Article VI of the United States Constitution, because Congress has expressly preempted the type of energy conservation standard enacted by Regulation 28 under EPCA and Regulation 28 fails to meet the exceptions to preemption under EPCA.

164. Plaintiffs therefore request that the Court (i) declare Regulation 28 as it is applied to existing buildings as preempted by EPCA, and (ii) enjoin Defendants from enforcing Regulation 28.

Second Cause of Action
**Colorado Regulation 28 is Preempted by EPCA as to ~~New~~Existing
Covered Buildings**

167. ~~165.~~ Plaintiffs re-allege the preceding paragraphs as though set forth fully herein.

168. ~~166.~~ Regulation 28 concerns the energy efficiency ~~and energy use of EPCA regulated~~**of** Covered Products in ~~new~~**existing Covered b**Buildings in Colorado**, requiring Plaintiffs' members to analyze their building energy usage, including the energy usage and efficiency of Covered Products, and implement energy efficiency**

67

**measures that target Covered Products**.

169. ~~167.~~ **In many cases,** Regulation 28 requires ~~greater energy efficiency and energy use standards for~~**the replacement of** EPCA compliant **consumer and commercial** Covered Products in ~~new~~**existing Covered b**~~B~~uildings ~~than current federal standards~~**, and is thus preempted by EPCA** under 42 U.S.C. § 6297(~~f~~**c**)~~(3)(B) and~~ **; 42 U.S.C. § 6316.**

170. **In many cases, Regulation 28** effectively prohibits the use of certain classes of EPCA compliant Covered Products (fossil fuel utilizing Covered Products)~~that meet EPCA standards~~, and is thus preempted by EPCA **under 42 U.S.C. § 6297(c); 42 U.S.C. § 6316**.

171. ~~168.~~Regulation 28 does not fall within the exceptions to preemption in EPCA for *consumer* Covered Products in ~~new~~**existing** buildings because ~~none of the applicable exemptions for new building codes apply~~:

    a. The State of Colorado has not applied for a waiver from preemption ~~for Regulation 28 as it applies to new building codes~~.

    b. **None of the applicable exemptions for R**~~r~~egulation**s** ~~28 effectively requires EPCA regulated~~**concerning** *consumer* **or** *commercial* Covered Products in new ~~buildings to have an energy efficiency exceeding current applicable energy conservation standards established and prescribed under section 6295 of title 42. See~~**construction in** 42 U.S.C. § 6297(f)(3)~~(B), and effectively prohibits the use of certain classes of EPCA regulated Covered Products (fossil fuel utilizing Covered Products) that meet EPCA standards~~ **apply to** *existing* **buildings**.

68

~~c. Regulation 28 does not set objectives in terms of total consumption of energy, but rather focuses on the total reduction of greenhouse gas emissions by: making the GHG Intensity reduction compliance pathway more stringent than the EUI score compliance pathway; providing incentives for electrifying buildings; providing REC offsets, and providing for compliance and timeline adjustments that consider the electrification feasibility of new buildings in violation of 42 U.S.C. § 6297(f)(3)(C) and (F).~~

~~169. Regulation 28 has not met the preemption exceptions for *commercial* Covered Products in *new* construction under 42 U.S.C. § 6316(b)(2)(B) because:~~

~~a. The State of Colorado has not applied for a waiver from preemption for Regulation 28 as it applies to new commercial construction.~~

~~b. Regulation 28 effectively requires that Covered Building owners select commercial Covered Products that exceed the ASHRAE/IES Standard 90.1 for *new* building construction.~~

<u>172.</u> ~~170.~~ Regulation 28 ~~therefore~~ violates the Supremacy Clause of Article VI of the United States Constitution, because Congress<u>, under EPCA,</u> has expressly preempted the type of energy conservation standard enacted by Regulation 28 ~~under EPCA,~~ and Regulation 28 fails to meet the exceptions to preemption under EPCA.

<u>173.</u> ~~171.~~ Plaintiffs therefore request that the Court (i) declare <u>**that**</u> Regulation 28 as it is applied to ~~new~~<u>**existing**</u> buildings ~~as~~<u>**is**</u> preempted by EPCA, and (ii) enjoin Defendants from enforcing Regulation 28 ~~as it is applied to new buildings~~.

69

## ~~Third~~Second Cause of Action

**The Energize Denver Ordinance and the Energize Denver Regulations are
Preempted by EPCA as to Existing Covered Buildings**

174.    ~~172.~~ Plaintiffs re-allege the preceding paragraphs as though set forth fully
herein.

