**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 24-cv-01093-RMR

COLORADO APARTMENT ASSOCIATION; APARTMENT ASSOCIATION OF METRO DENVER; COLORADO HOTEL AND LODGING ASSOCIATION, INC.; AND NAIOP COLORADO CHAPTER;

Plaintiffs,

v.

JILL HUNSAKER RYAN, in her Official Capacity as the Executive Director of the Colorado Department of Public Health and Environment, MICHAEL OGLETREE, in his Official Capacity as the Director of the Colorado Air Pollution Control Division; AND WILL TOOR, in his Official Capacity as the Executive Director of the Colorado Energy Office; AND

THE CITY AND COUNTY OF DENVER; THE DENVER CITY COUNCIL; DENVER MAYOR MICHAEL JOHNSTON; THE DENVER OFFICE OF CLIMATE ACTION, SUSTAINABILITY, AND RESILIENCY; AND ELIZABETH BABCOCK, in her Official Capacity as the Executive Director of the Denver Office of Climate Action, Sustainability, and Resiliency;

Defendants.

---

**MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO
FED. R. CIV. P. 12(b)(1) and (6)**

---

The City and County of Denver; Denver City Council; Denver Mayor Michael Johnston; Denver Office of Climate Action, Sustainability, and Resiliency; and Elizabeth Babcock, in her Official Capacity as the Executive Director of the Denver Office of Climate Action, Sustainability, and Resiliency (collectively "Denver"), through undersigned counsel, hereby move to dismiss the First Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and (6) and in support state as follows:

Certificate of Conferral

Counsel for Plaintiffs and Denver conferred regarding this motion and the reasons therefore via electronic mail on September 17 and 18, 2025. This motion is opposed.

## I.   INTRODUCTION

Plaintiffs are four organizations whose members either own or manage buildings in Denver. In their First Amended Complaint ("FAC") they allege that they will be irreparably harmed if they comply with a Denver Ordinance, known as Energize Denver, which is an energy efficiency program that establishes a building performance program aimed at reducing greenhouse gas emissions by existing buildings in the City.[1] Plaintiffs further allege that Energize Denver is preempted by the Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. § 6201 et. seq., because, as they apply it, it effectively requires building owners to install covered products powered by electricity rather than natural gas or other energy sources and thereby impermissibly regulates the energy use of covered products.[2]

Energize Denver prescribes a minimum level of energy efficiency or maximum quantity of energy use for a building as a whole and does not directly regulate the energy usage of any particular piece of equipment (including covered products) utilized within the building, require the use of any particular type of equipment or dictate the means by which any particular piece of

---

[1] Denver has a separate energy performance program from new construction which is not at issue here.

[2] Plaintiffs include their complaints against Energize Denver in the same pleading as their allegations against Regulation 28 even though the two programs are completely separate, function independently of each other and the operation of one has no bearing on the operation of the other. It is often difficult to determine which factual allegation is made against which program.

equipment (including covered products) is powered. The Energize Denver program requires buildings covered by the Ordinance to meet Interim Performance Targets in 2024 and 2027 and then, a Final Performance Target in 2030. These Performance Targets are determined by Energy Use Intensity ("EUI"); every building type is given a target EUI to meet by 2030.

Plaintiffs assert that they are unable to meet either their 2027 Interim Performance Target or their 2030 Final Performance Target without immediately beginning to remove functioning equipment with remaining useful life, including covered products as defined by EPCA, and replacing those products with covered products that are powered by energy sources other than natural gas. [ECF ## 68-1 ¶¶ 21, 23, 25; 68-2 ¶¶ 21, 26; 68-3, ¶¶ 20; 68-4 ¶¶ 19, 23, 27, 29; 68-5 ¶¶ 21, 23, 26; 68-6 ¶¶ 20, 22; 68-7 ¶¶ 21-22; 68-8 ¶¶ 19, 21; 68-9 ¶¶ 21, 23, 68-10 ¶¶ 20, 22, 24]. This, they argue, means that they will be irreparably and imminently harmed by Energize Denver and, because the renovations required to meet their Targets involve replacing covered products utilizing one energy source with a covered product utilizing another energy source, Energize Denver effectively regulates the energy use of covered products and is, therefore, preempted by EPCA. However, as will be demonstrated, Energize Denver is designed so as to avoid the injuries Plaintiffs ascribe to it. Only by applying a portion of the Energize Denver Program and ignoring provisions of the Program that could entirely alleviate their alleged injuries, can Plaintiffs assert a cause of action or claim injury.

