IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 24-cv-01093-RMR-KAS

COLORADO APARTMENT ASSOCIATION,
APARTMENT ASSOCIATION OF METRO DENVER,
COLORADO HOTEL AND LODGING ASSOCIATION, INC., and
COMMERCIAL REAL ESTATE DEVELOPMENT ASSOCIATION COLORADO,

Plaintiffs,

v.

JILL HUNSAKER RYAN, in her official capacity as the Executive Director of the Colorado Department of Public Health and Environment,
MICHAEL OGLETREE, in his official capacity as the Director of the Colorado Air Pollution Control Division,
WILL TOOR, in his official capacity as the Executive Director of the Colorado Energy Office,
THE CITY AND COUNTY OF DENVER,
THE DENVER CITY COUNCIL,
MIKE JOHNSTON, Denver Mayor,
THE DENVER OFFICE OF CLIMATE ACTION, SUSTAINABILITY, AND RESILIENCY, and
ELIZABETH BABCOCK, in her official capacity as the Executive Director of the Denver Office of Climate Action, Sustainability, and Resiliency,

Defendants,

and

SIERRA CLUB,
NATURAL RESOURCES DEFENSE COUNCIL,
COLORADO SOLAR AND STORAGE ASSOCIATION,
COALITION FOR COMMUNITY SOLAR ACCESS,

Intervenor Defendants.

---

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

---

**ENTERED BY MAGISTRATE JUDGE KATHRYN A. STARNELLA**

This matter is before the Court on four Motions: (1) a **Motion to Dismiss** filed by the City and County of Denver, Denver City Council, Denver Mayor Mike Johnston, Elizabeth Babcock, and the Denver Office of Climate Action, Sustainability, and Resiliency (collectively, the "City Defendants") [#71]; (2) a **Motion to Dismiss** filed by Jill Hunsaker Ryan, Michael Ogletree, and Will Toor (collectively, the "State Defendants") [#72]; (3) a **Motion to Dismiss** filed by Sierra Club, Natural Resources Defense Council, Colorado Solar and Storage Association, and Coalition For Community Solar Access (collectively, the "Intervenor Defendants") [#75]; and (4) a **Motion for Judicial Notice** [#73], in which the Intervenor Defendants ask the Court to take judicial notice of the dates of enactment of the state and local regulations at issue in this matter.

Plaintiffs filed Responses in opposition to the Motions to Dismiss. *Plfs.' Response to City Defs.' Motion* [#82]; *Plfs.' Response to State Defs.' Motion* [#81]; *Plfs.' Response to Intervenor Defs.' Motion* [#83]. Non-party Air-Conditioning, Heating, and Refrigeration Institute sought and was granted leave to submit an Amicus Curiae Brief [#88] in opposition to the Motions to Dismiss [#71, #72, #75]. *Motion for Leave* [#84]; *Order* [#86]. The Defendants filed Replies in support of their Motions. *State Defs.' Reply* [#91]; *City Defs.' Reply* [#92]; *Intervenor Defs.' Reply* [#93]. Defendants and Intervenor Defendants jointly filed two Notices of Supplemental Authority [#94, #96], and Plaintiffs filed a Response [#95] to the first Notice [#94]. On June 30, 2026, Plaintiffs filed a further Notice of Supplemental Authority [#101].

The Motions [#71, #72, #73, #75] have been referred to the undersigned for a Recommendation[1] pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure

[1] All parties do not consent to magistrate judge jurisdiction. *See Signed Consent/Non-Consent Form* [#4]; *Order Referring Case* [#78].

72(b)(1), and D.C.COLO.LCivR 72.1(c)(3). *See Order Referring Motions* [#79]. The Court has reviewed the briefs, the case file, and the applicable law. For the reasons stated below, the Court **RECOMMENDS** that the City Defendants' Motion to Dismiss [#71] be **GRANTED in part and DENIED in part**, the State Defendants' Motion to Dismiss [#72] be **DENIED**, the Intervenor Defendants' Motion to Dismiss [#75] be **GRANTED in part and DENIED in part**, and the Motion for Judicial Notice [#73] be **GRANTED**.

## I. Background

This declaratory judgment action arises from the Plaintiffs' assertion that certain environmental regulations promulgated by the State of Colorado and the City of Denver are preempted by the Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. § 6201 *et seq.*

### A. Regulatory Framework

The District Judge thoroughly laid out the at-issue regulations and federal statutory scheme in her earlier Order [#55] on the first round of Motion to Dismiss briefing. Seeing no reason to duplicate her efforts, the Court incorporates that Background here:

> In this action, Plaintiffs—four organizations whose members either own or manage buildings in Colorado, some of which are in Denver—challenge certain building performance standards enacted by the State of Colorado and the City of Denver. Plaintiffs contend these building performance standards, which require categories of large buildings to reduce their energy use or greenhouse gas emissions by a specified amount over a period of years, run afoul of the Energy Policy and Conservation Act's ("EPCA") express preemption provision, which preempts state and local energy efficiency and energy use standards for certain consumer and commercial appliances ("Covered Products"). Accordingly, Plaintiffs bring this action seeking to have the state and city regulations declared unlawful and void and ask the Court to enjoin Defendants from implementing and enforcing those regulations. Specifically, Plaintiffs ask the Court for declaratory and injunctive relief under federal law against the enforcement of:

- The Colorado Air Quality Control Commission's ("Commission") final regulation entitled Building Benchmarking and Performance Standards, 5 CCR 1001-32 ("Regulation 28") enacting regulations directed by the State of Colorado's House Bill 21-1286; and

- The City and County of Denver, Colorado's Denver Ordinance No. 20211310 ("Energize Denver Ordinance"), and the implementing rules for Energize Denver enacted by the Denver Office of Climate Action, Sustainability, and Resiliency, ("Denver OCASR") entitled "Rules & Regulations Governing Energize Denver Building Energy Performance Requirements" ("Energize Denver Regulations") (the Ordinance and Regulations may be collectively referred to as "Energize Denver").

**Colorado House Bill 21-1286 and Regulation 28**

In 2019, the Colorado General Assembly began introducing legislation aimed at combatting climate change and reducing greenhouse gas ("GHG") emissions in the state. Consistent with these goals, in 2021 the Colorado General Assembly passed House Bill ("HB") 21-1286. HB 21-1286 aims to reduce GHG emissions from select large residential and commercial buildings (buildings over 50,000 sq/ft) ("State Covered Buildings") seven percent by 2026 and twenty percent by 2030 as compared to 2021 levels. C.R.S. § 25-7-142(8)(a)(II)(A), (B); ECF No. 1, ¶ 34. Beginning on December 1, 2022, HB 21-1286 also required owners of State Covered Buildings to submit annual reports detailing their energy usage for the previous calendar year ("Benchmarking Requirements"). C.R.S. § 25-7-142(3); ECF No.1, ¶ 33.

The General Assembly also directed the Commission to establish statewide building performance standards to meet the statutory emission reductions. C.R.S. § 25-7-142(8)(c)(I); ECF No. 1, ¶ 34. The Commission fulfilled this by adopting Regulation 28, which applies to both existing and new State Covered Buildings. 5 Colo. Code Regs. § 1001-32; ECF No. 1, ¶ 37. Regulation 28 established building performance standards for State Covered Buildings to meet by 2026 and 2030 ("Performance Standards"). *Id.* ¶ 36. To meet the Performance Standards, State Covered Building owners must implement energy efficiency measures to meet certain Energy Use Intensity ("EUI") scores (calculated from a building's total site energy use per square foot per year), or implement measures to decrease the building's GHG emissions and reduce the GHG intensity ("GHG Intensity") score (calculated by the carbon dioxide equivalent measures in kilograms of carbon dioxide equivalent per square foot emitted per year associated with operations of a State Covered Building), or a combination of both. *Id.* ¶¶ 38-40; Regulation 28, Part C. Regulation 28 provides owners flexibility in what efficiency measures are utilized to achieve these targets through

multiple compliance pathways. *Id.* ¶ 42. Owners may also enroll in utility-offered programs or purchase renewable energy credits. *Id.* ¶ 45. Owners may also modify their 2026 and 2030 compliance obligations by applying to the Colorado Energy Office ("CEO") for an adjusted EUI score, adjusted GHG Intensity target, or adjusted compliance timeline. *Id.* ¶¶ 46, 54-58. The EUI and GHG Intensity targets are set on a "property type" basis, meaning that the standards differ depending on the property type of the State Covered Building. *Id.* ¶ 40.

**Energize Denver Ordinance and Regulations**

The Energize Denver Ordinance, passed by Denver's City Council in 2021, pushes the city to reach net-zero greenhouse gas emissions by 2040 through energy benchmarking and performance standards for new and existing commercial and multifamily buildings, also known as "covered buildings." Spearheaded by OCASR, commercial and multifamily buildings with more than 25,000 square feet ("City Covered Buildings") are required to meet certain building performance standards in 2024, 2027, and 2030. Energize Denver requires that these covered buildings determine and report the subject building's EUI. Energize Denver calculates a building's EUI as the total energy use over 12 months divided by the building's total square footage and normalized for weather. ECF No. 24-2, § 2.33. Per regulation, every building type is given a target EUI to meet by 2030. Some types of buildings are not given an EUI target at all but are instead required to reduce their EUI by 30% overall. *Id.* § 4.3(A). The 2024 and 2027 interim EUI building performance standards in the Energize Denver Regulations are set drawing a "straight line" from the City Covered Building's 2019 EUI score to the 2030 EUI building performance standard to determine interim targets for the 2024 and 2027 compliance year deadlines. *Id.* § 4.8(A)(i).