175.    ~~173.~~ Energize Denver concerns the energy efficiency ~~and energy use of
EPCA regulated~~**of** Covered Products in existing **Covered b**~~B~~uildings in ~~the City and
County of Denver.~~ **Denver, requiring Plaintiffs' members to analyze their building
energy usage, including the energy usage and efficiency of Covered Products, and
implement energy efficiency measures that target Covered Products.**

176.    ~~174.~~ **In many cases,** Energize Denver requires the replacement of
~~existing~~**EPCA compliant consumer and commercial** Covered Products ~~with Covered
Products that exceed the energy efficiency and energy use standards under Section 6295~~ in
existing Covered Buildings**,** and **is thus preempted by EPCA under 42 U.S.C. §
6297(c); 42 U.S.C. § 6316.**

177.    **Additionally Energize Denver** effectively prohibits the use of certain
classes of EPCA ~~regulated~~**compliant** Covered Products (fossil fuel utilizing Covered
Products) ~~that meet EPCA standards~~, and is thus preempted by EPCA under 42 U.S.C. §
6297(~~b~~**c**)**; 42 U.S.C. § 6316**.

178.    ~~175.~~ Energize Denver does not fall within the exceptions to preemption in
EPCA for existing buildings because:

70

a.    The City and County of Denver has not applied for a waiver from

preemption.

b.    None of the applicable exemptions for *consumer* or *commercial*

Covered Products ~~for~~in new ~~building codes~~**construction in 42 U.S.C. § 6297(f)(3)**

apply to existing buildings.

179.    ~~176.~~ Energize Denver ~~therefore~~ violates the Supremacy Clause of Article

VI of the United States Constitution because Congress**, under EPCA,** has expressly

preempted the type of energy conservation standard enacted by Energize Denver ~~under~~

~~EPCA~~, and Energize Denver fails to meet the exceptions to preemption under EPCA.

180.    ~~177.~~ Plaintiffs therefore request that the Court (i) declare **that** the

Energize Denver Ordinance and the Energize Denver Regulations as they are applied to

existing buildings are preempted by EPCA, and (ii) enjoin Defendants from enforcing

the Energize Denver Ordinance and the Energize Denver Regulations.

~~**Fourth Cause of Action**~~
~~**The Energize Denver Ordinance and the Energize Denver Regulations Are Preempted**~~
~~**by EPCA as to New Covered Buildings**~~
~~**178. Plaintiffs re-allege the preceding paragraphs as though set forth fully herein.**~~

~~**179. Energize Denver concerns the energy efficiency and energy use of EPCA-**~~

~~**regulated Covered Products in new buildings in the City and County of Denver.**~~

~~**180. Energize Denver requires new Covered Buildings to meet energy efficiency and**~~

~~**energy use standards and effectively prohibits the use of certain classes of EPCA-regulated**~~

~~**Covered Products (fossil fuel utilizing Covered Products) that meet EPCA standards, and is**~~

~~**thus preempted by EPCA under 42 U.S.C. § 6297(b).**~~

71

181. The City and County of Denver has not applied for a waiver from preemption for Energize Denver as it applies to both consumer and commercial Covered Products in new buildings, and Energize Denver is thus preempted.

182. Energize Denver does not fall within the exceptions to preemption in EPCA for *consumer* Covered Products in new buildings because none of the applicable exemptions for *new* building codes apply:

a. Energize Denver requires the Covered Products in new buildings have an energy efficiency exceeding current applicable energy conservation standards established and prescribed under section 6295 of title 42, 42 U.S.C. § 6297(f)(3)(B), and effectively prohibits the use of certain classes of EPCA regulated Covered Products (fossil fuel utilizing Covered Products) that meet EPCA standards;

b. Energize Denver does not set objectives in terms of total consumption of energy, but rather focuses on the total reduction of greenhouse gas emissions by providing incentives for 80% electrified buildings, providing REC offsets, and providing for compliance and timeline adjustments that consider the electrification feasibility of new buildings in violation of 42 U.S.C. § 6297(f)(3)(C) and (F).

183. Energize Denver has not met the preemption exceptions for *commercial* Covered Products in new buildings under 42 USCA § 6316(b)(2)(B) because Energize Denver effectively requires that Covered Building owners select commercial Covered Products exceeding the ASHRAE Standard 90.1.

184. Energize Denver therefore violates the Supremacy Clause of Article VI of the United States Constitution, because Congress expressly preempted the type of energy

72

conservation standard enacted by Energize Denver under EPCA, and Energize Denver fails to meet the exceptions to preemption under EPCA.