Energize Denver does not operate so as to ever require building owners to remove and replace major equipment, including covered products, with remaining useful life and, beginning in 2025, in response to concerns expressed by building owners, the regulations implementing the Energize Denver ordinance were modified to provide building owners who believe they cannot

3

meet either the Interim or Final Performance Targets with the opportunity to request a Timeline Adjustment giving them additional time to comply to allow major equipment to reach the end of its useful life and/or to receive a Customized Target reducing the building's Final EUI Performance Target altogether. Because Plaintiffs have not applied for or accounted for a Customized Target or a Timeline Adjustment, Plaintiffs cannot establish that Energize Denver operates so as to cause the injuries they claim even assuming they can prove that EPCA would preempt Energize Denver under the circumstances. Neither can plaintiffs establish that their claims are ripe for determination or that they have standing to assert their claims. Finally, since the Interim and Final Performance Targets of which they complain have existed since 2021, Plaintiffs' claims are barred by the statute of limitations.

## II.     The Energize Denver Program

The Energize Denver Program consists of the Ordinance found at Denver Revised Municipal Code ("D.R.M.C.) § 10-400 et. seq. and implementing regulations consisting both of Governing Energize Denver Building Energy Benchmarking and Performance Requirements ("Regulations") and Technical Guidance ("Guidance") (hereinafter collectively referred to as the "Program" or "Energize Denver") [Exhibit A (D.R.M.C.); Exhibit B (Regulations); Exhibit C (Guidance)].

### A.     End of System Service Life

The Program does not require a building owner to replace major equipment (including covered products such as boilers, air conditioners or hot water heaters) prior to end of service life even when failure to replace will mean that the building owner will not meet Interim or Final Performance Targets. [Exhibit D, Declaration of Sharon Jaye, ¶¶ 9-12]. "The Owner of a

4

Covered Building may apply to change the compliance timeline due to end of major equipment system life, energy service capacity constraints, district steam loop system limitations, the timing of major renovation, electrification or other similar reason." [Ex. B, Rule 4.7.A, p. 16]. The Denver Department which administers the Program is the Office of Climate Action, Sustainability and Resiliency ("CASR"). By looking at multiple data sources from the American Society of Heating, Refrigerating and Air-Conditioning Engineers ("ASHRAE"), CASR has calculated an average lifespan of major equipment by category, including both electric and gas-fired covered products. They did this by taking ASHRAE data and adding an extra 10% to the estimated system life of the particular equipment. [Ex. D, ¶ 11, Ex. C, p. 90, Table 36]. The information contained in Table 36 "represents the system service life that CASR would consider for a particular piece of equipment to extend a building's compliance timeline. [] This does not mean that the building owner is required to replace the equipment at the time listed in the chart. Building owners may experience longer or shorter service life depending on their maintenance practices." [Ex. C, App'x C, p. 90]. To receive a Timeline Adjustment to accommodate the end of system service life, building owners must apply to CASR and support that application with an energy audit (e.g. an ASHRAE audit), a compliance plan and an operations and maintenance program document. [Ex. C, § 7.2.2].

Even though the Program provides an opportunity for building owners to extend the timeline by which they must reach their respective performance goals and permits a building owner to extend their compliance deadline to allow for end of system life, none of the building owners who submitted a declaration along with the FAC have requested a Timeline Adjustment because of end of system service life, or any other reason. [Ex. D, ¶13]. Furthermore, except

where a request for Timeline Adjustment was submitted without any of the documentary support outlined in the Guidance, CASR has never rejected a building owner's request for a Timeline Adjustment. [*Id.*]. A Level II ASHRAE audit, such as the declarants state they have conducted for their buildings, would suffice for the energy audit portion of the required documentation. [*Id.*, ¶10.]. The required compliance plan is nothing more than a plan created by the building owner identifying the measures they intend to take to ultimately reach their goals and the maintenance program document is the projected timeframe of implementation that accounts for the reasoning of the timeline. [*Id.*].