Like Regulation 28, Energize Denver offers multiple compliance pathways to achieve the ultimate EUI goals. *See id.* §§ 4.5(A); 4.7(A); 4.7(C); 4.8(C). However, if a building owner chooses to meet the EUI target through 80% whole building electrification, OCASR offers a 10% increase to the 2030 EUI target. *Id.* § 4.5(A). Additionally, the OCASR Regs offer a number of Alternate Compliance Options such as a Timeline Adjustment which gives a Covered Building additional time to meet its interim target, *id.* § 4.7(A), and an alternate compliance option for a City Covered Building that has been issued a 30% reduction goal or which is limited by the Landmark Preservation Board as to what energy efficient measures can be implemented. *Id.* § 4.7(C). Furthermore, proof of renewable power generation, either on- or off-site, is credited towards a building's total energy use. *Id.* § 4.8(C).

> **EPCA**
>
> The EPCA regulates the energy efficiency of certain consumer and commercial equipment. *See* 42 U.S.C. §§ 6292, 6295. Under the EPCA, these "Covered Products" are subject to energy conservation standards established by the U.S. Department of Energy ("DOE"). *Id.* As relevant here, the EPCA's standards explicitly preempt state and local regulations "concerning the energy efficiency" and "energy use" of the products for which the EPCA sets its own energy efficiency standards. *Id.* § 6297(c). Section 6297(c) expressly provides:
>
> > [E]ffective on the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product . . . .
>
> *Id.* (emphasis added). This express preemption provision prevents states from adopting or enforcing energy efficiency standards for Covered Products regulated by the EPCA. The Covered Products regulated by EPCA include consumer appliances and commercial equipment such as air conditioners, water heaters, furnaces, clothes washers and dryers, and stoves. *See* 42 U.S.C. §§ 6292; 6295; 6311(1); 6313. "Energy conservation standard" is defined as "performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use . . . for a covered product . . . ." *Id.* §§ 6291(6)(A); 6311(18). "Energy use" is defined as "the quantity of energy directly consumed by a consumer or commercial product at point of use." *Id.* §§ 6291(4); 6311(4). "Energy efficiency" is defined as "the ratio of the useful output of services from a consumer product to the energy use of such product." *Id.* §§ 6291(3); 6311(3). "Energy" is defined as "electricity, or fossil fuels." *Id.* §§ 6291(3); 6311(7). There are limited exceptions to the preemption rule for Covered Products. *Id.* §§ 6297(d)-(f); 6316(b)(2)(B).

*Colorado Apartment Ass'n v. Ryan*, No. 24-cv-01093-RMR, 2025 WL 947531, at *1-3 (D. Colo. Mar. 28, 2025).

## B. Procedural History

In their original Complaint [#1], Plaintiffs alleged that Regulation 28 and Energize Denver "effectively require and force Covered Building owners to replace existing Covered Products (or in the context of new construction to choose Covered Products)

that exceed current federal energy efficiency standards under the EPCA." *Compl.* [#1] ¶ 5. In other words, Plaintiffs did not allege that Regulation 28 or Energize Denver *directly* regulates the energy efficiency of specific Covered Products, but rather, that they *effectively* require replacement of gas appliances with electric appliances, which amounts to a regulation on such an appliance's energy use or efficiency.

The State, City, and Intervenor Defendants filed separate Motions to Dismiss, raising issues of standing, ripeness, statute of limitations, and failure to state a claim. *State Defs.' First Motion to Dismiss* [#23]; *City Defs.' First Motion to Dismiss* [#24]; *Intervenor Defs.' First Motion to Dismiss* [#30]. The District Judge resolved the Motions [#23, #24, #30] on the issue of standing, concluding that Plaintiffs failed to show that at least one of their members had suffered or would imminently suffer a concrete, particularized injury. *Order* [#55] at 13-14. Put another way, Plaintiffs failed to assert anything beyond mere conclusions with respect to their ability to comply with Regulation 28 and Energize Denver without replacing their gas appliances. *Id.* at 14. Thus, any injury related to the need to replace Covered Products with those that exceed DOE efficiency standards was, based on the allegations in the original Complaint [#1], wholly speculative. *Id.* at 15. Accordingly, the District Judge dismissed Plaintiffs' claims without prejudice and set a deadline for Plaintiffs to move for leave to amend. *Id.* at 17-18.

In the meantime, the City amended the Energize Denver program, *see Intervenor Defs.' App'x* [#74] at 1, and the Colorado General Assembly passed House Bill 25-1269, which modified provisions of Regulation 28. Plaintiffs moved for leave to amend their Complaint [#1] in order to address the deficiencies identified by the District Judge and to account for subsequent modifications to the regulations. *Motion to Amend* [#62]. For

example, Plaintiffs provided Declarations showing that their members conducted energy audits revealing that they will need to replace EPCA-covered appliances in order to comply with Regulation 28 and Energize Denver, costing "from hundreds of thousands to millions of dollars at each Covered Building." *See Proposed Am. Compl.* [#62-1] ¶¶ 31-36, 65, 93, 117, 127-33, 143-50, 159. The District Judge found that such allegations "remedied [Plaintiffs'] Article III standing issues." *Order* [#67] at 5. In a footnote, the District Judge said:

> However, the Court does have concerns with Plaintiffs' lack of explicit allegations related to which Covered Products must exceed the federal DOE energy efficiency standards to comply with Regulation 28 and Energize Denver. *See* ECF No. 55 at 13-17. That said, the Court does not see it appropriate to reject the Motion at this early stage and will allow Plaintiffs to be put to their proof to give them the maximum opportunity for their claims to be decided on the merits.

*Id.* at 6 n.1. The operative Amended Complaint [#68] differs from the original Complaint [#1] in two primary respects. First, Plaintiffs removed allegations concerning the impact that Regulation 28 and Energize Denver have on new constructions, instead focusing their claims to existing buildings. Second, Plaintiffs removed all allegations that, in order to comply with the subject regulations, they would need to replace their gas-powered appliances with appliances that *exceed* federal standards. *See, e.g., Redlined Proposed Am. Compl.* [#62-1] at 159 (replacing allegation that the subject regulations require building owners to replace Covered Products "*with products that exceed the federal standards* that DOE established under EPCA" with allegation that the subject regulations require building owners to replace Covered Products "in order to meet the building performance standards of Regulation 28 and Energize Denver"); *see also id.* at 156, 176-78, 185-87, 188, 194-95, 197, 199, 201-02, 208, 214, 220, 222. Rather than emphasizing the need to obtain replacement products that exceed federal standards, Plaintiffs instead

amended their allegations to emphasize that their existing products still had remaining useful life. *See generally id.*

The State Defendants, City Defendants, and Intervenor Defendants then filed the instant Motions to Dismiss [#71, #72, #75]. The City Defendants argue that (1) Plaintiffs fail to state a claim because Energize Denver does not regulate the energy use of Covered Products and because Energize Denver is designed to avoid the injuries Plaintiffs ascribe to it; (2) Plaintiffs' claims are barred by the statute of limitations; (3) Plaintiffs' claims are not ripe; and (4) Plaintiffs still lack Article III standing. *City Defs.' Motion* [#71]. The State Defendants solely argue that Plaintiffs fail to state a claim because Regulation 28 does not regulate the energy use of Covered Products. *State Defs.' Motion* [#72]. Finally, the Intervenor Defendants argue that Plaintiffs' claims are barred by the statute of limitations and that Plaintiffs fail to state a claim because neither Energize Denver nor Regulation 28 regulate the energy use of Covered Products. *Intervenor Defs.' Motion* [#75].

## II. The Motion for Judicial Notice [#73]

Before proceeding to the merits, the Court must determine which factual sources it may consider in ruling on the Motions to Dismiss [#71, #72, #75]. "Typically, when deciding motions to dismiss, the district court cannot look beyond the four corners of the complaint." *Fuqua v. Santa Fe Cnty. Sheriff's Off.*, 157 F.4th 1288, 1297 (10th Cir. 2025). However, "courts may consider 'documents that a plaintiff (1) attaches to [his] complaint; (2) incorporates by reference in [his] complaint; or (3) refers to in [his] complaint and that are central to [his] complaint and indisputably authentic.'" *Id.* (quoting *Cuervo v. Sorenson*, 112 F.4th 1307, 1312 (10th Cir. 2024)). "The general rule prohibiting courts from

considering evidence outside the complaint on a motion to dismiss has another exception: 'matters of which a court may take judicial notice.'" *Id.* at 1298 (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)). The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. FED. R. EVID. 201(b). Courts may take judicial notice of public records and provisions in municipal ordinances. *Fuqua*, 157 F.4th at 1298.