185. Plaintiffs therefore request that the Court (i) declare the Energize Denver Ordinance and the Energize Denver Regulations as they are applied to new buildings are preempted by EPCA and (ii) enjoin Defendants from enforcing the Energize Denver Ordinance and the Energize Denver Regulations as they are applied to new buildings.

## REQUESTED RELIEF

186. Plaintiffs, and their members, will be irreparably harmed if Regulation 28 and Energize Denver are not enjoined and are enforced.

187. Plaintiffs, and their members, have already experienced and will continue to face economic injuries, including costs to undergo energy audits and begin retrofitting measures at Covered Buildings, loss of competitiveness in rental rates compared to similarly situated buildings that are below the Covered Building threshold of Regulation 28 and Energize Denver; their business planning, infrastructure investments, hiring decisions, jobs, and livelihoods are and will be affected; they face compliance burdens associated with Regulation 28 and Energize Denver; and their plans to build new Covered Buildings are negatively impacted by the compliance obligations associated with Regulation 28 and Energize Denver, including requiring them to change building plans and install Covered Products (both consumer and commercial) that exceed federal standards.

188. Plaintiffs, and their members, have no adequate remedy at law for these irreparable harms. Unless the Defendants are enjoined from effectuating and enforcing Regulation 28 and Energize Denver, Plaintiffs and their members will continue to be denied

73

~~their legal rights.~~

~~189. There will be no significant harm to Defendants from an injunction because Defendants have no legitimate interest in enforcing invalid laws and regulations.~~

~~190. The balance of harms thus favors injunctive relief.~~

~~191. An injunction is also in the public interest. The public interest is not served by enforcing invalid laws. Moreover, EPCA embodies a strong public interest in the uniform national regulation of energy conservation and use policy, encouraging diverse domestic supply of energy, and protecting consumer choice, all of which is undermined by conflicting state regulation of these matters, exemplified by Regulation 28 and Energize Denver.~~

~~192. In short, both Regulation 28 and Energize Denver are already causing substantial adverse consequences for Plaintiffs and the public. The Defendants' efforts to bypass federal law to implement their own energy policies violate EPCA, are contrary to the public interest, and cause irreparable harm to Plaintiffs and their members.~~

~~193. Plaintiffs therefore request that the Court (i) declare Regulation 28 and the Energize Denver Ordinance and the Energize Denver Regulations as they are applied to new and existing buildings are preempted by EPCA and (ii) enjoin Defendants from enforcing Regulation 28 and the Energize Denver Ordinance and the Energize Denver Regulations.~~

181. ~~194.~~ Plaintiffs ~~therefore~~ request that the Court award the following relief:

a.    Issue a declaratory judgment under 28 U.S.C. § 2201(a) that Regulation 28, the Energize Denver Ordinance, and the Energize Denver Regulations are preempted by EPCA and are therefore void and unenforceable;

74

b.      Issue a preliminary injunction enjoining Defendants from implementing and enforcing Regulation 28, the Energize Denver Ordinance, and the Energize Denver Regulations during the pendency of this action;

c.      Issue a permanent injunction enjoining Defendants from implementing and enforcing Regulation 28, the Energize Denver Ordinance, and the Energize Denver Regulations;

d.      Grant Plaintiffs costs of this suit, including reasonable attorneys' fees; and

e.      Grant such other and further relief as the Court may deem just and proper.

Dated: ~~April 22~~**June 10**, 202~~4~~**5**       Respectfully submitted,

GREENBERG TRAURIG, LLP

/s/ *Paul M. Seby*
Paul M. Seby
Matthew K. Tieslau
GREENBERG TRAURIG, LLP
1144 15th Street, Suite 3300
Denver, Colorado 80202
Phone Number:  303.572.6500
Fax Number: 303.572.6540
E-Mail:   SebyP@gtlaw.com
              TieslauM@gtlaw.com

ATTORNEYS FOR PLAINTIFFS

*Attorneys for Plaintiffs*

75

76

| Summary report:<br>**Litera Compare for Word 11.11.0.158 Document comparison done on 6/10/2025 3:38:15 PM** | |
|---|---|
| **Style name:** GT-1 - No headers and footers, no moves, no comments | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** FINAL 4-22-24 Federal Complaint EPCA CAA-AAMD-CHLA-NAIOP.docx | |
| **Modified filename:** FINAL 6-10-25 Federal Complaint EPCA CAA-AAMD-CHLA-NAIOP.docx | |
| **Changes:** | |
| **Add** | 566 |
| **Delete** | 571 |
| Move From | 0 |
| Move To | 0 |
| **Table Insert** | 0 |
| **Table Delete** | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 1137 |