      B.     <u>Target Adjustments</u>

The Program also allows for various Adjustments to provide building owners with maximum flexibility and opportunity to adjust the appropriate Performance Target for their building's unique uses. These include a Standard Target Adjustment which seven of the ten declarant building owners have already applied for and received. [Ex. D, ¶8]. Additional options are provided through the Customized Target process. [Ex. B, Rule 4.5.D, p. 15].

When a building has already received a Standard Target Adjustment and "still cannot determine a viable way to reach the final target, there is a custom target process available." [Ex. C, Section 5.6.2, p. 41]. A Customized Performance Target involves creating a new EUI Performance Target. The Customized Performance Target is determined using the estimated energy savings from energy efficiency measures identified in an energy audit, such as an ASHRAE audit, with less than a 20-year simple payback and improving energy leakage of the building's envelope as identified in the energy audit. [Ex. C, § 5.6.2, p. 41]. The Customized Target also considers whether the building owner will be replacing equipment in the future based

6

on the End of System Life Chart [Ex. C, App'x C, p. 90] and by examining the role of viable renewable energy options. [*Id*.]. To receive a Customized Target, a building owner need not perform all of the energy saving modifications identified in an ASHRAE audit. [Ex. D, ¶16]. Rather, CASR creates the Customized Target by examining what the energy audits conclude are available options for reducing energy in the building; it is up to the building owner to determine how they reach the Customized Performance Target and CASR will never require a specific methodology for reaching a Customized Target. [*Id*.]. Again, none of the building owners who submitted declarations with the FAC have applied for a Customized Target and CASR has never denied a Customized Target to any building owner who has applied. [Ex. D, ¶17].

      C.      Other Adjustments

The Program includes additional Adjustments to incentivize energy conservation and provide alternate compliance options to building owners. These include a 10% increase to the 2030 Final Performance Target if a building owner chooses to meet that Target through 80% whole building electrification. [Ex. B., §4.5(A)]. Additionally, if the building owner provides proof of renewable energy generation, either on- or off-site, this results in a credit toward the building's total energy use. [*Id*., § 4.8(C)].

      D.      Penalties

Finally, while the Program provides for penalties for non-compliance and CASR has assessed penalties against building owners who have failed to submit timely benchmarking reports, CASR has never assessed penalties against any building owner who has not met either Interim or Final Performance Targets. [Ex. D, ¶¶18-19].

### III.   LEGAL ARGUMENT

#### A.   Energize Denver does not Regulate the Energy Use of Covered Products

EPCA preempts state regulations "concerning the . . . energy use" of covered products. 42 U.S.C. § 6297(c). By its terms, Energize Denver does not directly regulate the energy use of covered products. Rather, it operates to limit the overall energy use of a covered building over time. However, Plaintiffs assert that they are unable to meet their 2027 Interim Performance Target or their 2030 Final Performance Target without, they believe, removing functioning equipment and replacing that equipment with expensive covered products that are powered by electricity rather than natural gas. This, Plaintiffs argue, is an effective regulation by Energize Denver which concerns the energy use of covered products and means that Energize Denver is preempted by EPCA. There is no legal support for this interpretation of EPCA preemption.

Plaintiffs claim that their position is supported by the holding in *California Rest. Ass'n v. City of Berkeley*, 89 F4th 1094 (9th Cir. 2024). Even discounting the problematic nature of this case, the holding does not support Plaintiffs' position.