Here, Intervenor Defendants ask the court to take judicial notice of the dates of enactment of Regulation 28 and Energize Denver. *Motion* [#73] at 4. Intervenor Defendants state that Plaintiffs oppose the motion, although Plaintiffs filed no Response and their deadline to do so has passed. The Court finds that the material supplied by Intervenor Defendants satisfies Rule 201(b)'s criteria because the effective dates of Regulation 28 and Energize Denver can be accurately and readily determined from sources whose accuracy cannot reasonably disputed. Accordingly, the Court **recommends**[2] that the Motion for Judicial Notice [#73] be **granted**. Thus, in addition to the well-pleaded factual allegations in Plaintiffs' Amended Complaint [#68], the Court will also consider the dates that Regulation 28 and Energize Denver and related amendments were enacted or took effect as necessary to adjudicate the Motions to Dismiss [#71, #72, #75].

---

[2] Although a Motion for Judicial Notice is likely nondispositive and could be adjudicated by Order, the Court has determined that, in the interest of judicial economy, a Recommendation is appropriate here. *See Heiner v. Watford*, No. 20-cv-02652-NYW-STV, 2022 WL 18777077, at *2 n.4 (D. Colo. Nov. 21, 2022), *report and recommendation adopted*, 2023 WL 2824288 (D. Colo. Mar. 27, 2023).

## III. Legal Standard

Federal Rule of Civil Procedure 12(b)(6)[3] permits dismissal of a claim where the plaintiff has "fail[ed] to state a claim upon which relief can be granted." The Rule 12(b)(6) standard tests "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). "A complaint must contain 'enough facts to state a claim to relief that is plausible on its face.'" *Santa Fe All. for Pub. Health & Safety v. City of Santa Fe*, 993 F.3d 802, 811 (10th Cir. 2021) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "When the complaint includes 'well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Carraway v. State Farm & Cas. Co.*, No. 22-1370, 2023 WL 5374393, at *4 (10th Cir. Aug. 22, 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

"A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (internal quotation marks and citation omitted). "[D]ismissal under Rule 12(b)(6) is appropriate if the complaint alone is legally insufficient to state a claim." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1104-05 (10th Cir. 2017). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at

[3] "Courts frequently resolve preemption challenges such as this one on Rule 12(b)(6) motions." *Md. Bldg. Indus. Ass'n, Inc. v. McIlwain*, 828 F. Supp. 3d 617, 628 (D. Md. 2026).

trial[.]" *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999).

## IV. Analysis

### A. The City Defendants' Justiciability Arguments

The City Defendants argue that the Court lacks jurisdiction because Plaintiffs do not have standing and because their claims are not ripe for judicial review. *Motion* [#71] at 11-12. They theorize that because Energize Denver allows for timeline extensions and target reduction variances—and because Plaintiffs cannot yet prove that they will be denied these extensions and variances—they cannot establish that their injuries are imminent or that the case is fit for judicial review. *Id.* The City Defendants' ripeness arguments misapprehend Plaintiffs' fundamental contention—that Regulation 28 and Energize Denver are preempted by the EPCA. *See Nat'l Ass'n of Home Builders of U.S. v. Montgomery Cnty.*, No. 8:24-CV-03024-PX, 2026 WL 817322, at *4 (D. Md. Mar. 25, 2026) (*Montgomery Cnty.*).

#### 1. Standing

Article III of the Constitution limits the federal courts' jurisdiction to "Cases" and "Controversies." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016). Because Article III standing is an issue of a court's jurisdiction, a court must first satisfy itself that it exists. *Kerr v. Polis*, 20 F.4th 686, 692 (10th Cir. 2021). Organizations have standing to bring suit on behalf of their members if (1) at least one of its members would have standing to sue in the member's own right; (2) the interest it seeks to protect is germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the member to participate in the lawsuit. *See Friends of the Earth v. Laidlaw*, 528 U.S. 167, 181 (2000).

With respect to the first element—standing of at least one member—the organization must demonstrate (1) an injury in fact to a legally protected interest that the member has or will imminently suffer, (2) a causal connection between challenged conduct and the asserted injury, and (3) a likelihood that a favorable decision will redress the alleged injury. *Id.* at 180-81. The alleged injury must be "concrete and particularized," and "actual or imminent, not conjectural or hypothetical." *Id.* To establish causation, the injury must be "fairly traceable to the challenged action of the defendant." *Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*, 21 F.4th 1229, 1241 (10th Cir. 2021) (quoting *Friends of the Earth*, 528 U.S. at 180-81).

The City Defendants argue that any injury Plaintiffs have or will imminently suffer is traceable to "their own failures to follow and take advantage of Adjustments provided by the Program." *Id.*

As an initial matter, the Court notes the District Judge's finding that "Plaintiffs have remedied their Article III standing issues in the [Proposed Amended Complaint] by alleging non-speculative, certainly impending injuries related to their members' necessary replacement of Covered Products to comply with Regulation 28 and Energize." *Order* [#67] at 5. The City Defendants' arguments to the contrary do not require the Court to rethink the District Judge's conclusion on this issue. Plaintiffs' members are presently subject to the Energize Denver program, and as such, must explore pathways to comply with its mandate. No amount of flexibility, extensions, or variances change the ultimate requirement of the program: that building owners reduce their buildings' energy consumption. *See Montgomery Cnty.*, 2026 WL 817322, at *3 (finding that the plaintiffs alleged a sufficiently concrete and particularized injury to confer jurisdiction where the

"gravamen" of the injury is that the challenged regulation "effectively bans gas appliances"); *see also Mulhern Gas Co. v. Mosley*, 798 F. Supp. 3d 304, 323 (N.D.N.Y. 2025) ("It cannot be logically disputed on the facts provided that a prohibition on the installation of fossil-fuel equipment in new buildings will have some tangible negative impact on Plaintiffs' businesses, regardless of whether a portion of such negative impacts might also be attributable to other factors[.]"). The City Defendants' arguments concern only the extent and degree of Plaintiffs' injuries, not the existence of an injury in the first place. *Mulhern*, 798 F. Supp. 3d at 323 (finding that although fact issues "obscure the specific extent of the injury Plaintiffs are suffering or will suffer," such issues "do not prevent the Court from finding that Plaintiffs have shown that they will suffer an imminent concrete harm as a result of the impending Code Amendments.").

**2. Ripeness**

"For an issue to be ripe, 'it must present a live controversy, ripe for determination, advanced in a clean-cut and concrete form.'" *N.M. Trappers Ass'n v. Torrez*, 178 F.4th 561, 570 (10th Cir. 2026) (quoting *Kan. Jud. Rev. v. Stout*, 519 F.3d 1107, 1116 (10th Cir. 2008)). "Under Article III, [courts] may not issue advisory opinions." *Id.* Further, the Court may decline to review a case "for prudential reasons after considering '(1) the fitness of the issue for judicial review, and (2) the hardship to the parties from withholding review.'" *Id.* (quoting *United States v. Cabral*, 926 F.3d 687, 693 (10th Cir. 2019)). The fitness inquiry focuses on "whether the determination of the merits turns upon strictly legal issues or requires facts that may not yet be sufficiently developed." *Id.* (quoting *Cabral*, 926 F.3d at 693). The hardship inquiry focuses on whether the plaintiff "'faces a direct and immediate dilemma' from the challenged conduct." *Id.* (quoting *Cabral*, 926 F.3d at 693).

The City Defendants argue that this case will only be ripe once Plaintiffs' members seek additional relief built into the Energize Denver program and, after seeking that relief, still have to replace EPCA-covered appliances with remaining useful life. However, EPCA preemption is a "narrowly circumscribed and a well-defined question of law." *Montgomery Cnty.*, 2026 WL 817322, at *4. No amount of deadline extensions or target reduction variances can confer upon the City the authority to promulgate regulations in a field that the federal government has expressly reserved for itself. Thus, although the extent of Plaintiffs' injuries may "rest[] upon contingent future events," *New Mexico Trappers*, 178 F.4th at 570, adjudication of the legal theory underlying this lawsuit does not. *See also Mulhern*, 798 F. Supp. 3d at 323. The matter is ripe for resolution now.

Therefore, the Court **recommends** that the City Defendants' Motion [#71] be **denied** insofar as it asserts that Plaintiffs lack standing and that their claims are not ripe.

**B. Statute of Limitations**

The City Defendants and the Intervenor Defendants argue that at least some, if not all, of Plaintiffs' claims are time barred. *City Defs.' Motion* [#71] at 10-11 (arguing that all claims against the City are time barred); *Intervenor Defs.' Motion* [#75] at 3-5 (arguing that all claims against the City and the State concerning consumer products are time barred).

**1. Applicable Law**

The parties agree that the relevant EPCA preemption provision does not contain a statute of limitations. Another court in this District recently considered what statute of limitations applies to a claim that a municipal ordinance is preempted by the EPCA. *Rest. L. Ctr. v. City & County of Denver*, No. 24-cv-01862-PAB-KAS, 2025 WL 2652871, at *7-

10 (D. Colo. Sept. 16, 2025). Seeing no reason to depart from District Judge Brimmer's thorough and persuasive analysis in *Restaurant Law Center*, the Court adopts it in full.