The Berkeley ordinance in question prohibited the installation of natural gas connections for new construction and it was this absolute prohibition that the court determined to be preempted by the EPCA. *Berkeley*, 89 F.4th at 1098.  *Berkeley* only deals with obvious and express prohibition of one type of energy which is not present in Energize Denver. "We only decide that EPCA's preemptive scope applies to building codes that regulate the gas usage of covered appliances on premises where gas is otherwise available." *Berkeley*, 89 F.4th at 1103. Nothing in Energize Denver expressly prevents the use of any specific type of covered product or regulates the type of energy source a building or a particular covered product can utilize.

8

Furthermore, as to Plaintiffs' argument regarding effective regulation, as explained above, Energize Denver contains numerous provisions through which building owners can request Timeline Adjustments or Customized Target Adjustments. While it is an open question how and to what extent these available Adjustments will apply to Plaintiffs should they choose to pursue the Adjustments, what is certain is that Plaintiffs cannot plausibly argue that Energize Denver effectively requires them to replace any covered product unless they comply with and follow the Program in its entirety as it is written.

Furthermore, it is not clear that *Berkeley* even applies in this Circuit because the decision has never been adopted by any circuit outside of the Ninth Circuit. Additionally, as stated, the decision itself is problematic. After a petition for rehearing *en banc* was denied, a single judge authored the primary decision to which two judges filed separate, consenting opinions. Twelve judges dissented from the denial of the petition for rehearing and were very critical of the primary decision urging "any future court that interprets the Energy Policy and Conservation Act not to repeat the panel opinion's mistake." *Id*. at 1119. In fact, two recent district courts, the only courts to have considered *Berkely* outside of the Ninth Circuit, have refused to follow the decision. *See Assoc. of Contracting Plumbers v. City of New York*, 2025 WL 843619 (S.D.N.Y., March 18, 2025); *Mulhern Gas Co. v. Mosley*, 2025 WL 2062194 (N.D.N.Y., July 23, 2025)

In *Association of Plumbers* and the *Mulhern Gas* the subject ordinance banned on the use of fossil fuels in newly constructed buildings. In each case, the district court found, contrary to the holding in *Berkeley*, that a covered product's energy use as defined by EPCA "represents the amount of energy a covered product consumes under typical conditions" and not the type of energy that product consumes. *Association of Plumbers*, 2025 WL 843619 at *6; *Mulhern Gas*,

9

2025 WL 2062194 at *14. Only by regulating the energy output of a particular covered product would an ordinance be preempted by EPCA. *Id*. As such, under this interpretation of the term "energy use" as used in 42 U.S.C. § 6297(c), Energize Denver is not preempted by EPCA because it in no way regulates, either directly or as-applied, the amount of energy utilized by a covered product.

Under any court's interpretation of EPCA preemption, Plaintiffs' preemption claims fail and must be dismissed.

B. <u>Plaintiffs' Claims are Barred by the Statue of Limitations</u>

The requirement that building owners meet their Interim Performance Targets by 2027 and their Final Performance Target by 2030 has been in existence since November 21, 2021. [Exhibit E, Ordinance No. 20211310]. Plaintiffs did not file their initial complaint in this matter until April 22, 2024. A separate division of Colorado District Court has recently ruled that EPCA preemption challenges to new building requirements contained in D.R.M.C. Chapter 10 are subject to a two year statute of limitations. *See Restaurant Law Center v. Denver*, 24-cv-01862-PAB-KAS, ECF #43. As there is no reason the same statute of limitations should not also apply to the existing building regulations, Plaintiffs' claims are barred by the statute of limitations.

A statute of limitations defense may be raised in a motion to dismiss when the complaint makes clear that the right sued upon has lapsed. *Alrich v. McColloch Props, Inc*., 627 F.3d 1036 n. 4 (10th Cir. 1980). Plaintiffs' claims that Energize Denver's Interim and Final Performance Goals are preempted by EPCA because they effectively require them to utilize covered products powered by electricity rather than natural gas have been in existence since 2021. Because they did not bring the instant lawsuit challenging the alleged application of the Program within two

years of the creation of the requirements they now challenge, the lawsuit is barred by the applicable statute of limitations.