28 U.S.C. § 1658(a) provides that "a civil action arising under an Act of Congress enacted after [December 1, 1990] may not be commenced later than 4 years after the cause of action accrues." *See also Rest. L. Ctr.*, 2025 WL 2652871, at *7 (citing *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004)). "EPCA's *consumer* appliance provisions were enacted in 1987, [while] the statute's *industrial* appliance provisions were enacted in 1992."[4] *Id.* at *9 (first citing Pub. L. No. 100-12; 101 Stat. 103 (Mar. 17, 1987) (consumer appliances), and then citing Pub. L. 102-486, 106 Stat. 2776 (1992) (industrial appliances)) (emphasis added). Thus, EPCA claims relating to industrial appliances are subject to the federal catch-all four-year statute of limitations. *Id.* at *10.

In contrast, EPCA claims relating to consumer appliances are not subject to the federal catch-all because they were made possible by a pre-1990 enactment. *Id.* at *9. "When a statute does not contain a statute of limitations, a court does not typically presume that no limitation applies; instead, the court's task is to 'borrow the most suitable statute or other rule of timeliness from some other source.'" *Id.* at *7 (quoting *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 158 (1983)). "State law is generally the 'lender of first resort,' supplying the period of limitation in the absence of a federal provision." *Id.* (quoting *N. Star Steel Co. v. Thomas*, 515 U.S. 29, 34 (1995)). However, "a court should not borrow from state law when doing so would 'stymie the policies underlying the federal

[4] Simply put, consumer product means any article that "consumes, or is designed to consume, energy" and that "to any significant extent, is distributed in commerce for personal use or consumption by individuals." 42 U.S.C. § 6291(1). Industrial equipment means any article that "consumes, or is designed to consume, energy," that "to any significant extent, is distributed in commerce for industrial or commercial use," and that is not a covered product within the meaning of § 6291. 42 U.S.C. § 6311.

cause of action.'" *Id.* (quoting *N. Star Steel*, 515 U.S. at 34). This exception applies when another federal law provides a closer analogy and when the "federal policies at stake and the practicalities of litigation make [the federal rule] a significantly more appropriate vehicle for interstitial lawmaking." *Id.* (quoting *North Star Steel*, 515 U.S. at 35).

Colo. Rev. Stat. § 13-80-102(1)(g), (h) provide that a two-year statute of limitations applies to actions upon liability created by a federal statute, where no period of limitation is provided in said federal statute, and to actions against any public or governmental entity (save for a few exceptions not relevant here), regardless of the theory upon which, or against whom, the suit is brought. Reasoning that state law is generally the lender of first resort and that the state-borrowing doctrine is subject to only narrow exceptions, the *Restaurant Law Center* court concluded that Colo. Rev. Stat. § 13-80-102's two-year statute of limitations most appropriately applied to an EPCA challenge to a municipal ordinance regulating consumer appliances. 2025 WL 2652871, at *10.

**2. Application**

**a. Energize Denver**

The City Defendants argue that Plaintiffs' claims against them are time barred pursuant to *Restaurant Law Center*. *Motion* [#71] at 10-11. Their reasoning is as follows: (1) under *Restaurant Law Center,* Colorado's two-year statute of limitations applies; (2) the ordinance giving rise to the program was passed in November 2021[5], (3) the complaint was filed in April 2024; and (4) Plaintiff's claims are therefore time-barred. *See id.* The City Defendants do not acknowledge the consumer/industrial appliance distinction recognized in *Restaurant Law Center*.

[5] Plaintiffs concede that the Energize Denver regulations that first included *enforceable* standards were promulgated on January 20, 2022. *See Response* [#83] at 6, 11.

In response, Plaintiffs argue that the four-year federal catch-all statute of limitations, not Colorado's two-year statute of limitations, applies to their claims concerning industrial appliances. *Response* [#82] at 5. They appear to assume that Colorado's two-year statute of limitations would apply to their claims concerning consumer appliances. *Id.* The Court agrees on both fronts. Plaintiffs' claims concerning industrial appliances are subject to the federal four-year statute of limitations, while their claims concerning consumer appliances and subject to Colorado's two-year statute of limitations. *Rest. L. Ctr.*, 2025 WL 2652871, at *9-10.

Plaintiffs do not stop there, however. In an effort to revive their otherwise time-barred claims associated with consumer appliances, Plaintiffs argue that, even if Colorado's two-year statute of limitations applies, their claims did not accrue (and the limitations period did not start running) until their members conducted studies of their buildings and evaluated the results to discern what upgrades would be required in order to comply. For support, Plaintiffs cite *Corner Post, Inc. v. Board of Governors of the Federal Reserve System*, 603 U.S. 799, 809 (2024).

In *Corner Post*, the Court considered when a claim brought under the Administrative Procedure Act accrues. 603 U.S. at 804. The plaintiff, who opened for business in 2018, was not yet in existence when the defendant adopted the 2011 regulation at issue. *Id.* at 806. The Court recognized that "[a] right of action 'accrues' when the plaintiff has a 'complete and present cause of action'—*i.e.*, when she has the right to 'file suit and obtain relief.'" *Id.* (quoting *Green v. Brennan*, 578 U.S. 547, 554 (2016)). In the context of an APA claim, "[a]n APA plaintiff does not have a complete and present cause of action until she suffers an injury from final agency action, so the statute of

limitations does not begin to run until she is injured." *Id.* Therefore, the Court held that the plaintiff was entitled to challenge the 2011 regulation after it opened for business in 2018 and became injured by it. *Id.* at 805-06.

Plaintiffs do not argue that their associations were not yet in existence when the operative regulations were promulgated, as was the case for the plaintiff in *Corner Post*. Undeterred, they argue that *Corner Post* supports their argument that their claims did not accrue until each of their members sufficiently analyzed their buildings, completed energy audits, and determined that they would need to replace products regulated by the EPCA. The Court is not persuaded that *Corner Post* goes so far. Indeed, the Court in *Corner Post* identified the moment of accrual as when the plaintiff *has the right* to file suit and obtain relief, not when Plaintiff did the necessary research to learn the extent of its injury.

"Federal courts . . . generally apply a discovery accrual rule when a statute is silent on the issue[.]" *In re Credit Default Swaps Auctions Litig.*, 710 F. Supp. 3d 895, 932 (D.N.M. 2023) (quoting *Rotella v. Wood*, 528 U.S. 549, 555 (2000)). "[U]nder the federal discovery rule, claims accrue and 'the statute of limitations begins to run when the plaintiff knows or has reason to know of the existence and cause of the injury which is the basis of his action.'" *Id.* (quoting *Alexander v. Oklahoma*, 382 F.3d 1206, 1215 (10th Cir. 2004)). Here, Plaintiffs assert that Energize Denver, by "its plain terms," is preempted by the EPCA because it concerns the energy efficiency or use of Covered Products. *See Am. Compl.* [#168] ¶ 139. Surely, to the extent that those terms injured Plaintiffs, such injury occurred at the time the challenged regulations were promulgated. *Indus. Constructors Corp. v. U.S. Bureau of Reclamation*, 15 F.3d 963, 969 (10th Cir. 1994) ("A plaintiff need not know the full extent of his injuries before the statute of limitations begins to run.").

Therefore, the Court **recommends** that the City Defendants' Motion [#71] and the Intervenor Defendants' Motion [#75] be **granted in part**, insofar as they move for dismissal of Plaintiffs' claims concerning consumer appliances, and that such claims be **dismissed with prejudice**. *Gardner v. Schumacher*, No. 23-cv-00189-MIS-DLM, 2023 WL 5352452, at *2 (D.N.M. Aug. 21, 2023) ("A dismissal based on the running of the statute of limitations is treated as dismissal with prejudice."), *aff'd*, No. 23-2150, 2024 WL 5199962 (10th Cir. Dec. 23, 2024) (unpublished). The Court **recommends** that the City Defendants' Motion [#71] be **denied in part**, insofar as they move for dismissal of Plaintiffs' claims concerning industrial appliances.

**b. Regulation 28**

Regulation 28 took effect on October 15, 2023. Plaintiffs filed their original Complaint on April 22, 2024—within two years of the challenged regulation's enactment. The State Defendants do not assert a statute of limitations argument in their Motion [#72]. The Intervenor Defendants argue, however, that the 35-day limitations period under Colorado's Administrative Procedure Act, Colo. Rev. Stat. § 24-4-106(4) (the "Colorado APA"), should apply to Plaintiffs' claims against Regulation 28. *Motion* [#75] at 8-9. Intervenor Defendants even go so far as to disclaim the application of Colorado's catch-all two-year statute of limitations applied by the *Restaurant Law Center* court, *see* § 13-80-102(1)(g), (h), in favor of the Colorado APA's statute of limitations. *Id.* at 9.

Colorado's APA provides for judicial review of agency actions, which may be set aside on a showing that the action is arbitrary or capricious; amounts to a denial of statutory right; is contrary to constitutional right; is taken in excess of the agency's statutory authority; contravenes the APA's procedures; is an abuse of discretion; is based

upon clearly erroneous findings of fact; or is unsupported by substantial evidence. § 24-4-106(7)(b). Such challenges must be brought "within thirty-five days after such agency action becomes effective." § 24-4-106(4). Intervenor Defendants assert that because this limitations period is more recent and more specific than § 13-80-102, it should apply here.