  C. <u>Plaintiffs' Claims are Not Ripe</u>

Because it is unclear whether Plaintiffs' injuries will ever occur considering there are provisions within Energize Denver specifically designed to avoid those very injuries, Plaintiffs' claims are not yet ripe.

When a case "involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all" the case is not fit for adjudication. *Salt Lake Trib. Publ'g Co., LLC v. Mgmt. Plan., Inc*. 454 F.3d 1128, 1140 (10th Cir. 2006). When determining ripeness a court considers: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Qwest Communications v. F.C.C.*, 240 F.3d 886, 893-4 (10th Cir. 2001). None of these elements favor a finding of ripeness here.

It remains to be seen if Plaintiffs will ever be harmed by the operation of Energize Denver. As stated, because the Program allows for both Timeline and Target Adjustments and Plaintiffs cannot prove that they would be denied these Adjustments by CASR, a determination of Plaintiffs' claims at this point would be inappropriate. Before asking this Court to find that Energize Denver effectively requires them to imminently and prematurely replace functioning equipment at great economic costs to them, Plaintiffs are required to work within the framework of Energize Denver and first seek relief from the Program itself. Otherwise Plaintiffs cannot establish whether their alleged injuries rise from the application of the Program or from their

own failures to follow the express provisions of the Program. Pursuing the Adjustments available through the Program could alleviate their alleged harm altogether. For this reason, Plaintiffs cannot prove that delayed review of their claims regarding Energize Denver would cause them any harm at all.

Finally, before this Court can find that Energize Denver is the cause of Plaintiffs' alleged harm, rather than their own failures to follow the Program, this Court would need additional proof that Plaintiffs had tried, and failed, to obtain Timeline and Target Adjustments. Only if, and when, CASR either denies Plaintiffs' request for a Timeline or Target Adjustment or Plaintiffs demonstrate that they still cannot comply with either an Interim or Final Performance Targets after obtaining an Adjustment and then only by being forced to install covered products relying on a particular energy source, could Plaintiffs demonstrate any harm from the effective application of the Program or that the Program is preempted by EPCA even accepting Plaintiffs theory of EPCA preemption. As such, Plaintiffs claims are not yet ripe for adjudication.

D.  <u>Defendants Have no Article III Standing</u>

For very similar reasons, because Plaintiffs cannot establish that their alleged injuries are imminent or that they are caused by Energize Denver as it is written and designed, they have no Article III standing.

*1.  The Elements of Standing*

Standing is an indispensable part of a plaintiff's case and "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.* with the manner and degree of evidence required at the successive stages of litigation*.*" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "The party invoking federal jurisdiction has the burden to

establish that it is proper, and there is a presumption against its existence." *Salzer v. SSM Health Care of Okla. Inc*., 762 F.3d 1130, 1134 (10th Cir. 2014). As organizational plaintiffs, to establish Article III standing, Plaintiffs must allege at a minimum that at least one of their members has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

A plaintiff's alleged injury must be both particularized and concrete. *Id*., p. 340. To be concrete, an injury must actually exist. *Id.* at 340. Speculative or hypothetical injuries may not serve as the basis for Article III standing. *See, e.g., Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 411 (2013) (alleged harm based on speculation and/or assumptions insufficient for Article III standing); *TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2203 (2021) ("Under Article III, federal courts do not adjudicate hypothetical or abstract disputes.").

> 2. *Plaintiffs Cannot Establish that their Alleged Injuries are Imminent or Caused by the Application of Energize Denver as it is Drafted*

Energize Denver specifically allows for Adjustments to its requirements when building owners do not wish to replace major equipment prior to end of system life, when Denver's energy provider (Xcel Energy) cannot accommodate the equipment required to meet performance goals and when a building owner cannot otherwise meet performance goals in good faith. [Ex. B, Rule 4.7.A, p. 16]. Energize Denver also permits building owners to obtain altogether new Customized Performance Targets when they are unable to otherwise meet their Performance Targets. [Ex. C, Section 5.6.2, p. 41]. Nonetheless, without ever accessing either a Timeline or a Customized Target Adjustment, Plaintiffs argue that they will be harmed by the application of the Program to their buildings. However, under these circumstances, Plaintiffs

cannot trace their alleged injuries to Energize Denver as opposed to their own failures to adhere to and follow the Program in its entirety as it is designed. Furthermore, to the extent that Plaintiffs allege actual or imminent injury from the penalty provisions of Energize Denver, Plaintiffs cannot establish that any building owner has ever been monetarily penalized for failure to meet an Interim or Final Performance Target. [Ex. D, ¶ 18].