District Judge Brimmer considered a similar argument in *Restaurant Law Center*. There, Intervenor Defendant Sierra Club—who is also one of the Intervenor Defendants in this matter—asserted that the sixty-day statute of limitations for challenges to rules prescribed pursuant to the EPCA, 42 U.S.C. § 6306(b)(1), should apply to EPCA preemption challenges. *Rest. L. Ctr.*, 2025 WL 2652871, at *8. But the court found that the sixty-day limitation period was inappropriate for two reasons.

First, the procedural posture of a challenge to agency rulemaking is different from that of an EPCA preemption challenge. Namely, § 6306(b)(1) "applies to actions filed directly with a circuit court of appeals after an agency rulemaking has taken place." *Rest. L. Ctr.*, 2025 WL 2652871, at *8. "Before that rulemaking takes place, a potentially aggrieved party would have had the opportunity to participate in the notice-and-comment process." *Id.* "Section 6306(c)(1), on the other hand, provides aggrieved parties with the opportunity to seek a determination as to whether a state or local government is complying with EPCA." *Id.*; *see also Birmingham v. Omaha Sch. Dist.*, 220 F.3d 850, 854 (8th Cir. 2000) (declining to borrow the Arkansas Administrative Procedure Act's thirty-day statute of limitations for a claim brought under the Individuals with Disabilities Education Act because the standard of review, scope of review, and evidence considered for each type of claim vary significantly), *superseded by statute*, Individuals with

Disabilities Education Improvement Act of 2004, Pub. L. No. 108-446, 118 Stat. 2647, *as recognized in*, *Richardson v. Omaha Sch. Dist.*, 957 F.3d 869, 876 (8th Cir. 2020).

Second, the court found that a 60-day limitation would not "appropriately protect the 'federal policies at stake.'" *Rest. L. Ctr.*, 2025 WL 2652871, at *9 (quoting *North Star Steel*, 515 U.S. at 35)). The court reasoned that "[t]here is a federal interest in ensuring that state and local governments do not enact laws that are contrary to EPCA," and that "[a] 60-day limitation period would place a tight limit on the time period in which a private party could challenge a regulation, thus limiting the opportunity to vindicate the federal interest in uniform appliance standards." *Id.*

The Court finds that both rationales apply equally—if not with even greater force—here. The Colorado APA contemplates a regulatory scheme in which an aggrieved party had the opportunity to participate in the rulemaking process. *See generally* COLO. REV. STAT. § 24-4-103. Further, a court reviewing a Colorado APA claim is limited to reviewing for the deficiencies enumerated by the statute, *see* § 24-4-106(7)(b), whereas a federal district court reviewing a challenge pursuant to § 6306(c) has jurisdiction over any action raised by any adversely affected person to determine whether a State or local government is complying with the EPCA's requirements. *See* 42 U.S.C. § 6306(c)(1). Judicial review of state agency rulemaking takes an appellate posture, with review limited to the record before the agency. § 24-4-106(6). EPCA preemption claims, in contrast, take the same posture as any other civil action filed in federal district court. *See Rest. L. Ctr.*, 2025 WL 2652871, at *8. Finally, a 35-day limitation period would even further frustrate the federal interests at stake. *See id.*

Therefore, the Court finds that Intervenor Defendants' proposed statute of limitations is inappropriate. Additionally, because the EPCA contains no limitation period and because an EPCA preemption challenge to a state regulation, like its municipal counterpart, is an action asserted against a public or governmental entity, the Court will borrow the two-year limitation period from Colo. Rev. Stat. § 13-80-102(1)(g), (h). *Rest. L. Ctr.*, 2025 WL 2652871, at *10. Finding that Plaintiffs' complaint was timely filed pursuant to that limitations period, the Court **recommends** that the Intervenor Defendants' Motion [#75] be **denied in part**, insofar as it asserts that Plaintiffs' claims against Regulation 28 are time barred.

### C. Preemption

At the crux of the City, State, and Intervenor Defendants' Motions [#71, #72, #75] is the argument that Regulation 28 and Energize Denver are not preempted by the EPCA because they do not concern the energy use of efficiency of Covered Products.

#### 1. Applicable Law

"The Supremacy Clause of the United States Constitution grants Congress the authority to preempt state law." *Thornton v. Tyson Foods, Inc.*, 28 F.4th 1016, 1021 (10th Cir. 2022) (citing U.S. CONST. art. VI, ¶ 2). Here, Plaintiffs assert a claim of express preemption, which "occurs when Congress 'define[s] explicitly the extent to which its enactments pre[]empt state law.'" *Id.* (quoting *Emerson v. Kansas City S. Ry. Co.*, 503 F.3d 1126, 1129 (10th Cir. 2007)). "To determine whether a state law is expressly preempted by a federal preemption clause, '[courts] apply ordinary principles of statutory interpretation, looking initially to the plain language of the federal statute.'" *Day v. SkyWest Airlines*, 45 F.4th 1181, 1184 (10th Cir. 2022) (quoting *Chamber of Com. of U.S. v.*

*Edmondson*, 594 F.3d 742, 765 (10th Cir. 2010)). The party claiming preemption bears the burden of showing with specificity that Congress intended to preempt state law. *See id.* In this Circuit, courts do not invoke any presumption for or against preemption in express preemption cases and focus instead on the plain language of the at-issue provision, "which necessarily contains the best evidence of Congress' pre[]emptive intent." *Thornton*, 28 F.4th at 1023-24 (quoting *Emerson*, 503 F.3d at 1129); *but see Bradshaw v. Am. Airlines, Inc.*, 123 F.4th 1168, 1173 (10th Cir. 2024) (stating, "any preemption inquiry begins with the presumption that federal law does not override 'the historic police powers of the States,' without the 'clear and manifest' intent of Congress.").

The two EPCA preemption provisions at issue in this case come from § 6297(c) and § 6316(b)(2)(A), which preempt state and local regulations "concerning the energy efficiency [and] energy use" of Covered Products, subject to exceptions not at issue here. Plaintiffs assert that Regulation 28 and Energize Denver, as applied to existing constructions, are preempted by the EPCA because they "concern" the energy efficiency and use of products falling within its purview. "Concerning" means "to relate to" or "relating to." *Md. Bldg. Indus. Ass'n, Inc. v. McIlwain*, 828 F. Supp. 3d 617, 630 (D. Md. 2026) (first citing *Concern*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/concern; and then citing *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018)).

In 2022, the Tenth Circuit invoked the Supreme Court's "connection with or reference to" test—originally developed in the ERISA context—to analyze a preemption claim brought under the Airline Deregulation Act, 49 U.S.C. § 41713(b)(1), which contains similar "relation" language. *Day*, 45 F.4th at 1185-86. Under this test, a state law is

preempted if it bears an impermissible "reference to" or "connection with" the area of law that Congress expressly preempted. *Id.* A state law has an impermissible reference to the preempted area of law if (1) the state law "acts immediately and exclusively upon" it, or (2) the existence of the preempted area is "essential to the law's operation." *Id.* at 1185 (quoting *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319-20 (2016)). In determining whether a state law has an impermissible connection with the preempted subject matter, the Court "considers the federal statute's objectives 'as a guide to the scope of the state law that Congress understood would survive,' as well as 'the nature of the effect of the state law' on the subject matter of the federal statute." *Id.* (quoting *Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N. A., Inc.*, 519 U.S. 316, 325 (1997)). Preemption does not occur if the state law has only a "tenuous, remote, or peripheral" connection with the preempted subject matter, "as is the case with many laws of general applicability." *Id.* at 1185-86 (quoting *Dist. of Columbia v. Greater Wash. Bd. of Trade*, 506 U.S. 125, 130 n.1 (1992)).

Applying the "connection with or reference to" test in this context, the Court finds that Regulation 28 and Energize Denver "concern" the energy use or energy efficiency of Covered Products, and are thus preempted, if (1) they act immediately and exclusively upon Covered Products' energy use or energy efficiency or rely upon Covered Products' energy use or energy efficiency as essential to their operation; or (2) they have a sufficient connection with those subjects, considering Congress's preemptive intent and the nature and effect of Energize Denver and Regulation 28 on Covered Products' energy use and energy efficiency.

### 2. "Reference To"

The Court first finds that Regulation 28 and Energize Denver do not "refer to" the preempted subject matter because they do not act immediately and exclusively upon any Covered Products' energy efficiency or use or otherwise depend on the existence of the same for their operation.

"[I]n its current iteration, EPCA requires that covered products meet statutorily and/or administratively prescribed energy conservation standards." *Ass'n of Contracting Plumbers of City of New York, Inc. v. City of New York*, No. 23-CV-11292 (RA), 2025 WL 843619, at *4 (S.D.N.Y. Mar. 18, 2025) (*Plumbers I*), *aff'd*, 180 F.4th 434 (2d Cir. 2026) (*Plumbers II*).