For Article III standing purposes, causation requires "a fairly traceable connection between the plaintiff's injury and the complained of conduct." *Hutchinson v. Pfeil*, 211 F.3d 515, 521 (10th Cir. 2000). "[P]laintiffs must show a predictable chain of events leading from the government action to the asserted injury." *Food and Drug Admin. v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 385 (2004

Here, Plaintiffs cannot link their alleged conduct to Energize Denver nor are their alleged injuries traceable to CASR's enforcement of Energize Denver. Rather, the injuries of which they complain are traceable to their own failures to follow and take advantage of Adjustments provided by the Program. No Plaintiff representative has demonstrated that they have complied with Energize Denver in its entirety and will nonetheless imminently be forced to replace major equipment, including covered products, when that equipment still has remaining useful life and it is this alleged forced replacement which allegedly is causing the imminent injuries of which Plaintiffs complain. Furthermore, no Plaintiff has established that Denver has failed to accommodate any request for a Timeline or Target Adjustment and they are unable to meet their Interim or Final Performance Target as a result. Plaintiffs' inability to point to Energize Denver of the source of their alleged injuries rather than their own failures to follow the Program is a fatal break in the chain of causation which defeats Article III standing. Plaintiffs "cannot

14

manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending. *Clapper*, 568 U.S. at 416. Article III requires proof of a substantial likelihood that the <u>defendant's</u> conduct caused the plaintiff's injury in fact. *Utah v. Evans*, 536 U.S. 452, 464 (2002) (emphasis added). The future feared harms presented by Plaintiffs may never actually occur if they comply with the Program as it is written and their injuries are, therefore, hypothetical and they, therefore, have no Article III standing.

Because, even assuming that Plaintiffs theory of EPCA preemption is correct, Plaintiffs have not pled that they have attempted to comply with Energize Denver in its entirety as it is designed and were unable to do so without installing covered products that only rely on a specific energy source or that any plaintiff member has ever been fined or otherwise harmed for failure to meet an Interim or Final Performance Target, they have not demonstrated Article III standing and their FAC must be dismissed against Denver.

### IV.   CONCLUSION

Wherefore, for the foregoing reasons, the First Amended Complaint should be dismissed in its entirety. Because this is the second time Plaintiffs have attempted and failed to assert a cause of action against Denver related to Energize Denver, the dismissal should be with prejudice.

Respectfully submitted this 3rd day of October, 2025.

By: *s/Michele A. Horn*
Michele A. Horn
Assistant City Attorney
City and County of Denver
201 West Colfax Avenue, Dept. 1207
Denver, CO 80202-5332
(720) 913-3275
michele.horn@denvergov.org

*Attorney for Defendants the City and County of Denver, Denver City Council; Denver Mayor Michael Johnston; Denver Office of Climate Action, Sustainability, and Resiliency; and Elizabeth Babcock, in her Official Capacity as the Executive Director of the Denver Office of Climate Action, Sustainability, and Resiliency*

### CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2025, I caused a true and correct copy of the foregoing **MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(1) and (6)** to be electronically filed with the Clerk of Court and served on the following parties using the CM/ECF system:

Paul M. Seby
Matthew K. Tieslau
GREENBERG TRAURIG, LLP
1144 15th Street, Suite 3300
Denver, CO  80202
Email: sebyp@gtlaw.com
         tieslaum@gtlaw.com
*Attorneys for Plaintiffs*

*s/Shannon Egan*
Shannon Egan, Paralegal
City and County of Denver
201 West Colfax Avenue,
Dept. 1207
Denver, Colorado  80202-5332