> In general, before a manufacturer may distribute a covered product in commerce, it must (1) perform test procedures on the product, *see generally*, 42 U.S.C. §§ 6293, 6314; 10 C.F.R. §§ 430–31; (2) certify to the Department of Energy that the product meets the applicable energy conservation standard, *see* 10 C.F.R. § 429.12, *i.e.*, a "performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use" or a "design requirement" for the product, 42 U.S.C. § 6291(6); and (3) include on the product a label containing the energy efficiency and energy use information required by applicable regulations, see 42 U.S.C. §§ 6294, 6315; *see also, e.g.*, 16 C.F.R. § 305.17.

*Id.* The EPCA defines "energy use" as "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293." § 6291(4); *see also* 42 U.S.C. § 6311(4). "Energy efficiency" means "the ratio of the useful output of services from a consumer product to the energy use of such product." § 6291(5); *see also* § 6311(3). "When 'a statute includes an explicit definition' of a term, '[a court] must follow that definition, even if it varies from a term's ordinary meaning.'" *Plumbers II*, 180 F.4th at 439 (quoting *Van Buren v. United States*, 593 U.S.

374, 387 (2021)). "It is plain then that a product's 'energy use' is a standardized, fixed measure assigned to a product before it reaches consumers." *Id.*

To the extent that Plaintiffs urge the Court to adopt an alternate interpretation of the term "energy use," the Court declines the invitation. Plaintiffs invoke *California Restaurant Association v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024), which involved a local law banning the installation of natural gas piping in new construction. In finding that the regulation was preempted by the EPCA, the *California Restaurant* court interpreted the "point of use" component of the definition of "energy use" to concern an end-user's ability to use installed Covered Products at their intended final destinations, thus bringing the natural gas piping ban within the EPCA's preemptive scope. 89 F.4th at 1101-02. Eight active judges on the Ninth Circuit dissented from a subsequent denial of rehearing en banc. Of note was the dissent penned by Judge Friedland, who criticized the majority opinion for, in her view, "misinterpret[ing] the statute's key terms to have colloquial meanings instead of the technical meanings required by established canons of statutory interpretation." *Id.* at 1120 (Friedland, J., dissenting).

Every federal district court (of which this Court is aware) to consider similar EPCA challenges since *California Restaurant* has departed from the panel's position and adopted Judge Friedland's analysis instead. *Rest. L. Ctr. v. City & County of Denv.*, No. 24-cv-01862, slip op. (D. Colo. Aug. 7, 2026); *Clean Energy Choice Coal., NFP v. Vill. of Oak Park,* No. 25-CV-04353, 2026 WL 2205908, at *8-9 (N.D. Ill. July 30, 2026); *Md. Bldg. Indus. Ass'n*, 828 F. Supp. 3d at 637; *Nat'l Ass'n of Home Builders of the U.S. v. District of Columbia*, No. 24-cv-02942 (ACR), 2026 WL 837674, at *6-8 (D.D.C. Mar. 26, 2026) (*District of Columbia*); *Montgomery Cnty.*, 2026 WL 817322, at *7; *Mulhern*, 798 F. Supp.

3d at 325; *Plumbers I*, 2025 WL 843619, at *4-5. As recently as June 30, 2026, the Second Circuit also departed from the panel's position in *California Restaurant*, thus generating a split among the Circuits on the question of what "energy use" means in the context of EPCA preemption challenges. *Plumbers II*, 180 F.4th at 451-52. And on July 2, 2026, the Ninth Circuit declined to extend *California Restaurant* to a regulation that prohibits gas-powered appliances that emit nitrous oxides, repeatedly stressing that *California Restaurant*'s holding was "very narrow" and acknowledging its lack of persuasiveness among the federal district courts. *Rinnai Am. Corp. v. S. Coast Air Quality Mgmt. Dist.*, --- F.4th ----, 2026 WL 1912093, at *6, *10, *11 n.9 (9th Cir. July 2, 2026). Thus, the Court need not spill much ink explaining why it declines to adopt the *California Restaurant* court's understanding of the meaning of "energy use."

Turning back to the meaning of "energy use" and "energy efficiency" as those terms are defined by the EPCA, the Court finds that Regulation 28 and Energize Denver do not refer to Covered Products' energy use or energy efficiency. They do not set a floor on energy efficiency or a ceiling on energy use for any particular appliance regulated by the EPCA. *See Md. Bldg. Indus. Ass'n*, 828 F. Supp. 3d at 634-35. Nor do they impose design standards concerning the manufacture of Covered Products. Instead, both regulatory schemes impose building-wide energy and emission standards, leaving building owners with the choice of how to comply, without reference or regard for the energy use of any particular appliance.

Plaintiffs assert that Regulation 28 and Energize Denver operate as proxies for "energy use" and "energy efficiency." In so arguing, they invoke *Metropolitan Taxicab Board of Trade v. City of New York*, 615 F.3d 152, 155-56 (2d Cir. 2010). In *Metropolitan*

*Taxicab*, the Second Circuit considered New York City's revisions to the maximum lease rates for taxicabs that "effectively shifted fuel costs from drivers of fleet taxis to fleet owners to incentivize the use of hybrid-engine and fuel-efficient vehicles." 615 F.3d at 154. The court held that the new rules were preempted by the EPCA under a separate provision preempting regulations "related to fuel economy standards." *Id.* at 156. The court found that the challenged rules contained a reference to fuel economy standards because they relied on "a distinction between hybrid and non-hybrid vehicles." *Id.* at 157. "The equivalency of the term 'hybrid' with 'greater fuel efficiency' for purposes of the new rules is self-evident," the court reasoned. *Id.* Further, the rules amounted to a proxy for fuel economy standards because "imposing reduced lease caps solely on the basis of whether or not a vehicle has a hybrid engine has no relation to an end other than an improvement in fuel economy[.]" *Id.*

Plaintiffs argue that Regulation 28 and Energize Denver similarly impose a "performance standard by proxy" because EPCA-covered appliances "use the vast majority of the energy that must be reduced" at the building-wide level. *See, e.g.*, *Response* [#81] at 14.

The *Maryland Building Industry Association* court distinguished *Metropolitan Taxicab* in a manner that the Court finds persuasive here. The court reasoned that if a state or local regulation "drew . . . a distinction—by, for example, imposing different greenhouse gas emissions benchmarks based on the energy efficiency of a building's appliances or by rendering the owners of buildings with less energy-efficient appliances ineligible for a waiver of the emissions requirements," such regulations "would regulate their objects differently depending on the subject matter of the preemption clause." *Md.*

*Bldg. Indus. Ass'n*, 828 F. Supp. 3d 617 at 633. Thus, such regulations would fall within the EPCA's purview under the "proxy" theory recognized in *Metropolitan Taxicab*. Similarly, the Second Circuit in *Plumbers II* concluded that a "proxy" requires an "equivalency," and there is no "equivalency" between the type of energy an appliance uses and that appliance's "energy use." 2026 WL 1871692, at *9.

While the subject regulations at issue here present a closer question than those at issue in *Maryland Building Industry Association* or *Plumbers*, the Court finds that a building's overall energy use and a covered-appliance's energy use are not entirely equivalent in the same way that a regulation differentiating hybrid and non-hybrid vehicles is equivalent to a regulation related to fuel economy standards. This is because, as Plaintiffs all but concede, there are *technically* other ways to reduce a building's energy use besides replacing EPCA-covered appliances. *See Am. Compl.* [#68] ¶ 56 ("In *most* cases, the most effective (but not cost effective) way for Covered Buildings to meet the building performance standards of Regulation 28 is to target the removal fossil fuel utilizing Covered Products, as those products have the greatest associated GHG emissions at the Covered Buildings.") (emphasis added); *id.* ¶ 65 ("In *many* instances, the Covered Building owner will not be able meet the building performance standards in Regulation 28 by simply replacing existing compliant Covered Products with similarly fueled, but higher efficiency, Covered Products, instead being forced to purchase electric Covered Products.") (emphasis added). Therefore, to the extent that there are ways to comply with the subject regulations without replacing EPCA-covered appliances, the subject regulations further objectives other than reducing Covered Products' energy use

and efficiency. Therefore, Regulation 28 and Energize Denver do not present the type of equivalency contemplated in *Metropolitan Taxicab*.

However, the more difficult question is whether Regulation 28 and Energize Denver bear an impermissible connection with the preempted subject matter, and the Court thus turns to that question next.

**3. "Connection With"**

With respect to the EPCA's purpose, *Day*, 45 F.4th at 1186, the current iteration of the EPCA was designed to provide a uniform set of performance standards for consumer and industrial products in order to eliminate burdens imposed on manufacturers by a "'growing patchwork' of state efficiency standards that had developed as the result of the absence of national standards." *Plumbers II*, 180 F.4th at 442-43; *see also Md. Bldg. Indus. Ass'n*, 828 F. Supp. 3d at 634 ("[I]t is clear that Congress sought to impose nationwide energy conservation standards for covered consumer products and to maintain a tight grip over those products' manufacture and distribution."). The inverse is also true; the EPCA contains *no* provisions that "affirmatively protect consumers' ability to access covered products" or "preserv[e] manufacturers' ability to operate in static markets." *Plumbers II*, 180 F.4th at 443. Thus, the challenged laws do not directly interfere with or undermine Congress's primary objectives.

Turning next to the effect of the challenged laws, *Day*, 45 F.4th at 1186, the Court finds that Regulation 28 and Energize Denver do not, in a literal sense, have a direct impact on the preempted subject matter. Indeed, "[t]he same energy conservation standards will apply before and after the challenged laws are implemented." *Plumbers II*, 180 F.4th at 444. And while a growing consensus has emerged that regulations that

require or incentivize the use of appliances that *exceed* federal energy standards would be preempted, *see id.*; *see also Md. Bldg. Indus. Ass'n*, 828 F. Supp. 3d at 639, Plaintiffs expressly removed any allegation that Regulation 28 and Energize Denver require building owners to make such replacements in their Amended Complaint [#68]. *See Redlined Proposed Am. Compl.* [#62-1] at 156, 159, 176-78, 185-87, 188, 194-95, 197, 199, 201-02, 208, 214, 220, 222.

It would be easy to stop here, fall in line with the rest of the post-*California Restaurant* courts to consider this issue, and find that Plaintiffs' claims fail on the "impermissible connection" prong. However, each court to consider similar EPCA preemption challenges, as far as this Court is aware, has considered a different style of regulation than those at issue here. This is because Regulation 28 and Energize Denver—instead of merely banning gas-powered appliances in new constructions or setting only greenhouse gas emission standards for covered buildings—directly regulate energy usage on a building-wide level. *See Am. Compl.* [#68] ¶¶ 44-46, 81-83. Thus, the Court believes they present a much closer question than immediately meets the eye.

Plaintiffs argue that, even if the challenged regulations do not directly regulate any particular appliance's energy use, and the subject regulations do not undermine Congress's *primary* objectives, Congress nevertheless intended to limit "whole building energy conservation standards," as demonstrated by the exemption to preemption for certain building codes for new constructions. *See Response* [#81] at 9.

The EPCA provides that state laws that would otherwise be preempted are exempted from preemption if they exist "in a building code for new construction" and meet certain criteria. Importantly, § 6297(f) is titled, "Exception for *certain* building code

requirements." (emphasis added). Section 6297(f)(3) provides that "a regulation or other requirement contained in a State or local building code for new construction concerning the energy efficiency or energy use of such covered product" is not preempted if the following requirements are met:

> (A) The code permits a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective.
>
> (B) The code does not require that the covered product have an energy efficiency exceeding the applicable energy conservation standard established in or prescribed under section 6295 of this title, except that the required efficiency may exceed such standard up to the level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under subsection (d).
>
> (C) The credit to the energy consumption or conservation objective allowed by the code for installing covered products having energy efficiencies exceeding such energy conservation standard established in or prescribed under section 6295 of this title or the efficiency level required in a State regulation referred to in subparagraph (B) is on a one-for-one equivalent energy use or equivalent cost basis.
>
> (D) If the code uses one or more baseline building designs against which all submitted building designs are to be evaluated and such baseline building designs contain a covered product subject to an energy conservation standard established in or prescribed under section 6295 of this title, the baseline building designs are based on the efficiency level for such covered product which meets but does not exceed such standard or the efficiency level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under subsection (d).
>
> (E) If the code sets forth one or more optional combinations of items which meet the energy consumption or conservation objective, for every combination which includes a covered product the efficiency of which exceeds either standard or level referred to in subparagraph (D), there also shall be at least one combination which includes such covered product the efficiency of which does not exceed such standard or level by more than 5 percent, except that at least one combination shall include such covered product the efficiency of which meets but does not exceed such standard.
>
> (F) The energy consumption or conservation objective is specified in terms of an estimated total consumption of energy (which may be calculated from

> energy loss- or gain-based codes) utilizing an equivalent amount of energy (which may be specified in units of energy or its equivalent cost).
>
> (G) The estimated energy use of any covered product permitted or required in the code, or used in calculating the objective, is determined using the applicable test procedures prescribed under section 6293 of this title, except that the State may permit the estimated energy use calculation to be adjusted to reflect the conditions of the areas where the code is being applied if such adjustment is based on the use of the applicable test procedures prescribed under section 6293 of this title or other technically accurate documented procedure.

*See also* 42 U.S.C. § 6316(b)(2)(B)(i) (establishing a similar exemption in the context of industrial appliances). Plaintiffs argue that "EPCA's limitations on whole building energy conservation standards demonstrate Congressional intent to prevent state and local government[s] from evading EPCA's preemption provisions by cleverly drafting regulations or ordinances that indirectly regulate existing EPCA-compliant Covered Products." *Response* [#81] at 10.

To be sure, "for the exemption to make any sense, the kind of regulation it describes must be preempted in the first place; otherwise, the exemption would do no work." *Plumbers*, 180 F.4th at 447. Thus, the Court cannot ignore the fact that this exemption may serve as a useful interpretive guide to understand Congress's broader preemptive intent. Other courts to consider this "building code exemption argument" in the context of gas-powered appliance bans or greenhouse gas emission standards have found it unavailing. Nevertheless, several courts have offered dicta on the circumstances in which such an argument might have legs.

The Court starts at the beginning, with Judge Friedland's dissent in the *California Restaurant* case. After rejecting the panel's conclusion concerning the meaning of "energy use" within the context of EPCA preemption challenges, Judge Friedland nevertheless recognized that "EPCA contemplates preempting building codes that set

building-wide energy efficiency standards that can only be met through the use of hyper-efficient appliances." *Cal. Rest. Ass'n*, 89 F.4th at 1125 (Friedland, J., dissenting). Judge Friedland opined that the word "concerning" in the EPCA's preemption provision broadened the statute's preemptive scope from only those regulations directly regulating an appliance's energy use to "indirect regulations" that "aim to require consumers to use products with higher efficiency standards than those prescribed by DOE." *Id.* "Because the terms 'energy use' and 'energy efficiency' are product-specific, a preemption provision without the word 'concerning' might not preempt building codes that set standards by, for example, capping overall energy consumption per apartment or per building." *Id.* Thus, Judge Friedland concluded, even though a ban on natural gas hookups in new constructions was not preempted, there was still room under her interpretation for a more indirect energy regulation to be preempted.

In *Maryland Building Industry*, the District of Maryland considered regulations that set greenhouse gas emissions targets for government, commercial, and multi-family residential buildings and that require such buildings to have net-zero greenhouse gas emissions by 2040. 828 F. Supp. 3d at 621-22. Faced with a similar building code exemption argument, the *Maryland Building Industry* court noted that the building code exemptions are "illuminating" not because they "delineate the scope of the preemption clause" but because they "signal Congress's intent about the preemption of building regulations." *Id.* at 636 (internal quotation marks and citation omitted). Specifically, the building code exemption "tells us that Congress wanted to preempt (at a minimum) state or local building codes that set an 'objective' for 'energy consumption' or 'conservation' and do so in a way that mandates the installation of high-efficiency appliances." *Id.* at

637. However, the court found that comparing the Maryland regulations to the building code exemption was "like trying to fit a square peg into a round hole" because the regulations did not "set an objective for energy consumption or conservation at all." *Id.* at 639. Then, in a footnote, the *Maryland Building Industry* court noted as follows:

> The Court notes, however, an important caveat. It appears from [the Maryland Department of the Environment's ("MDOE")] response to public comments on the [subject regulations] that—in compliance with its statutory mandate—MDOE intends to update the [subject regulations] to include "energy use intensity" targets that may push building owners to install more efficient products. . . . The current version of the [subject regulations] do[] not include "energy use intensity" targets, and the Court expresses no view on whether any future version of the [subject regulations] that include[ ] such a requirement would be preempted by EPCA in whole or in part.

*Id.* n.14.

In *Mulhern*, the Northern District of New York considered a set of regulations that prohibit "the installation of fossil-fuel equipment and building systems" in certain new constructions. 798 F. Supp. 3d at 311. In explaining why the building code exemption argument did not apply to the at-issue regulation, the court said "[t]he relevant [building code exemption] makes clear that it is applicable in situations where the underlying building code regulation is one concerning energy efficiency or energy use, as such regulations are typically preempted." *Id.* at 326. The court opined that a building code that set a maximum-building-wide energy consumption standard, in contrast to one merely banning gas-powered appliances, "would be clearly preempted" because "it would be an indirect regulation concerning the energy use of the covered products that could be used in that building." *Id.*

As recently as June 30, 2026, the Second Circuit tied the dicta from the *California Restaurant* dissent, *Maryland Building Industry*, and *Mulhern* together. In a consolidated appeal from *Mulhern* and *Plumbers I*, the Second Circuit departed from the Ninth Circuit

and held that gas-powered appliance bans are not preempted by the EPCA. *Plumbers II*, 180 F.4th at 453-54. But the court also addressed the building code exemption in relative detail. *See id.* at 447-48. The court explained that "the building code regulations covered by the exemption look different from the kind of energy conservation standards that primarily concerned Congress[.]" *Id.* at 447. "[E]nergy conservation standards are specific to a certain appliance and mandatory, whereas the regulations that are covered by the building code exemption operate on a building-wide basis through incentives." *Id.* The court opined that building-wide energy conservation standards nevertheless may refer to or have an impermissible connection with the subject matter preempted by the EPCA. *Id.* at 447-48. "If states were permitted to regulate energy conservation on an aggregated scale (rather than the per-product basis employed by EPCA)," the court reasoned, "states could easily escape the preemption provision's reach by a simple refashioning of their regulations." *Id.* Therefore, "the regulations covered by the building code exemption nevertheless have an impermissible relationship to EPCA's subject matter, and thus, are preempted," even if all-out bans of gas-powered appliances are not. *Id.* (internal citation marks and quotation omitted). In a footnote, the Second Circuit insightfully synthesized the above referenced dicta as follows: "it is not the prohibitive nature of a regulation governing covered products that triggers preemption; it is the law's use of the appliance's 'energy use' as a mechanism for regulating." *Id.* at 447 n.12.

These cases paint a clear picture: outright bans of certain types of Covered Products based on fuel source and building-wide regulations concerning greenhouse gas emissions are *not* preempted by the EPCA, but regulations imposing building-wide energy reductions very well could be. However, the Court recognizes that this clear picture is

somewhat muddied by the *District of Columbia* case. In that case, the court considered a regulation "requir[ing] that by 2027, certain newly constructed or improved buildings in Washington, D.C., operate as zero-energy—essentially, they must produce as much energy as they consume." *District of Columbia*, 2026 WL 837674, at *1. On its face, this regulation sounds more like Regulation 28 and Energize Denver than any of the other regulatory schemes considered in the above-referenced cases. However, the court went on to say that, in order to achieve this "zero-energy" goal, the challenged regulation "bans the use of gas appliances in those buildings." *Id.* Thus, the *District of Columbia* case again presents a fact pattern distinguishable from the regulations at issue here.

Nevertheless, the court considered the same building code argument and concluded, rather summarily, that the plaintiffs' argument was "a too-long stretch." *Id.* at *10. The court noted that exceptions to preemption, while sometimes helpful, do not themselves delineate Congress's intended preemptive scope. *Id.* (citing *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 264 (2013)). The court then returned to its conclusion that the regulation is not preempted because it does not concern energy use or efficiency and noted that the exemption is available for building codes that do. *Id.*

The Court respectfully observes that the *District of Columbia* court did not engage with the dicta from *Mulhern* that preceded it. And in fairness, the *District of Columbia* court did not have at its disposal the dicta from *Maryland Building Industry* or *Plumbers II*, which both issued more recently. Therefore, the Court declines to follow the *District of Columbia* court's manner of disposing of this building exemption argument, because that court did not have the opportunity to meaningfully wrestle with the dicta that the Court now contemplates.

Given the legal landscape that this case law has created, the Court concludes that Plaintiffs have plausibly alleged that the EPCA preempts Regulation 28 in part and Energize Denver in whole.

Regarding Regulation 28, although the State Defendants emphasize the portions of the regulation that impose greenhouse gas emissions caps and downplay the portions that regulate energy-use intensity, they ultimately concede that certain portions of the regulatory scheme impose building-wide energy consumption caps. *See Reply* [#91] at 6. Plaintiffs have plausibly alleged that Regulation 28's compliance pathway concerning energy-use intensity, as applied to existing buildings, is preempted by the EPCA because it bears an impermissible connection to the energy use and efficiency of appliances covered by the EPCA. *See Am. Compl.* [#68] ¶¶ 48-66; *also* 5 Code Colo. Regs. 1001-32, § C(I)(I.A.) (2026). State Defendants argue that Regulation 28's relative flexibility compared to an inflexible, across-the-board ban should weigh in its favor. However, at this early stage in the proceedings, the Court concludes that Plaintiffs have plausibly stated a claim for preemption with regard to Regulation 28 because relevant case law suggests that it is precisely *because* Regulation 28 is not a fuel-source ban, but is instead an energy cap aiming to accomplish the same end, that it is preempted. Therefore, the Court concludes that Plaintiffs' Regulation 28 claims are not entirely defeated by the Motions to Dismiss.

Regarding Energize Denver, the Court notes that the program's explicit purpose is to "require covered building owners to address existing building performance through energy efficiency, renewables, and/or renewable heating and cooling (electrification) to reduce greenhouse gas emissions." DENV. MUN. CODE § 10-401. The program

accomplishes that aim by requiring covered buildings to "meet energy performance targets" by 2025, 2027, and 2030, with an ultimate reduction in energy use by 30% in 2030. DENV. MUN. CODE § 10-404(a). Plaintiffs allege that Energize Denver is a "de facto regulat[ion] [of] the energy efficiency of Covered Products because the only sources of GHG emissions are the energy consuming equipment and fixtures within a Covered Building." *Am. Comp.* [#68] ¶ 83. Plaintiffs further allege that Energize Denver's building performance standards "are so stringent that the only feasible way for the vast majority of Covered Buildings to comply is, in addition to implementing any other energy efficiency measures, to remove existing, EPCA compliant Covered Products with remaining useful life and replace[] them with higher efficiency, typically electric, Covered Products." *Id.* ¶ 84. Given the present legal landscape, the Court concludes that Plaintiffs have plausibly alleged that Energize Denver, as it is applied to mandatory reductions in energy-use intensity for existing buildings, is preempted by the EPCA because it bears an impermissible connection to the energy use and efficiency of appliances covered by the EPCA.

The Intervenor Defendants' arguments do not change the Court's analysis. *See Intervenor Defs.' Motion* [#93] at 16. First, they argue that the Court should disregard the above-referenced dicta because the building code exemption applies to new constructions, not existing constructions. However, such an argument actually weighs in Plaintiffs' favor, because codes regulating building-wide energy usage that are not expressly exempted are necessarily preempted, and Congress clearly only intended to exempt building-wide energy consumption caps in new constructions where builders had more flexibility. *See* 42 U.S.C. § 6297(f)(3)(A).

Second, Intervenor Defendants note that the *Mulhern* dicta pertained only to regulations that count the "off the rack lab tested energy consumption of appliances," when the challenged regulations here account for weatherization, insulation, operations and maintenance practices, use of renewable energy, and the impact of other building systems. In other words, Intervenor Defendants assert that the *Mulhern* dicta envisioned a regulation that was more "appliance-focused" than Regulation 28 and Energize Denver. And while that may be true, Plaintiffs' allegations align with the growing consensus among multiple courts as to building-wide energy caps, and those allegations deserve to be tested through the adversarial process of litigation.

Finally, Intervenor Defendants urge this Court not to give dicta authoritative weight. While the Court recognizes that it is not bound by dicta, the Court finds it significant that four courts that generally held in Defendants' favor recognized a limiting principle with respect to building-wide energy consumption caps. Recognizing that this Court may be the first to consider an EPCA preemption challenge to that very type of regulation, the Court cannot ignore other courts' contemplation of this question—even if that contemplation is in dicta.

Therefore, the undersigned **recommends** that the Motions [#71, #72, #75] be **denied** because Plaintiffs have plausibly alleged that portions of Regulation 28 and Energize Denver, in full, bear an impermissible connection to Covered Products' energy efficiency or use, and are thus preempted by the EPCA.

## V. Conclusion

Based on the foregoing,

IT IS HEREBY **RECOMMENDED** that the City Defendants' Motion [#71] be **GRANTED in part and DENIED in part**.

IT IS FURTHER **RECOMMENDED** that the City Defendants' Motion [#71] be **granted in part**, insofar as they move for dismissal of Plaintiffs' claims concerning consumer appliances, and that such claims be **DISMISSED with prejudice**.

IT IS FURTHER **RECOMMENDED** that the City Defendants' Motion [#71] be otherwise **DENIED**.

IT IS FURTHER **RECOMMENDED** that the State Defendants' Motion to Dismiss [#72] be **DENIED**.

IT IS FURTHER **RECOMMENDED** that the Intervenor Defendants' Motion to Dismiss [#75] be **GRANTED in part and DENIED in part**.

IT IS FURTHER **RECOMMENDED** that the Intervenor Defendants' Motion [#75] be **granted in part**, insofar as they move for dismissal of Plaintiffs' claims against the City concerning consumer appliances, and that such claims be **DISMISSED with prejudice**.

IT IS FURTHER **RECOMMENDED** that the Intervenor Defendants' Motion [#75] be otherwise **DENIED**.

IT IS FURTHER **RECOMMENDED** that the Intervenor Defendants' Motion for Judicial Notice [#73] be **GRANTED**.

IT IS FURTHER **ORDERED** that any party may file objections **within 14 days** of service of this Recommendation. In relevant part, Federal Rule of Civil Procedure 72(b)(2) provides that, "within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days

after being served with a copy." "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. 2121 E. 30th St.*, 73 F.3d 1057, 1060 (10th Cir. 1996). The objection must be "sufficiently specific to focus the district court's attention on the factual and legal issues that are truly in dispute." *Id.* "[A] party who fails to make a timely objection to the magistrate judge's findings and recommendations waives appellate review of both factual and legal questions." *Morales-Fernandez v. I.N.S.*, 418 F.3d 1116, 1119 (10th Cir. 2005).

Dated: August 21, 2026

BY THE COURT:

Kathryn A. Starnella
United States Magistrate Judge